CHARLES V. BERWANGER (SBN: 047282)
cberwanger@grsm.com
ANDREA K. SCRIPPS (SBN: 235375)
ascripps@grsm.com
GORDON REES SCULLY MANSUKHANI, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101
Telephone: (619) 230-7784
Facsimile: (619) 696-7124

Attorneys for Plaintiffs
NICOLE UHLIG AND MICHELLE STOLDT, AS TRUSTEES OF (1) THE
SURVIVOR'S TRUST ESTABLISHED UNDER THE WOLFGANG AND
ELKE UHLIG REVOCABLE LIVING TRUST U/A/D APRIL 16, 1998; (2)
THE MARITAL GST NON-EXEMPT TRUST ESTABLISHED UNDER THE
WOLFGANG AND ELKE UHLIG REVOCABLE LIVING TRUST U/A/D
APRIL 16, 1998, AS AMENDED; (3) THE MARITAL GST EXEMPT TRUST
ESTABLISHED UNDER THE WOLFGANG AND ELKE UHLIG
REVOCABLE LIVING TRUST U/A/D APRIL 16, 1998, AS AMENDED; AND
(4) THE BYPASS TRUST ESTABLISHED UNDER THE WOLFGANG AND
ELKE UHLIG REVOCABLE LIVING TRUST U/A/D APRIL 16, 1998, AS
AMENDED

Gordon Rees Scully Mansukhani, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICOLE UHLIG AND MICHELLE STOLDT, AS TRUSTEES OF (1) THE SURVIVOR'S TRUST ESTABLISHED UNDER THE WOLFGANG AND ELKE UHLIG REVOCABLE LIVING TRUST U/A/D APRIL 16, 1998; (2) THE MARITAL GST NON-EXEMPT TRUST ESTABLISHED UNDER THE WOLFGANG AND ELKE UHLIG REVOCABLE LIVING TRUST U/A/D APRIL 16, 1998, AS AMENDED; (3) THE MARITAL GST EXEMPT TRUST ESTABLISHED UNDER THE WOLFGANG AND ELKE UHLIG REVOCABLE LIVING TRUST U/A/D APRIL 16, 1998, AS AMENDED; AND (4) THE BYPASS TRUST ESTABLISHED UNDER THE WOLFGANG AND ELKE UHLIG REVOCABLE LIVING TRUST U/A/D APRIL 16, 1998, AS AMENDED,<br><br>Plaintiffs,<br><br>vs. | **CASE NO. 20-CV-00887-DMS-MSB**<br><br>*Action Filed: May 13, 2020*<br><br>*Judge: Hon. Dana M. Sabraw*<br>*Magistrate: Hon. Michael S. Berg*<br><br>**DECLARATION OF NICOLE UHLIG IN OPPOSITION TO MOTION TO DISMISS**<br><br>Date: September 4, 2020<br>Time: 1:30 PM<br>Dept: Courtroom 13 A<br><br>Submitted Concurrently with Memorandum of Points and Authorities in Opposition to Motion to Dismiss<br><br>Action Filed: May 12, 2020 |

FAIRN & SWANSON HOLDINGS, INC. a )
Delaware Corporation; LEON FALIC, an )
individual; SIMON FALIC, an individual; )
JEROME FALIC, an individual; and DOES 1 )
through 20, inclusive, )
_____ )
                    Defendants.

I, Nicole Uhlig, hereby declare as follows:

1.    I am now and have at all times relevant to this declaration resided in California. I am a co-trustee with my sister, Michelle Stoldt, of the four trusts herein ("Trusts") and we are responsible for their administration and oversight. The Trusts' assets and administration are all in California. Among the assets of the Trusts are their respective interests in Fairn & Swanson, Inc. ("F&S") totaling 80% of the outstanding stock of F & S. This litigation arose out of a transaction which I on behalf of the Trusts negotiated with defendants, as discussed below, in which defendants agreed to purchase the Trusts' shares in F & S. As discussed below, the negotiations reached the point of a binding letter of intent signed by Michelle and me on behalf of the Trusts and signed by defendants, and each of them. In addition, I have at all relevant times to this declaration been the Chairperson of the Board, President, and Secretary of F & S. The matters set forth within this declaration are within my firsthand knowledge and if I were to be called as a witness to testify thereto I would be competent to so testify.

*F & S*

2.    F & S was incorporated in California in 1949 and has at all times since been headquartered in Northern California. At its corporate headquarters are kept all its financial records, corporate records, and other records relevant to its business. F&S since 1949 has been a retailer of products in the travel and retail

Gordon Rees Scully Mansukhani, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101

DECLARATION OF NICOLE UHLIG IN OPPOSITION TO MOTION TO DISMISS
*Case No. 20-CV-00887-DMS-MSB*

1   industries. Initially, it supplied duty – free products to marine vessels visiting the

2   San Francisco Port and has since evolved into one of the larger wholesale and

3   retail companies in the American duty – free and travel retail industry.  It supplies

4   retail products to international travelers, including passengers and crew, from

5   fishing vessels leaving the Port of Seattle for the Bering Sea, commercial freighters

6   traveling to and from Shanghai and the Port of Los Angeles, cruise ships traveling

7   through the Caribbean islands, as well as visitors and commuters driving to and

8   from Mexico and Canada. Its business is dependent upon the travel and tourist

9   industries.

10

11   *Duty-Free Americas, Leon Falic, Simon Falic, Jerome Falic, and Fairn &*

12   *Swanson Holdings, Inc.*

13

14   3.     Duty-Free Americas is one of the largest businesses in the travel retail

15   industry in the Western Hemisphere offering an extensive selection of fragrances,

16   cosmetics, wines, spirits, tobaccos, edibles, luxury leather goods, and other such

17   goods in its hundred 80 locations.  I know from my involvement in the travel retail

18   industry and from Duty – Free Americas website that Leon Falic, Simon Falic, and

19   Jerome Falic ("the Falics") effectively own and control Duty – Free Americas.

20   Duty-Free Americas is a competitor of F & S.

21   4.     Fairn & Swanson Holdings, Inc. ("F & S Holdings") was formed in or

22   about 2015 by the Falics to participate in a stock purchase agreement dated 2015

23   by which the Falics  jointly purchased 123 shares of F & S stock, representing 20%

24   of the outstanding stock in F & S, and the Falics, by such agreement were provided

25   an option to purchase from the Trusts the remaining 492 shares in F & S; and

26   granted the right to the Trusts to require F & S Holdings to purchase from the

27   Trusts the remaining 492 shares.  (Such transaction in set forth in the Stock

28

Purchase and Option Agreement by and Among Jerome Falic, Simon Falic and
Leon Falic as Initial Purchasers etc. dated August 4, 2015, a true and correct copy
of which is attached hereto and marked "Exhibit 1." Herein, "2015 SPOA.")

*The Overall Business Transaction of the Falics' Attempt to Acquire the
Entirety of F & S Stock.*

5.     The Falics have over the last 15 years made numerous overtures to
purchase all or a portion of F & S's stock and to that end entered into negotiations
and contracts all to accomplish that purpose.   In 2005, the Falics entered into
negotiations with my father, Wolfgang Uhlig, to purchase all outstanding shares of
stock in F & S.   The negotiations culminated in a letter of intent prepared by the
Falics and forwarded to my father by which the Falics declared they were "pleased
to set forth in this letter agreement your and our agreement and understanding of
the essential terms and conditions for the acquisition... of all outstanding stock of
Fairn & Swanson Inc.... by a newly formed entity ("Buyer") controlled by us and
affiliated with DFA Holdings, Inc." (The "DFA" reference apparently is to "Duty-
Free Americas".)   The purchase price was to be $12 million.   My father decided
that he did not want to have a business relationship with the Falics and terminated
the negotiations without executing the proposed letter of intent.   (A true and
correct copy of such proposed letter of intent is attached hereto and marked
"Exhibit 2.")

6.     The Falics continued to pursue acquisition of F & S stock.   The
culmination of that effort in 2015 was the execution of the 2015 SPOA.   By the
2015 SPOA the Falics, parties to the 2015 and identified as "Initial Purchasers",
jointly purchased 123 shares of F & S; and F & S Holdings, LLC, identified as

Gordon Rees Scully Mansukhani, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101

1   "Buyer", was given rights and obligations to purchase the remaining 492 shares

2   outstanding of F & S stock.

3       7.      In accordance with the 2015 SPOA, F & S provided periodic financial

4   records to the Falics including balance sheets, profit and loss statements, and

5   related financial information.  The Falics were necessarily fully aware of and

6   acknowledged to me their awareness of the dire financial condition of F & S in the

7   period from December 2019 until F&S filed for a Chapter 7 bankruptcy proceeding

8   in June 2020.

9       8.      The 2015 SPOA provided the Falics with a right of first offer should

10  the Trusts determine to sell the remaining 80% interest in F & S. On November 21,

11  2019 I prepared and sent a letter to the Falics advising them that marketing of the

12  remaining 80% interest for $25,600,000.00 was going to be undertaken and

13  provided them with the terms for the exercise of such right.  (A true and correct

14  copy of such letter is attached hereto and marked "Exhibit 3.")  The Falics refused

15  the offer in December 2019, contacted me and requested I negotiate with them to

16  sell them all of the stock.

17

18      *The Negotiations, Documentation, and Follow up Documents Relating to the*

19  *March 3, 2020 Binding Letter of Intent, the Subject of this Action.*

20

21      9.      On March 3, 2020 Leon Falic forwarded to me the three Falics fully

22  executed by the three Falics the letter of intent by which F & S Holdings, the buyer

23  and the Trusts, sellers, agree the Trusts will convey their 80% interest in F&S to

24  F&S Holdings with escrow to close on March 17, 2020.  (A true and correct copy

25  of such letter of intent with the forwarding email by Leon Falic are attached hereto

26  and marked "Exhibit 4."  Herein, referred to as the "2020 Binding LOI.")  The

27  individual Falics executed the 2020 Binding LOI without specifying they were

28

1   signing it only on behalf of Holdings.  Within days thereafter the Falics told me

2   they intended to purchase the F&S stock individually rather than by Holdings.

3       10.     The negotiations leading up to the execution of the 2020 Binding LOI

4   were between me and Leon Falic, who told me he was negotiating on behalf of his

5   brothers as well as himself, and commenced in December, 2019 and continued

6   until the execution of the 2020 Binding LOI on March 3, 2020.  At all times during

7   those negotiations, except for one trip to Las Vegas and one trip to Miami, Florida,

8   I was in California communicating with Leon Falic over terms and conditions for a

9   sale of the stock.   We met in Las Vegas rather than California although Leon

10  Falic asked to come to California to perform due diligence.  I did not want him

11  present at the F&S facility because I was concerned he would discuss the

12  transaction with non-owners while in California.  I therefore provided due

13  diligence materials to Leon Falic and his brothers in Las Vegas.  The Trusts

14  executed the 2020 Binding LOI in California.  Escrow was opened with Old

15  Republic Title Company, located in San Francisco, California, and the Falics

16  deposited $1,500,000 in escrow as partly contemplated by the 2020 Binding LOI.

17  (The 2020 Binding LOI provides for a one million-dollar deposit.  The Falics

18  deposited an additional $500,000 apparently to have such funds available for the

19  transaction closing.)

20      11.     Before the 2020 Binding LOI was executed, I was in the process of

21  marketing the Trusts' 80% stock holding in F & S. Leon Falic was aware of that

22  marketing effort and demanded that it cease.  I refused to terminate such marketing

23  effort unless and until a binding letter of intent was signed committing the Falics

24  by a binding contract to consummate the acquisition of the Trusts' 80% stock

25  holdings in F & S.  I was quite concerned about the fact that marketing the stock

26  required substantial time and that once a potential buyer was found its due

27  diligence and related issues would undoubtedly delay any binding contract for

28

months. Before November 2019 and thereafter F & S had been losing money so fast a quick closing was vital. Our investment bankers, who I retained to assist in the marketing effort projected that it would take 4 to 6 months from the time we signed an agreement with them that they would be able to find a buyer. (Attached hereto and marked "Exhibit 6" is an email from Leon Falic dated February 14, 2020 in which he acknowledges that the marketing process will take at "least 6 Months…" and if the Trusts did not agree to sell the stock to him "he will be standing on the sidelines" waiting to exercise the Falics' right of first refusal under the 2015 SPOA.)

12.     While I was negotiating with Leon Falic, I was also following through on inquiries from other potential purchasers brought to me by investment bankers and word-of-mouth in the industry and those inquiries led to negotiations with potential buyers during the period I was negotiating with Leon Falic. In several instances nondisclosure agreements were entered into to enable the parties to have access to F & S trade secrets and financial information. Leon Falic insisted that he be provided with the names of all potential purchasers as well as copies of all nondisclosure agreements. I refused advising him that unless and until a binding letter of intent was signed my efforts to market the 80% stock holding would continue.

13.     Leon and his brothers thereupon signed the 2020 Binding LOI provided to me by Leon on March 3, 2020 and the Trusts terminated all marketing efforts. By paragraph 5 the 2020 Binding LOI required the Trusts to terminate all marketing efforts and terminate any ongoing marketing discussions and the Trusts fulfilled such obligations immediately.

14.     Upon the signing of the 2020 Binding LOI the parties thereupon undertook to finalize a definitive agreement. The parties exchanged draft agreements with edits and suggested changes after March 3. The draft definitive

Gordon Rees Scully Mansukhani, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101

1  agreements, pursuant to the Falics' demand, provided that they would individually

2  purchase the 80% stock holding. On March 15, 2020 Leon Falic forwarded a

3  Stock Purchase Agreement advising that "we haven't reviewed but might be some

4  changes but this should be what can be signed with minor modifications once we

5  reviewed in detail." (Attached hereto and marked "Exhibit 7" are a true and

6  correct copy of the email and the Falics' Stock Purchase Agreement forwarded by

7  Leon Falic.)

8      15.    On or about March 17, 2020 Leon Falic advised that the transaction

9  would not be consummated. His advice was followed up by confirmation by his

10  counsel that the transaction was being terminated and a demand the deposit be

11  returned to the Falics. (A true and correct copy of such letter is attached hereto and

12  marked "Exhibit 8."). The Trusts were unable to reinstate their marketing efforts.

13      16.    As a direct result of the Falics' default F & S has been forced to file a

14  Chapter 7 liquidation bankruptcy proceeding. The result of the Falics' having

15  required the Trusts to terminate their marketing efforts prevented the Trusts from

16  being able to resurrect their marketing efforts at a time when F&S's financial

17  condition was dire.

18      I declare under penalty of perjury under the laws of the State of California

19  that the foregoing is true and correct. Executed on August  6 , 2020 in Oakland,

20  California.

21

22                                        Nicole Uhlig

23                                            8-6-2020

24

25

26

27

28

-8-

**EXHIBIT 1**

---

**STOCK PURCHASE AND OPTION AGREEMENT**

**by and among**

**Jerome Falic, Simon Falic and Leon Falic,
as Initial Purchasers**

**Fairn & Swanson Holdings, Inc.,**

**Fairn & Swanson Inc.,**

**The Sellers Named on the
Signature Pages Hereto,**

**and**

**Sellers' Representative**

**Dated as of August 4, 2015**

---

# TABLE OF CONTENTS

Page

**ARTICLE I** PURCHASE AND SALE OF THE FIRM SHARES ............................................. 1
    Section 1.1    Purchase and Sale of Firm Shares.................................................. 1
    Section 1.2    Firm Share Price .............................................................................. 1
    Section 1.3    Initial Closing .................................................................................. 2
    Section 1.4    Sellers' Representative..................................................................... 2

**ARTICLE II** CALL AND PUT OPTIONS................................................................................ 2
    Section 2.1    Call Option....................................................................................... 2
    Section 2.2    Put Option ........................................................................................ 3
    Section 2.3    Option Deposit ................................................................................. 3
    Section 2.4    Option Closing ................................................................................. 3
    Section 2.5    No Partial Exercise .......................................................................... 4
    Section 2.6    Expiration of Options ...................................................................... 4
    Section 2.7    No Transfer of Option Shares or Call Option.................................. 4
    Section 2.8    Special Dividend .............................................................................. 4

**ARTICLE III** REPRESENTATIONS AND WARRANTIES OF THE COMPANY ................. 5
    Section 3.1    Organization and Qualification........................................................ 5
    Section 3.2    Authorization; Enforceability ......................................................... 5
    Section 3.3    Organizational Documents............................................................... 5
    Section 3.4    Capitalization .................................................................................. 5
    Section 3.5    Options............................................................................................. 6
    Section 3.6    No Violation..................................................................................... 6
    Section 3.7    Consents........................................................................................... 6
    Section 3.8    Financial Statements ........................................................................ 7
    Section 3.9    Accounts Receivable........................................................................ 7
    Section 3.10   Inventory ......................................................................................... 8
    Section 3.11   Absence of Undisclosed Liabilities ................................................ 8
    Section 3.12   Absence of Certain Changes ........................................................... 8
    Section 3.13   Taxes ............................................................................................... 9
    Section 3.14   Material Contracts ......................................................................... 11
    Section 3.15   Real Property ................................................................................. 13
    Section 3.16   Personal Property .......................................................................... 14
    Section 3.17   Intellectual Property ...................................................................... 14
    Section 3.18   Insurance Policies ......................................................................... 15
    Section 3.19   Litigation....................................................................................... 15
    Section 3.20   Compliance with Applicable Laws; Regulatory Compliance.................. 16
    Section 3.21   Compliance with Environmental, Health and Safety Requirements ........ 16
    Section 3.22   Employee Benefit Plans................................................................. 17
    Section 3.23   Labor Matters................................................................................ 18
    Section 3.24   Employees...................................................................................... 19
    Section 3.25   Affiliate Transactions.................................................................... 19
    Section 3.26   Brokers.......................................................................................... 20
    Section 3.27   Banks............................................................................................. 20
    Section 3.28   Customers and Suppliers............................................................... 20

i

Section 3.29    Full Disclosure ................................................................. 20

**ARTICLE IV** REPRESENTATIONS AND WARRANTIES OF THE SELLERS ................... 21
    Section 4.1    Authorization; Enforceability ............................................ 21
    Section 4.2    Title to Shares ............................................................. 21
    Section 4.3    No Consents ................................................................. 21
    Section 4.4    Litigation ....................................................................... 21
    Section 4.5    No Violation .................................................................. 21
    Section 4.6    Brokers ......................................................................... 22

**ARTICLE V** REPRESENTATIONS AND WARRANTIES OF THE INITIAL
PURCHASERS AND THE BUYER .............................................................. 22
    Section 5.1    Organization and Qualification .................................... 22
    Section 5.2    Authorization; Enforceability ...................................... 22
    Section 5.3    No Consents ................................................................. 22
    Section 5.4    Litigation ....................................................................... 22
    Section 5.5    No Violation .................................................................. 22
    Section 5.6    Eligible as S Corporation Shareholders ....................... 22
    Section 5.7    Brokers ......................................................................... 23

**ARTICLE VI** COVENANTS OF THE COMPANY AND THE SELLERS ..................... 23
    Section 6.1    Conduct of Business ..................................................... 23
    Section 6.2    Further Assurances ....................................................... 25
    Section 6.3    Subsequent Events; Schedules Updates ........................ 25
    Section 6.4    Regulatory Filings ........................................................ 25
    Section 6.5    Reasonable Access ....................................................... 25
    Section 6.6    Company Press Releases and Public Disclosure ........... 26
    Section 6.7    Exclusivity; Proposed Acquisition Transactions .......... 26
    Section 6.8    Notification .................................................................. 26
    Section 6.9    Termination of Affiliate Arrangements ........................ 27
    Section 6.10   Cooperation with the Buyer's Financing ..................... 27

**ARTICLE VII** COVENANTS OF THE INITIAL PURCHASERS AND THE BUYER .......... 27
    Section 7.1    Further Assurances ....................................................... 27
    Section 7.2    Regulatory Filings ........................................................ 28
    Section 7.3    Buyer Press Releases and Public Disclosure ............... 28
    Section 7.4    WARN .......................................................................... 28

**ARTICLE VIII** CONDITIONS PRECEDENT TO THE CLOSINGS ............................ 28
    Section 8.1    Conditions Precedent to Each Party's Obligations ....... 28
    Section 8.2    Conditions Precedent to Obligations of the Initial Purchasers and
                    the Buyer ...................................................................... 28
    Section 8.3    Conditions Precedent to Obligations of the Sellers ...... 30

**ARTICLE IX** DELIVERIES AT CLOSINGS ...................................................... 30
    Section 9.1    Deliveries by the Company and the Sellers .................. 30
    Section 9.2    Deliveries by the Initial Purchasers and the Buyer ...... 32

**ARTICLE X POST CLOSING COVENANTS** ................................................................ 33
    Section 10.1   Tax Covenants ................................................................................ 33
    Section 10.2   Access to Books and Records ........................................................ 35
    Section 10.3   Non-Competition; Non-Solicitation; Confidentiality .................. 35
    Section 10.4   Preservation of Records ................................................................ 37
    Section 10.5   Use of Name .................................................................................. 37
    Section 10.6   General .......................................................................................... 37
    Section 10.7   Certain Agreements ...................................................................... 38

**ARTICLE XI INDEMNIFICATION** ........................................................................ 38
    Section 11.1   Survival of the Company's and the Sellers' Representations, Warranties and Covenants; Time Limits on Indemnification Obligations ...................................................................................... 38
    Section 11.2   Survival of the Buyer's Representations, Warranties and Covenants; Time Limits on Indemnification Obligations ...................... 38
    Section 11.3   Indemnification by the Sellers and the Company Relating to the Company .................................................................................... 38
    Section 11.4   Indemnification by the Sellers .................................................... 39
    Section 11.5   Indemnification by the Initial Purchasers and the Buyer ............ 39
    Section 11.6   Indemnification Procedure for Third Party Claims .................... 40
    Section 11.7   TTB Matters .................................................................................. 40
    Section 11.8   Limitation as to Certain Qualifiers ............................................ 42
    Section 11.9   Limitation on Indemnification .................................................... 42
    Section 11.10  Exclusion of Other Remedies ...................................................... 42
    Section 11.11  No Right of Contribution ............................................................ 42

**ARTICLE XII TERMINATION OF OPTIONS; LIQUIDATED DAMAGES** ........................ 43
    Section 12.1   Termination .................................................................................. 43
    Section 12.2   Effect of Termination .................................................................. 43
    Section 12.3   Liquidated Damages .................................................................... 44

**ARTICLE XIII DEFINITIONS** ............................................................................ 44

**ARTICLE XIV MISCELLANEOUS** ...................................................................... 51
    Section 14.1   Notices, Consents, etc. ................................................................ 51
    Section 14.2   Severability .................................................................................. 52
    Section 14.3   Successors; Assignment .............................................................. 52
    Section 14.4   Counterparts; Facsimile Signatures ............................................ 52
    Section 14.5   Expenses ...................................................................................... 52
    Section 14.6   Governing Law ............................................................................ 53
    Section 14.7   Table of Contents and Headings .................................................. 53
    Section 14.8   Entire Agreement ........................................................................ 53
    Section 14.9   Third Parties ................................................................................ 53
    Section 14.10  Disclosure Generally .................................................................. 53
    Section 14.11  Interpretive Matters .................................................................... 53
    Section 14.12  Construction ................................................................................ 54
    Section 14.13  Submission to Jurisdiction .......................................................... 54
    Section 14.14  Waiver of Jury Trial .................................................................... 54

Section 14.15 Specific Performance ................................................................. 55
Section 14.16 Arbitration ................................................................................... 55
Section 14.17 Press Releases and Communications ......................................... 55
Section 14.18 Sellers' Representative ................................................................ 55
Section 14.19 Waiver; Remedies Cumulative ................................................... 56
Section 14.20 Time of the Essence ................................................................... 56
Section 14.21 Release ........................................................................................ 56

## STOCK PURCHASE AND OPTION AGREEMENT

This **STOCK PURCHASE AND OPTION AGREEMENT** (this "**Agreement**") is made and entered into as of August 4, 2015, by and among Jerome Falic, Simon Falic and Leon Falic (each an "**Initial Purchaser**" and collectively, the "**Initial Purchasers**"), Fairn & Swanson Holdings, Inc., a Delaware corporation (the "**Buyer**"), Fairn & Swanson Inc., a California corporation (the "**Company**"), the holders of the Equity Interests thereof whose signatures appear on the signature pages hereof (each such holder of Equity Interests of the Company a "**Seller**," and collectively the "**Sellers**"), and Andrew J. Armanino, Jr., as the Sellers' representative (the "**Sellers' Representative**"). Each of the parties named above may be referred to herein as a "**Party**" and collectively as the "**Parties**." Capitalized terms used, but not otherwise defined, herein shall have the meanings set forth in **Article XIII** below.

## RECITALS

WHEREAS, the Sellers own all of the issued and outstanding Equity Interests of the Company, which as of the date hereof consists of 615 shares of common stock, without par value (collectively, the "**Shares**"), each as set forth opposite the Sellers' names on Schedule I attached hereto;

WHEREAS, the Initial Purchasers desire to purchase from the Sellers, and the Sellers desire to sell to the Initial Purchasers, 123 Shares (the "**Firm Shares**") as set forth on Schedule I attached hereto, pursuant to the terms and subject to the conditions set forth in this Agreement;

WHEREAS, the Buyer desires to obtain an option to purchase from the Sellers, and to grant the Sellers the right to require the Buyer to purchase from the Sellers, the remaining 492 Shares (the "**Option Shares**") as set forth on Schedule I attached hereto, pursuant to the terms and subject to the conditions set forth in this Agreement;

WHEREAS, the Sellers desire to appoint Andrew J. Armanino, Jr. as the Sellers' Representative to represent their interests and act on their behalves in connection with all matters relating to this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF THE FIRM SHARES

Section 1.1 Purchase and Sale of Firm Shares. Upon the terms and subject to the conditions of this Agreement, at the Initial Closing (as defined herein) the Initial Purchasers shall purchase, acquire and accept the Firm Shares from the Sellers, and the Sellers shall sell, convey, assign and transfer to the Initial Purchasers the Firm Shares, free and clear of all Liens, and together with all rights now and hereafter attaching thereto.

Section 1.2 Firm Share Price. The aggregate purchase price for the Firm Shares to be purchased pursuant to **Section 1.1** (the "**Firm Share Price**") shall be Three Million Two Hundred Thousand Dollars ($3,200,000.00). The Firm Share Price shall be paid at the time and in the manner set forth in **Section 1.3(b)**.

Section 1.3    Initial Closing.

(a)    Initial Closing Date. The closing of the purchase and sale of the Firm Shares (the "**Initial Closing**") shall take place as described in **Article IX**; provided, that the closing conditions set forth in **Article VIII**, with respect to the Initial Closing, shall have been satisfied or waived in writing as provided therein at or prior to the Initial Closing. The date on which the Initial Closing occurs shall be referred to in this Agreement as the "**Initial Closing Date.**"

(b)    Initial Closing Date Payment. On the Initial Closing Date, the Initial Purchasers shall pay to the Sellers an aggregate amount equal to Firm Share Price by wire transfer of immediately available funds to the bank account(s) specified by the Sellers. The Sellers shall specify such account(s) in writing at least two (2) days prior to the Initial Closing Date.

Section 1.4    Sellers' Representative. In connection with the execution and delivery of this Agreement, each of the Sellers has appointed **Andrew J. Armanino, Jr.** as the Sellers' Representative, designated and authorized to act for the Sellers, and on the Sellers' behalves, as an agent with respect to all matters relating to, contemplated by or connected with this Agreement, with the same legal force and effect as the Sellers acting for themselves. The Initial Purchasers and the Buyer shall be entitled to rely on the full power and authority of the Sellers' Representative to act hereunder in such capacity on behalf of the Sellers. The Sellers' Representative is serving in such capacity solely for the purpose of administrative convenience, and is not personally liable in such capacity for any of the obligations of the Sellers hereunder. The Buyer agrees that it will not look to the personal assets of the Sellers' Representative, acting in such capacity, for the satisfaction of any obligations to be performed by the Sellers hereunder.

**ARTICLE II**
**CALL AND PUT OPTIONS**

Section 2.1    Call Option. In consideration of the purchase of the Initial Shares, the Sellers hereby grant to the Initial Purchasers an option (the "**Call Option**") to purchase for an aggregate purchase price of Twelve Million Eight Hundred Thousand Dollars ($12,800,000.00) (the "**Option Price**") the Option Shares, free and clear of all Liens, and together with all rights now and hereafter attaching thereto, on the following terms and conditions:

(a)    Subject to **Section 2.6**, the Call Option shall be exercisable at the Initial Purchasers' sole discretion at any time during the period commencing on the Initial Closing Date and expiring on the thirtieth day following the TTB Resolution Notice Date (the "**Call Option Exercise Period**"). The Sellers' Representative will give the Initial Purchasers written notice of the occurrence of the TTB Resolution ("**TTB Resolution Notice**"), as soon as practicable following the TTB Resolution, but in any event within ten (10) days thereof. The TTB Resolution Notice shall contain a brief description of the nature of the TTB Resolution, and shall be accompanied by documentary evidence thereof. For purposes of this **Article II:**

(i)    the term "**TTB Resolution**" means the earlier to occur, with respect to all of the TTB Matters, of (i) the date on which the EW-WA-39, CA-TI-168, CA-I-598 and CA-P-2408 permits are approved by the TTB, and/ or (ii) to the extent that the TTB Matters are the subject of litigation (whether commenced by the Company or otherwise), the date on which such litigation is judicially determined (by the entry of a final judgment or decree by a court of competent jurisdiction and the expiration of time to appeal or the denial of the last right of appeal); and

(ii)     the term "**TTB Resolution Notice Date**" means the date the Initial Purchasers receive the TTB Resolution Notice.

(b)     If the Initial Purchasers desire to exercise the Call Option, then prior to the end of the Call Option Exercise Period, the Initial Purchasers shall give the Sellers' Representative a written notice of exercise (the "**Call Option Exercise Notice**").

(c)     Following exercise of the Call Option, the Option Price shall be payable at the time and in the manner set forth in **Section 2.4**.

(d)     The Initial Purchasers may assign the Call Option (or the right to acquire the Option Shares following exercise of the Call Option) to the Buyer at any time prior to exercise thereof. The Initial Purchasers shall give the Sellers written notice of such assignment.

Section 2.2     Put Option.  The Initial Purchasers hereby grant the Sellers an option (the "**Put Option**") to require the Initial Purchasers severally to purchase for the Option Price the Option Shares, free and clear of all Liens, and together with all rights now and hereafter attaching thereto, on the following terms and conditions, provided, however, that the Put Option shall only be exercisable if the Call Option is not exercised:

(a)     Subject to **Section 2.6**, the Put Option shall be exercisable at the Sellers' sole discretion at any time during the period commencing on the thirty first day following the TTB Resolution Notice Date and expiring on the sixtieth day following the TTB Resolution Notice Date (the "**Put Option Exercise Period**"); provided, that the Put Option shall only be exercisable if there has not been a Material Adverse Change between the date hereof and the TTB Resolution Notice Date (which, for purposes of this **Section 2.2**, shall include a decrease of more than 10% in the Company's net sales or EBITDA for the trailing twelve months ("**TTM**") ended immediately prior to the exercise of the Put Option, compared to the amounts recorded in the TTM ended March 8, 2015).

(b)     If the Sellers desire to exercise the Put Option, then prior to the end of the Put Option Exercise Period, the Sellers' Representative shall give the Initial Purchasers a written notice of exercise ("**Put Option Exercise Notice**"), which notice shall certify that the condition specified in the proviso to **Section 2.2(a)** has been satisfied.  If the Initial Purchasers elect, the Option Shares may be purchased by the Buyer following exercise of the Put Option. The Initial Purchasers shall give the Sellers written notice of such election.

(c)     Following exercise of the Put Option, the Option Price shall be payable by the Initial Purchasers or the Buyer, as applicable, at the time and in the manner set forth in **Section 2.4**.

Section 2.3     Option Deposit.  Upon or within three (3) Business Days after the Initial Purchasers' or the Buyer's exercise of the Call Option, or the Sellers' exercise of the Put Option, the Initial Purchasers shall deliver (or cause the Buyer to deliver ) to Greenberg, Traurig, P.A. ("**GT**") Five Hundred Thousand Dollars ($500,000) in cash (the "**Option Deposit**"), which shall serve as a deposit towards the payment of the Option Price at the Option Closing.  If the Call Option has been exercised and the Option Deposit has not been delivered within such time period, the exercise of the Call Option shall be null and void.

Section 2.4     Option Closing.

(a)     The closing of the purchase and sale of the Option Shares pursuant to the exercise of the Call Option or the Put Option (the "**Option Closing**" and, together with the Initial Closing, the "**Closings**"), shall take place at the offices of Greenberg Traurig, LLP on a date specified by

the Initial Purchasers or the Buyer (as the case may be) not more than 90 days following the exercise of the Call Option or the Put Option, as applicable (provided, that the closing conditions set forth in **Article VIII** with respect to the Option Closing shall have been satisfied or waived in writing as provided therein at or prior to such date), or such later date that is two (2) Business Days after the satisfaction or waiver in writing of the conditions set forth in **Article VIII** (other than those conditions that by their terms shall be or must necessarily be satisfied at the Option Closing). The date on which the Option Closing occurs shall be referred to in this Agreement as the **"Option Closing Date."**

(b)     On the Option Closing Date, the Initial Purchasers or the Buyer (as the case may be) shall pay to the Sellers the Option Price less, if provided in **Section 2.4(c)**, the Escrow Amount. All such payments shall be made by wire transfer of immediately available funds to the bank account(s) specified by the Sellers. The Sellers shall specify such account(s) in writing at least two (2) Business Days prior to the Option Closing Date.

(c)     If a Final Determination (as defined in **Section 11.7(e)**) has not occurred prior to the Option Closing Date, or if a Final Determination has occurred prior to the Option Closing Date but the Company has not yet paid all TTB Losses due and payable as a result of such Final Determination, then on the Option Closing Date, the Initial Purchasers shall deposit an amount in cash equal to Estimated TTB Losses into an escrow account (the **"Escrow Account"**), such amount (the **"Escrow Amount"**) to be held and disbursed pursuant to an Escrow Agreement entered into by and among the Initial Purchasers, the Sellers' Representative and the Escrow Agent, the form of which shall be substantially in the form customarily used by the Escrow Agent and reasonably acceptable to the Initial Purchasers and the Seller's (the **"Escrow Agreement"**). The Escrow Amount shall be used to satisfy the obligations of the Sellers under **Section 11.3(d)** of this Agreement.

Section 2.5     No Partial Exercise. The Call Option and the Put Option shall be exercisable in whole only, and none of the Initial Purchasers, the Buyer or the Sellers, as applicable, shall have the right to exercise such options for less than all of the Option Shares.

Section 2.6     Expiration of Options. If the TTB Resolution does not occur by January 8, 2016, the Call Option and the Put Option shall expire and be of no further force and effect. If the TTB Resolution occurs prior to January 8, 2016, the Call Option and the Put Option shall expire and be of no further force and effect if they are not exercised during the Call Option Exercise Period or the Put Option Exercise Period, respectively.

Section 2.7     No Transfer of Option Shares or Call Option. During the period commencing on the date hereof and continuing until the earliest of (i) expiration of both the Call Option and the Put Option, and (iii) the Option Closing Date, (a) the Sellers shall not, directly or indirectly, sell, assign, pledge, encumber, hypothecate or otherwise transfer or dispose of the Option Shares or any interest therein or allow to exist any Liens on the Option Shares, and (b) the Initial Purchasers shall not, directly or indirectly, sell, assign, pledge, encumber, hypothecate or otherwise transfer or dispose of the Call Option or any interest therein or allow to exist any Liens on the Call Option.

Section 2.8     Special Dividend. If the Call Option or the Put Option is exercised, then the Sellers shall be entitled to cause the Company to declare and pay, at the Option Closing, a special dividend (the **"Special Dividend"**) in an amount equal to the lesser of (i) the positive increase (if any) in the Company's retained earnings (*i.e.*, net income less dividends paid) during the period beginning July 6, 2015 and ending the last day of the fiscal quarter of the Company ended immediately preceding the Option Closing Date (**"Measurement Period"**), and (ii) $500,000; provided, that no Special Dividend shall be declared or paid if such declaration or payment would constitute an event of default under the Company Credit Agreement or if the Company does not have adequate resources (consisting of cash on hand or availability under the Company Credit Agreement) to pay the Special Dividend on the Option

Closing Date. Not less than ten (10) days prior to the Option Closing Date, the Sellers' Representative shall provide the Initial Purchasers with a calculation of the amount, if any, of the Special Dividend payable, which shall be reviewed and certified by Armanino LLP, and accompanied by the Company's financial statements for the Measurement Period.

### ARTICLE III
### REPRESENTATIONS AND WARRANTIES
### OF THE COMPANY

The Company hereby represents and warrants to the Initial Purchasers and the Buyer with respect to the matters specified in this **Article III** as follows:

Section 3.1    <u>Organization and Qualification</u>.  The Company is a corporation duly organized, validly existing and in good standing under the Laws of the State of California.  The Company has the requisite corporate power and authority to conduct the Business as it is now being conducted, to own and lease the Assets which it owns and leases and to perform all of its obligations under each Contract by which it is bound.  The Company is duly qualified to conduct its business as a foreign entity and is in good standing under the Laws of the jurisdictions listed on **Schedule 3.1**, which are all of the jurisdictions where the nature of its business or the ownership or leasing of its Assets requires such qualification, except for any jurisdiction where the failure to be qualified would not be material, individually or in the aggregate.  Set forth on **Schedule 3.1** are all the names (*i.e.* "trading" or "doing business as" names) under which the Company is currently conducting its business.

Section 3.2    <u>Authorization; Enforceability</u>.  The Company has the requisite right, power and authority to execute and deliver this Agreement and the Other Agreements to which it is a party, to perform its obligations under this Agreement and the Other Agreements to which it is a party, and to consummate the transactions contemplated by this Agreement and the Other Agreements to which it is a party, and such actions have been duly authorized by all necessary corporate action of the Sellers and of the Company's board of directors.  This Agreement has been duly executed and delivered by the Company, and the Other Agreements to which the Company is a party have been, or will be at the Closings, duly executed and delivered by the Company, and this Agreement and the Other Agreements constitute the legal, valid and binding obligations of the Company, enforceable in accordance with their terms and conditions, except as such enforceability may be limited by the General Enforceability Exceptions.

Section 3.3    <u>Organizational Documents</u>.  The Company has delivered to the Initial Purchasers and the Buyer copies of the Company's Organizational Documents, and all such copies are complete and correct as of the date hereof.  The minute books of the Company delivered to the Initial Purchasers and the Buyer, to the Company's Knowledge, contain true, complete and correct records of all meetings held, and accurately reflect all other corporate action of the stockholders and board of directors (and any committees thereof) of the Company.  The books and records of the Company delivered to the Initial Purchasers and the Buyer have been maintained in accordance with sound business practice, and applicable law and accounting policies.  The Company is not in default under or in violation of any provision of its Organizational Documents.

Section 3.4    <u>Capitalization</u>.  The Sellers are the record and beneficial holders of those and that number of Shares set forth opposite each Seller's name on **Schedule 3.4**.  All of such Shares have been duly authorized and are validly issued, fully paid and non-assessable, free and clear of all Liens, and have been issued in compliance with applicable Law.  As of the date hereof, the Shares constitute the only outstanding Equity Interests of the Company.  No Equity Interests of the Company are subject to, or have been issued in violation of, preemptive or similar rights.  All issuances, sales or repurchases by the Company of its Equity Interests have been effected in compliance with all applicable

5

federal and state securities laws. There are no voting trusts, proxies, or other agreements or understandings with respect to the voting Equity Interests of the Company. The Company does not own, directly or indirectly, or have any obligation to acquire, any Equity Interests of any Person.

Section 3.5    Options.  There are no authorized or outstanding subscriptions, options, rights (conversion, preemptive or otherwise), warrants, calls, convertible securities or commitments or any other arrangements or agreements of any nature whatsoever to which the Company is a party requiring the issuance, conversion, registration, voting, sale or transfer of any Equity Interests of the Company, or any synthetic equity, including without limitation, phantom stock, profits participation or stock appreciation rights or any securities convertible, directly or indirectly, into Equity Interests of the Company, or evidencing the right to subscribe for any Equity Interests of the Company, or giving any Person (other than the Initial Purchasers or the Buyer) any rights with respect to any Equity Interests of the Company.

Section 3.6    No Violation.  Except as set forth on **Schedule 3.6** and subject to the receipt of the Consents and to the filing of notices and the expiration of any waiting periods as contemplated by **Section 3.7**, neither the execution and delivery of this Agreement or the Other Agreements to which the Company is a party, nor the performance by the Company of its obligations hereunder or thereunder, or the consummation of the transactions contemplated hereby or thereby will (with or without the passage of time or the giving of notice) (a) violate, conflict with or constitute a default under the Organizational Documents of the Company, (b) to the Company's Knowledge, violate, conflict with or result in a Breach of, constitute a material default under, give rise to any right of termination, modification, foreclosure, cancellation or acceleration under, or cause any loss of benefit under, any of the terms, conditions or provisions of any Material Contract or Lease to which the Company is a party or by which the Assets of the Company are bound, or give to others any rights (including rights of termination, modification, foreclosure, cancellation or acceleration) in or with regard to the Company, or any of its Assets, or the Shares, or result in, require or permit the creation or imposition of any Lien of any nature upon or with regard to the Shares, the Company, or any of its Assets, (c) to the Company's Knowledge, conflict with or violate in any material respect any Laws applicable to the Company or by which any of its Assets is bound or any of the Material Licenses and Permits held by the Company, or give any Governmental Authority the right to revoke, withdraw, suspend, cancel, terminate or modify any Material License or Permit, (d) alter or impair the ability of the Company to conduct the Business, or (e) give any Person the right to challenge any of the transactions contemplated hereby, or exercise any remedy or obtain any relief under any Law or any order of a judicial or arbitral authority to which the Company may be bound.

Section 3.7    Consents.

(a)    Third Party Consents.  Except as set forth on **Schedule 3.7(a)**, neither the execution and delivery of this Agreement or the Other Agreements to which the Company is a party, nor the performance by the Company of its obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby will (with or without the passage of time or the giving of notice) require any Consent (collectively, the **"Third Party Consents"**) under any of the terms, conditions or provisions of any Material Contract to which the Company is a party or by which its Assets is bound.

(b)    Governmental Consents.  Except for (i) Consents required pursuant to the Licenses and Permits held by the Company and listed on **Schedule 3.7(b)**, and (ii) any other filings listed on **Schedule 3.7(b)**, no Consent of, permit or exemption from, or declaration, filing or registration with, any Person or Governmental Authority (collectively, the **"Governmental Consents"**) is required to be made or obtained by the Company in connection with the execution, delivery and performance by the Company of this Agreement and the Other Agreements to which the Company is a party and the

consummation of the transactions contemplated hereby and thereby, which, if not made or obtained, (A) would result in a material violation of any Law, License or Permit, (B) would result in any material Liability to the Company, or (C) would prohibit the consummation of the transactions contemplated hereby and thereby.

Section 3.8    Financial Statements.

(a)    Attached as **Schedule 3.8(a)** hereto are complete and correct copies of the audited balance sheet of the Company as at January 4, 2015 and December 29, 2013 (the "**Audited Balance Sheet**"), and the related audited statement of income, statement of Stockholders' equity and statement of cash flows of the Company for the fiscal year ended January 4, 2015 and for the fiscal year ended December 29, 2013 (collectively, with the Audited Balance Sheet, the "**Audited Financial Statements**").

(b)    Attached as **Schedule 3.8(b)** hereto are complete and correct copies of the unaudited balance sheet of the Company as at May 3, 2015 (the "**Latest Balance Sheet**"), and the related unaudited statement of income, statement of Stockholders' equity and statement of cash flows of the Company for the four-month period ended May 3, 2015 (collectively, with the Latest Balance Sheet, the "**Interim Financial Statements**" and together with the Audited Financial Statements, the "**Financial Statements**").

(c)    The Financial Statements have been based upon and are consistent with the information contained in the Company's books and records and are complete and correct, consistent with the books and records of the Company. The Financial Statements fairly present in all material respects the financial condition of the Company, as of the dates thereof, and the cash flows and results of operations of the Company, for the periods related thereto, in accordance with GAAP in all material respects (except that the Interim Financial Statements lack the footnote disclosure and other presentation items, and are subject to normal year-end adjustments otherwise required by GAAP, none of which are material either individually or in the aggregate). The Company maintains a system of internal accounting controls sufficient to provide reasonable assurances that: (a) transactions are executed in accordance with management's general or specific authorization, (b) transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP and to maintain accountability for assets, (c) access to its Assets is permitted only in accordance with management's general or specific authorization, and (d) the recorded accountability for Assets is compared with the actual levels at reasonable intervals and appropriate action is taken with respect to any differences.

(d)    No financial statements of any other Person are required by GAAP to be included in the Financial Statements to fairly and accurately represent the operations of the Company. The financial books and records, and the accounts, of the Company used to prepare the Financial Statements: (i) have been maintained in accordance with sound business practices on a basis consistent with prior years, (ii) are stated in reasonable detail and reflect actual bona fide transactions of the Company in all material respects, and (iii) constitute the basis for the Financial Statements.

Section 3.9    Accounts Receivable.    All Accounts Receivable of the Company that are reflected on the Financial Statements (collectively, the "**Company Accounts Receivable**") represent or will represent at the Closings valid obligations arising from sales actually made or services actually performed by the Company in the ordinary course of business. To the Company's Knowledge, there is no contest, claim or right of set-off, other than returns in the ordinary course of business, in any Contract with any maker of a Company Account Receivable relating to the amount or validity of such Company Account Receivable.

Section 3.10    Inventory. All Inventory of the Company (the "**Company Inventory**"), whether or not reflected on the Financial Statements, consists of a quality and quantity usable and saleable in the ordinary course of business, except for slow-moving or obsolete items and items of below-standard quality, all of which have been written off or written down to net realizable value in the Financial Statements. The quantities of each item of Company Inventory are not excessive and are reasonable in the present circumstances of the Business.

Section 3.11    Absence of Undisclosed Liabilities. The Financial Statements reflect all Liabilities of the Company as of the dates thereof required to be disclosed or reflected in accordance with GAAP. The Company does not have any Liability (and to the Company's Knowledge there is no Basis for any present or future Legal Proceeding against the Company giving rise to any Liability), except the Liabilities (a) that are accrued for or reserved against in the Latest Balance Sheet, (b) that have arisen since the date of the Latest Balance Sheet in the ordinary course of business, or (c) that are otherwise disclosed on **Schedule 3.11**, in each case, (i) none of which results from, arises out of, relates to, is in the nature of, or was caused by any Breach of Contract, Breach of warranty, tort, infringement or violation of Law, and (ii) none of which, individually or in the aggregate, is material.

Section 3.12    Absence of Certain Changes. Since the date of the Latest Balance Sheet, except as otherwise set forth on **Schedule 3.12**, the Company has conducted the Business in the ordinary course of business, and since the date of the Latest Balance Sheet, there has been no Material Adverse Effect, nor to the Company's Knowledge has any event occurred that could reasonably be expected to have a Material Adverse Effect, on the Company or the Business. Except as set forth on **Schedule 3.12**, since the date of the Latest Balance Sheet, there has not been, nor has the Company committed to, any:

(a)    borrowings or Indebtedness, other than borrowings or Indebtedness under the Senior Debt;

(b)    mortgages or pledges of any of its Assets, other than Permitted Liens;

(c)    sale, assignment, transfer, lease or license (other than licenses to customers for fair consideration in the ordinary course of business) of its Intellectual Property or abandonment or lapse of any rights in its Intellectual Property;

(d)    incident of damage, destruction or loss of any of its Assets, whether or not covered by insurance, having a replacement cost or fair market value in excess of $10,000;

(e)    voluntary or involuntary sale, transfer, surrender, abandonment, waiver, release, assignment, conveyance, lease or other disposition of any kind of any right, power, claim, debt, or Asset (having a replacement cost or fair market value in excess of $50,000 in the aggregate);

(f)    material loan, guarantee or advance (other than loans, guarantees or advances to be incurred in the ordinary course of business and not exceeding $50,000 in the aggregate), to the Sellers, any Affiliates of the Sellers, any Representatives of the Company, or any other Person, or any discharge or satisfaction of any Lien except in the ordinary course of business;

(g)    capital expenditures in excess of $10,000 individually or $50,000 in the aggregate, or deferral or failure to incur any capital expenditures and other expenditures in the ordinary course of business consistent with the most recent budget and forecasts provided to the Initial Purchasers and the Buyer prior to the date hereof;

(h)     declaration, setting aside, or payment of any dividend or other distribution in respect of Equity Interests or other securities of the Company, or any direct or indirect redemption, purchase, or other acquisition of such Equity Interests or other securities, or the payment of principal or interest on any note, bond, debt instrument or debt to any Affiliate of the Company;

(i)     issuance of any notes, bonds, or other debt securities or any Equity Interests or securities convertible into, or exchangeable for, any Equity Interests, or any synthetic equities;

(j)     cancellation, waiver or release of any material debts, rights or claims, except in the ordinary course of business, or write-down or write-off of the value of any Asset except for write-downs and write-offs in the ordinary course of business;

(k)     change in the accounting principles, methods or practices (including, without limitation, any change in depreciation or amortization policies or rates) utilized by the Company;

(l)     amendment of any Organizational Documents or any action with respect to any such amendment, or any reorganization, liquidation or dissolution of the Company;

(m)     change in cash management practices or policies (including, without limitation, the timing of collection of receivables and payment of payables and other current liabilities) or change in the maintenance of its books and records other than in the ordinary course of business;

(n)     adoption, amendment or termination of any Employee Plan or increase in the benefits provided under any Employee Plan, or payment of any vacation pay, sick pay, bonus, severance, incentive, disability, profit sharing or other payments, in each case except in the ordinary course of business, or as required by applicable Law;

(o)     material increase in any manner of compensation or benefits payable or to become payable to any stockholder or Representative of the Company (except for increases in the ordinary course of business, and other than pursuant to the requirements of pre-existing Contracts listed on **Schedule 3.12**), or entry into (or amendment of) any employment, severance, or similar agreement with any stockholder or Representative of the Company, or any change in job title or other material change in the position or job responsibilities of any Representative of the Company;

(p)     disclosure of any Confidential Information; or

(q)     entry by the Company into any other transaction, other than in the ordinary course of business.

Section 3.13    Taxes.  Except as set forth on **Schedule 3.13**:

(a)     The Company has timely filed, or will timely file (taking into account available extensions of time to file), all Tax Returns required to be filed by it through the date hereof and through the Initial Closing Date or Option Closing Date, as applicable, with the appropriate Governmental Authority. Each such Tax Return is complete and correct and correctly reflects the taxable income or loss (or other measure of Tax) of the Company. The Company has timely paid and discharged all Taxes required to be paid by it (whether or not shown on any Tax Return). The Company has withheld, collected and paid over to the appropriate Taxing Authority, or is properly holding for such payment, all Taxes required by Law to be withheld or collected. The unpaid Taxes of the Company (i) did not, as of the date of the Latest Balance Sheet, exceed the reserves for Tax Liability set forth on the face of the Latest Balance Sheet, and (ii) will not exceed the reserve described in clause (i) as adjusted for the passage of time through the Initial Closing Date or Option Closing Date, as applicable, in accordance with

past custom and practice of the Company in filing its Tax Returns. Since the date of the Latest Balance Sheet, the Company has not incurred any Liability for Taxes arising from extraordinary gains or losses or transactions outside the ordinary course of business.

(b)     The Company is not a party to any Tax allocation or Tax sharing agreement.

(c)     The Company is not (nor was) (i) a member of an affiliated group within the meaning of Section 1504(a) of the Code (or any similar group defined under a similar provision of state, local, or foreign Law), (ii) filing a consolidated federal income Tax Return with any other Person, or (iii) liable for the Taxes of any Person (other than the Company) under Treasury Regulation Section 1.1502-6 or any analogous or similar provision of Law.

(d)     The Company has not been notified that it is currently under audit by any Taxing Authority or that any Taxing Authority intends to conduct such an audit, and no action, suit, investigation, claim or assessment is pending or proposed with respect to any alleged deficiency in Taxes. Except as and to the extent shown on **Schedule 3.13(d)**, all deficiencies asserted or assessments made as a result of any examinations by any Taxing Authority have been fully paid, and there are no other unpaid deficiencies asserted or assessments made by any Taxing Authority against the Company.

(e)     The Company has not (and the Sellers have not, on its behalf) (i) waived any statute of limitations in respect of any Taxes, (ii) agreed to any extension of time with respect to any Tax assessment or deficiency, or (iii) executed any closing agreement pursuant to Section 7121 of the Code or any predecessor provision thereof, or any similar provision of foreign, state or local law.

(f)     Complete and correct copies of all federal and state Tax Returns filed by the Company for the taxable periods beginning on or after fiscal year 2011, and all examination reports, statements of deficiencies and communications between the Company or any of its Representatives and any Taxing Authority relating to Taxes for taxable periods beginning on or after fiscal year 2011, have been provided to the Initial Purchasers and the Buyer.

(g)     No claim has ever been made by any Taxing Authority in a jurisdiction where the Company (nor the Sellers, on its behalf) does not file Tax Returns claiming that the Company is or may be subject to taxation by that jurisdiction.

(h)     There are no Liens (aside from Permitted Liens) relating to any Taxes existing, threatened or pending with regard to any of the Assets of the Company.

(i)     The Company is not a party to any Contract that has resulted or would result, separately, or in the aggregate, in the payment of (i) any "excess parachute payment" within the meaning of Section 280G of the Code (or any corresponding provision of state, local or foreign Tax law), or (ii) any amount that will not be fully deductible as a result of Section 162(m) of the Code (or any corresponding provision of state, local or foreign Tax law). The Company has not been a United States real property holding corporation within the meaning of Sections 897 and 1445 of the Code during the applicable period specified in such Sections of the Code. The Company has disclosed on its federal income Tax Returns all positions taken therein that could give rise to a substantial understatement of federal income Tax within the meaning of Section 6662 of the Code. The Company has not participated in a reportable transaction subject to Section 1.6011-4(a) of the Treasury Regulations or any transaction that is the same as or substantially similar to one of the types of transactions that the Internal Revenue Service has determined to be a "tax avoidance transaction" and identified by notice, regulation, or other form of published guidance.

(j)        **Schedule 3.13(j)** sets forth the following information with respect to the Company as of the most recent practicable date: (i) the tax basis of the Company in its Assets, and (ii) the amount of any deferred gain or loss allocable to the Company arising out of any intercompany transaction.

(k)        The Company will not be required to include any items of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Initial Closing Date or, if the Option Closing occurs, the Option Closing Date as a result of any: (i) change in method of accounting for a taxable period ending on or prior to the Initial Closing Date or, if the Option Closing occurs, the Option Closing Date, (ii) "closing agreement" as described in Section 7121 of the Code (or any corresponding provision of state, local or foreign income Tax Law) executed on or prior to the Initial Closing Date or, if the Option Closing occurs, the Option Closing Date, (iii) intercompany transactions or any excess loss account described the Treasury Regulations promulgated under Section 1502 of the Code (or any corresponding provision of state, local or foreign income Tax Law), (iv) installment sale or open transaction disposition made on or prior to the Initial Closing Date or, if the Option Closing occurs, the Option Closing Date, or (v) prepaid amount received on or prior to the Initial Closing Date or, if the Option Closing occurs, the Option Closing Date.

(l)        The Company has not distributed Equity Interests of another Person, and has not had its Equity Interests distributed by another Person during the last five (5) years in a transaction that was purported or intended to be governed in whole or in part by Sections 355 or 361 of the Code.

(m)        Except as disclosed on **Schedule 3.13(m),** none of the Sellers or the Company has in effect any tax elections for federal income tax purposes under Sections 108, 168, 338, 441, 471, 1017, 1033, 1502 and 4977 of the Code with respect to the Company.

(n)        Except as provided for on **Schedule 3.13(n),** the Company does not own an interest in any (i) domestic international sales corporation, (ii) foreign sales corporation, (iii) controlled foreign corporation, or (iv) passive foreign investment company.

(o)        The Company has been a validly electing S corporation within the meaning of Code Sections 1361 and 1362 at all times since January 1, 1993, and the Company will be an S corporation up to and including the Initial Closing Date or, if the Option Closing occurs, the Option Closing Date.

Section 3.14        Material Contracts.  Except as listed or described on **Schedule 3.14,** as of the date hereof, the Company is not a party to or bound by any Contract in effect on the date hereof of a type described below (such Contracts that are required to be listed on **Schedule 3.14** are herein referred to as "**Material Contracts**"):

(a)        any consulting agreement or employment agreement that provides for annual compensation exceeding $100,000 per year and which cannot be terminated by the Company without penalty on notice of thirty (30) days or less, any collective bargaining arrangement with any labor union, any Contract or arrangement providing for the Company to indemnify any Person, and any such agreements currently in negotiation or proposed;

(b)        any Contract for capital expenditures or the acquisition of fixed assets in excess of $20,000;

(c)        any Contract for the purchase, lease, maintenance or acquisition, or the sale or furnishing of, materials, supplies, merchandise, equipment, parts or other Assets or services requiring

remaining aggregate future payments in excess of $10,000, other than purchase orders entered into the ordinary course of business or any Contract with any customer or supplier;

(d)     any Contract that restricts the right of the Company to engage in any line of business, compete with any Person, solicit any customers, suppliers, employees or contractors of any other Person, or sell or purchase any product;

(e)     any Contract relating to the acquisition or disposition, directly or indirectly, of any business, Real Property or other Assets, or the Equity Interests of any other Person;

(f)     any Contract relating to the borrowing of money, or the guaranty of another Person's borrowing of money or other obligation, including, without limitation, all notes, mortgages, indentures and other obligations, guarantees of performance, letters of credit, advances, and agreements and instruments for or relating to any lending or borrowing, including assumed indebtedness;

(g)     any Contract under which the execution and delivery of this Agreement or the Other Agreements by the Company may cause a default, give rise to any right of termination, cancellation or acceleration, or require any Consent;

(h)     any Contract granting any Person a material Lien on all or any part of the material assets of the Company, other than Liens that will be released at or prior to the Initial Closing;

(i)     any Contract or group of related Contracts with an Affiliate or group of Affiliates, the performance of which provides for the expenditures of more than $10,000 annually or **$10,000** in the aggregate;

(j)     any Contract under which the Company has granted or received a material license or sublicense or under which it is obligated to pay or has the right to receive a royalty, license fee or similar payment in an amount in excess of $10,000, other than licenses for commercially available prepackaged software;

(k)     any lease, rental or occupancy agreement, installment and conditional sale agreement, and other Contract affecting the ownership of, leasing of, title to, use of, or any leasehold or other interest in, any Real Property or other Assets (other than leases of personal property with remaining obligations of less than $20,000);

(l)     any license, sublicense or other Contract with respect to the Intellectual Property of the Company including, without limitation, any maintenance or support agreement, trial agreement, beta test agreement, consulting, development or escrow agreement, or agreements with current or former Representatives of the Company and other Persons regarding the development, appropriation or the non-disclosure of any Intellectual Property of the Company;

(m)     any Contract to which any Representative of the Company is bound that in any manner purports to (A) restrict such Person's freedom to engage in any line of business or activity or to compete with any other Person, or (B) assign to any other Person such Person's rights to any copyright, software, invention, improvement, or discovery;

(n)     any joint venture, partnership, and other Contract (however named) involving a sharing of profits, losses, costs, or Liabilities by the Company with any other Person;

(o)     any Contract providing for payments to or by any Person based on sales, purchases, or profits, including distribution, reseller and sales representative agreements, other than direct payments for goods by end users of the Company's products;

(p)     any written warranty, guaranty or other similar undertaking with respect to contractual performance extended by the Company;

(q)     any other material Contract of the Company, whether or not entered into in the ordinary course of business; and

(r)     any amendment, supplement, and modification (whether oral or written) in respect of any of the foregoing.

The Company has delivered to the Initial Purchasers and the Buyer a complete and correct copy of each written Material Contract, together with all amendments, exhibits, attachments, waivers or other changes thereto, and written descriptions of each oral Contract, if any. To the Company's Knowledge, except as set forth on **Schedule 3.14**, (i) each Material Contract is valid, binding, in full force and effect, and enforceable by the Company against the parties thereto in accordance with its terms, except as such enforceability may be limited by the General Enforceability Exceptions, and is not subject to any material claims, charges, set-offs or defenses, (ii) the Company is not in material Breach or material default under any of the Material Contracts, nor has any event occurred which with the giving of notice or the passage of time (or both) would constitute a material Breach or material default by the Company thereunder, (iii) the Company has not waived any material rights under any of the Material Contracts or modified any material terms thereof, and (iv) to the Company's Knowledge, no other party to any Material Contract is in material Breach or material default in any respect thereunder, nor has any event occurred or is expected to occur (including without limitation the transactions contemplated hereby), which with the giving of notice or the passage of time (or both) would constitute a material default by such other party thereunder. No Material Contract set forth on **Schedule 3.14** in relation to **Section 3.14(f)** contains any prepayment premium or penalty, or restricts the payment, at any time or from time to time, of all or any portion of the outstanding balance due under such Material Contract.

Section 3.15     Real Property.

(a)     The Company does not own any Real Property. **Schedule 3.15** sets forth a complete and correct list of all Real Property in which the Company has a leasehold or subleasehold interest, or other right to use or occupy (such Real Property is herein referred to as the "**Leased Real Property**"). **Schedule 3.15** indicates the address of all Leased Real Property and the owner of the Leased Real Property. The Company has delivered to the Initial Purchasers and the Buyer a complete and correct copy of each Lease or other Contract pertaining to any of the Leased Real Property, together with all amendments, extensions, renewals, modifications, alterations, guaranties and other changes thereto (collectively, the "**Company Leases**") all of which are identified on **Schedule 3.15**. Each of the Company Leases is legal, valid, binding, enforceable and in full force and effect in accordance with the terms thereof. All conditions precedent to the enforceability of each Company Lease have been satisfied and there is no material Breach or default, nor state of facts which, with the passage of time, notice or otherwise, would result in a material Breach or default (i) on the part of or by the Company, or permit the termination, modification or acceleration of rent by the lessor thereunder, or (ii) to the Company's Knowledge, on the part of the lessor thereunder.

(b)     Assuming good title in the landlord, the Company holds a valid, binding and enforceable leasehold interest in the Leased Real Property, in each case free and clear of all Liens. Except as set forth on **Schedule 3.15**, the Leased Real Property constitutes all of the Real Property currently used or occupied by the Company in connection with or related to the Business. Such Leased

Real Property, and the premises located thereon occupied by the Company, is sufficient for the Business and operations use and requirements.

(c)     There is no Legal Proceeding pending, or the Company's Knowledge Threatened, against any of the Leased Real Property which, if adversely determined, could have an adverse impact on the Company's leasehold interest in any Leased Real Property, or which could in any way interfere with the consummation of the transactions contemplated by this Agreement.

Section 3.16     Personal Property. Except as set forth on **Schedule 3.16**, or as disposed of in the ordinary course of business since the date of the Latest Balance Sheet, the Company has good title to, a valid leasehold interest in, or a valid license to use, all material Assets reflected on the Latest Balance Sheet as owned or used by the Company, and all Assets necessary or useful in the operation of the Business, free and clear of any Liens, other than Permitted Liens. All tangible Assets used by the Company in the ordinary course of business are in good working condition and repair and sufficient for the operation of the Business as presently conducted (normal maintenance, wear and tear excepted). All Assets owned, leased or licensed by the Company are in the possession of, and under the control of, the Company and are in good condition and repair, ordinary wear and tear excepted, and are suitable for the purposes for which they are being used and are of a condition, nature and quantity sufficient for the conduct of the Business as currently conducted. All tangible Assets of the Company are located on or at the Leased Real Property.

Section 3.17     Intellectual Property. **Schedule 3.17** sets forth a complete and correct list of all Intellectual Property owned or used by the Company in the operation of the Business (the "**Company Intellectual Property**"). For each item of Company Intellectual Property, **Schedule 3.17** sets forth the registration, patent, serial and/or application number, if any, and the Governmental Authority or other entity with which any such application has been filed and/or which has issued, reissued and/or renewed any such patent or registration. Except as set forth on **Schedule 3.17**, or except as has not had or would not reasonably be expected to have a Material Adverse Effect:

(a)     the Company owns all right, title and interest in, or has a valid license to use, the Company Intellectual Property in the Business, free and clear of all Liens, other than Permitted Liens;

(b)     (i) the use of the Company Intellectual Property in the conduct of the Business does not infringe upon, dilute or misappropriate any intellectual property rights of any Person; and (ii) no claims or allegations of infringement or unauthorized use involving any Company Intellectual Property are pending against a third party or the Company;

(c)     the Company Intellectual Property constitutes all technology and Intellectual Property reasonably necessary for the conduct of the Business;

(d)     the Company has delivered to the Initial Purchasers and the Buyer complete and correct copies of each license agreement granting to any third party and rights relating to any of the Company Intellectual Property or granting to the Company the right to use any Intellectual Property (the "**IP License Agreements**"), and each IP License Agreement is a legal, binding and enforceable obligation of the Company, no party to any IP License Agreement is in material Breach or default of such IP License Agreement, no event has occurred which with notice or the passage of time would constitute a material Breach or default or permit termination, modification or acceleration thereunder, and the Company is not obligated under any IP License Agreement or otherwise to pay royalty or license fees for the use of any Company Intellectual Property;

(e)     the information technology systems owned, licensed, leased, operated on behalf of, or otherwise held for use in the Business, by the Company, including all computer hardware, software,

firmware and telecommunications systems used in the Business, perform reliably and in material conformance with the appropriate specifications or documentation for such systems.

Section 3.18    Insurance Policies.

(a)    The Company has delivered to the Initial Purchasers and the Buyer complete and correct copies of all policies and binders of insurance (each of which are listed on **Schedule 3.18**), including, without limitation, property, general liability, casualty, cargo, product liability, life, health, accident, workers' compensation, disability insurance, bonding arrangements and umbrella insurance policies, maintained as of the date hereof by the Company (collectively, the **"Insurance Policies"**), together with descriptions of all "self-insurance" programs.  All Insurance Policies are in full force and effect for such amounts as are sufficient for requirements of Law and all Contracts to which the Company is a party or by which it is bound, and will not be affected by, terminate or lapse by reason of the transactions contemplated by this Agreement.  Except as set forth on **Schedule 3.18**, there have been no material claims made under any Insurance Policies at any time during the three (3)-year period prior to the date hereof.  Except as set forth on **Schedule 3.18**, the Company has not received written notice under any Insurance Policy denying or disputing any claim (or coverage with respect thereto) made by the Company or regarding the termination, cancellation or material amendment of, or material premium increase with respect to, any Insurance Policy, in each case, at any time during the one year period prior to the date hereof.  Since January 1, 2012, the Company has not been refused any insurance, nor has its coverage been limited or suspended.

(b)    All Insurance Policies are legal, valid, binding, enforceable, and in full force and effect, and will continue to be legal, valid, binding, enforceable, and in full force and effect on identical terms following the consummation of the transactions contemplated by this Agreement.  All premiums due and payable with respect to the Insurance Policies have been paid.  To the Company's Knowledge, neither the Company, nor any other party to any Insurance Policy is in Breach or default (including with respect to the giving of notices), and no event has occurred that, with notice or the lapse of time, would constitute such a Breach or default, or permit termination, modification, or acceleration, under any Insurance Policy.  No party to any Insurance Policy has repudiated any provision thereof.  The Company has been covered during the past three (3) years by insurance in scope and amount customary and reasonable for the Business in which it has engaged during such period.

Section 3.19    Litigation.  Except as set forth on **Schedule 3.19**, no claim, action, suit, litigation, arbitration, hearing, inquiry, audit, proceeding or investigation, whether civil, criminal, judicial or investigative, formal or informal, public or private, commenced, brought, conducted or heard by or before any Governmental Authority, judicial authority or arbitral panel (each, a **"Legal Proceeding"**) is pending or, to the Company's Knowledge, Threatened, against the Company or any of the current or former Representatives of the Company in their respective capacity as Representatives of the Company, nor is there, to the Company's Knowledge, any Basis for any of the foregoing.  Neither the Company, nor any such Representative, is subject to any judgment, order or decree of any court, judicial authority or Governmental Authority (nor have any of them been subject to such a judgment, order or decree in the past five (5) years).  **Schedule 3.19** sets forth a complete and correct list and description of all Legal Proceedings made, filed or otherwise initiated in connection with the Company that are pending or have been resolved in the past two (2) years, and the resolution thereof.  Prior to the execution of this Agreement, the Company has delivered to the Initial Purchasers and the Buyer all responses of legal counsel for the Company to auditors' requests for information delivered in connection with preparation of the Audited Financial Statements (together with any updates provided by such counsel) regarding any Legal Proceeding pending or Threatened against the Company.  The Company has adequate insurance with respect to all Legal Proceedings.

Section 3.20    Compliance with Applicable Laws; Regulatory Compliance.

(a)    **Schedule 3.20** contains a complete and correct list of all Licenses and Permits issued to or maintained by the Company as of the date hereof that are to Company's Knowledge necessary to the conduct of the Business as the Business has been operated during the past twelve (12) months (collectively, the "**Material Licenses and Permits**"), along with the date of issuance and the current term thereof. All such Material Licenses and Permits are in full force and effect.

(b)    The Company, and its predecessors and Affiliates, have complied in all material respects with the Material Licenses and Permits and all Laws applicable to it or to the operation of the Business, and no facts or circumstances exist which would reasonably be expected to cause the Company to violate or fail to comply with any such Material Licenses and Permits and Laws in the future. The Company has not received any written notice from any court, judicial authority or Governmental Authority asserting a failure, or possible failure, to comply with any such Material Licenses and Permits or applicable Laws, the subject of which notice has not been conclusively resolved as required thereby or otherwise to the satisfaction of the party sending such notice. Except for the TTB Matters, to the Company's Knowledge, the Company is not under investigation with respect to violations of any such Material Licenses and Permits or Laws.

Section 3.21    Compliance with Environmental, Health and Safety Requirements. The Company has obtained and possesses all Licenses and Permits required for the conduct of the Business under Laws and contractual obligations concerning public health and safety, worker health and safety, pollution, or protection of the environment, including without limitation those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control or clean up of any hazardous materials, substances, or wastes, chemical substances or mixtures, pesticides, pollutants, contaminants, toxic chemicals, petroleum products or byproducts, asbestos, polychlorinated biphenyls, noise or radiation (collectively, "**Environmental, Health and Safety Requirements**"). Except as set forth on **Schedule 3.21**, to the Company's Knowledge, the Company, and its predecessors and Affiliates, is in compliance with all terms and conditions of such Licenses and Permits and is also in compliance with all other Environmental, Health and Safety Requirements. The Company has delivered to the Initial Purchasers and the Buyer all reports, studies, correspondence and documents concerning its compliance with or Liability under Environmental, Health and Safety Requirements.

(a)    Neither the Company nor its predecessors or Affiliates has received any written or oral notice, report or other information regarding any actual or alleged violation of Environmental, Health and Safety Requirements, or any Liabilities, including any investigatory, remedial or corrective obligations, relating to any of them or their facilities arising under Environmental, Health and Safety Requirements.

(b)    No facts, events or conditions relating to the past or present facilities, Real Property or operations of the Company, or its predecessors or Affiliates will prevent, hinder or limit continued compliance with Environmental, Health and Safety Requirements, give rise to any investigatory, remedial or corrective obligations pursuant to Environmental, Health and Safety Requirements, or give rise to any other liabilities pursuant to Environmental, Health and Safety Requirements, including without limitation any relating to on-site or off-site releases or threatened releases of hazardous materials, substances or wastes, personal injury, property damage or natural resources damage.

Section 3.22    Employee Benefit Plans.

(a)    **Schedule 3.22** contains a complete and accurate list of all Employee Benefit Plans. The Company does not have any agreement, commitment or obligation to create, enter into or contribute to any other Employee Benefit Plan, or to modify or amend any existing Employee Benefit Plan. The terms of each Employee Benefit Plan permit the Company to amend and terminate such Employee Benefit Plan at any time and for any reason without penalty and without liability or expense.

(b)    With respect to each Employee Benefit Plan: (i) such Employee Benefit Plan is, and at all times has been, maintained, administered and funded in all respects in accordance with its terms and in compliance with all applicable Laws; (ii) each Employee Benefit Plan which is intended to be qualified within the meaning of Section 401(a) of the Code is so qualified and has received a favorable determination letter, opinion letter, or advisory letter from the Internal Revenue Service upon which it may rely as to its qualification, and nothing has occurred, whether by action or failure to act, that could reasonably be expected to cause the loss of such qualification; (iii) the Company has not incurred, and there exists no condition or set of circumstances in connection with which the Company or the Buyer could incur, directly or indirectly, any liability or expense (except for routine contributions and benefit payments) under ERISA, the Code or any other applicable Law, or pursuant to any indemnification or similar agreement with respect to such Employee Benefit Plan; (iv) for each Employee Benefit Plan with respect to which a Form 5500 has been filed, no material change has occurred with respect to the matters covered by the most recent Form since the date thereof; (v) no nonexempt "prohibited transaction" (as such term is defined in Section 406 of ERISA and Section 4975 of the Code) has occurred with respect to any Employee Benefit Plan; (vi) no actions, suits or claims (other than routine claims for benefits in the ordinary course) are pending, in progress or to the Company's Knowledge threatened; (vii) no facts or circumstances exist that could give rise to any such actions, suits or claims; and (viii) no administrative investigation, audit or other administrative proceeding by the Department of Labor, the Internal Revenue Service or other Governmental Authority is pending, in progress or, to the Company's Knowledge threatened. All Taxes that are required by law to be withheld from benefits derived under the Employee Benefit Plans have been properly withheld and remitted to the proper depository in a timely manner.

(c)    The Company is not, nor has it ever been, treated as a single employer for purposes of Section 414(b), (c), (m) or (o) of the Code in combination with any other Person. The Company does not sponsor, maintain or contribute to, and has never sponsored, maintained or contributed to (or been obligated to sponsor, maintain or contribute to), and no Employee Benefit Plan is, (i) a "multiemployer plan," as defined in Section 3(37) or Section 4001(a)(3) of ERISA, (ii) a multiple employer plan within the meaning of Section 4063 or Section 4064 of ERISA or Section 413 of the Code, (iii) an employee benefit plan that is subject to Section 302 of ERISA, Title IV of ERISA or Section 412 of the Code, or (iv) a "multiple employer welfare arrangement," as defined in Section 3(40) of ERISA.

(d)    Neither the Company nor any Employee Benefit Plan provides or has any obligation to provide (or contribute toward the cost of) post-employment or post-termination benefits of any kind, including death and medical benefits, with respect to any current or former officer, employee, agent, director or independent contractor of the Company, other than continuation coverage mandated by Sections 601 through 608 of ERISA and Section 4980B(f) of the Code.

(e)    Neither the execution and delivery of this Agreement or any of the Other Documents nor the consummation of the transactions contemplated hereby or thereby (either alone or upon the occurrence of any additional or subsequent event(s)) will (i) entitle any individual to severance pay, unemployment compensation or any other compensation or benefit, (ii) result in any benefit or right becoming established or increased, or accelerate the time of payment or vesting of any benefit, under any Employee Benefit Plan, (iii) require the Company, the Buyer or any of their respective Affiliates to transfer or set aside any assets to fund or otherwise provide for any benefits for any individual, (iv) limit

or restrict the right of the Company to merge, amend or terminate any Employee Benefit Plan, (v) cause the Company to record additional compensation expense on its income statement with respect to any outstanding stock option or other equity-based award, or (vi) result in payments under any Employee Benefit Plan which would not be deductible under Section 280G of the Code.

(f)     Each Employee Benefit Plan that is a "nonqualified deferred compensation plan" within the meaning of Section 409A of the Code, is, and at all times has been, maintained, administered, operated and funded in all respects in accordance with the applicable requirements of Section 409A of the Code.

(g)     The Company does not sponsor, maintain or contribute to, and has never sponsored, maintained or contributed to (or been obligated to sponsor, maintain or contribute to), any Employee Benefit Plan subject to the laws of any jurisdiction outside of the United States.

(h)     With respect to each Employee Benefit Plan, the Company has made available to the Initial Purchasers and the Buyer a current, accurate and complete copy (or, to the extent no such copy exists, an accurate description) thereof and, to the extent applicable: (i) any Contract relating to any Employee Benefit Plan, including all trust agreements, insurance or annuity contracts, investment management agreements, record keeping agreements and other documents or instruments related thereto; (ii) the most recent determination letter, if applicable; (iii) any summary plan description and other written communications (or a description of any oral communications) by the Company to the Company's employees concerning the extent of the benefits provided under an Employee Benefit Plan; (iv) for the three (3) most recent years (A) the Form 5500 and attached schedules, (B) reviewed financial statements, (C) actuarial valuation reports and (D) any non-discrimination testing results; and (vi) all material written correspondence relating to any audit, investigation or correction associated with any Employee Benefit Plan.

(i)     All contributions, reimbursements, premiums and other payments (including all employer contributions and employee salary reduction contributions) required to have been made under or with respect to each Employee Benefit Plan as of or prior to the date hereof have been made on or before their due dates in accordance with applicable Law and the terms of such Employee Benefit Plan, and all such contributions, reimbursements, premiums and other payments that are not required to have been so made as of or prior to the date hereof, but that will be required to be made have been properly accrued and reflected on the Company's financial statements.

Section 3.23     Labor Matters.

(a)     No charge or complaint of employment discrimination, notice to the State of California Labor & Workforce Development Agency or the Company issued pursuant to Labor Code Section 2699.3, or other similar charge or complaint has been made against the Company during the last five (5) years, or is pending or, to the Knowledge of the Company, Threatened, nor does the Company know of any basis for any such allegation, charge or complaint.

(b)     Except as set forth in **Schedule 3.23(b)**, the Company is not a party to or bound by any collective bargaining agreement. To the Company's Knowledge, no organizational effort is presently being made or Threatened by or on behalf of any labor union with respect to Representatives of the Company. The Company is not engaged in any unfair labor practice and there is (i) no unfair labor practice charge or complaint pending against the Company or, to the Knowledge of the Company Threatened against the Company before the National Labor Relations Board, and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement is so pending against the Company, or to the Knowledge of the Company so Threatened, (ii) no strike, labor dispute, slow down or work stoppage pending against the Company or, to the Knowledge of the Company, is

Threatened against the Company, and (iii) no union representation question, petition or proceeding exists with respect to the employees of the Company.

(c) The Company has complied in all material respects with all applicable Laws relating to labor, labor relations or employment, including, without limitation, any provisions thereof relating to equal employment opportunity, wages, hours, overtime regulation, employee safety, immigration control, drug testing, termination pay, vacation pay, fringe benefits, collective bargaining and the payment and/or accrual of the same and all taxes, insurance and all other costs and expenses applicable thereto, and the Company is not liable for any arrearage, or any taxes, costs or penalties for failure to comply with any of the foregoing. Without limiting the generality of the foregoing, the Company has not incurred a violation of COBRA or other applicable state insurance continuation law. No material COBRA or other state insurance continuation law violation exists or will exist with respect to any employees of the Company prior to and including the Initial Closing Date or Option Closing Date, as applicable, nor will any such violation occur as a result of the transactions contemplated hereby. As of the Closings, the Company will not have incurred any Liabilities under the Worker Adjustment and Retraining Notification Act or any similar state law (collectively referred to as "**WARN**").

Section 3.24    Employees.

(a) Except as set forth on **Schedule 3.24(a)**, the Company does not have any unsatisfied Liability to any previously terminated Representative. The Company has disclosed all written employee handbooks, policies, programs and arrangements to the Initial Purchasers and the Buyer. No Representative has received any bonus or increase in compensation since the date of the Latest Balance Sheet, nor since such date has there been any promise orally or in writing to any such employee of any bonus or increase in compensation. With the exception of compensation for work in a current pay period, the Company has paid all employees and all contractors and vendors for all sums owed to them.

(b) No Representative or group of Representatives has informed the Company, either orally or in writing, of any plans to terminate their employment or relationship with the Company generally or as a result of the transactions contemplated hereby or otherwise.

(c) All Representatives of the Company are "employees at will" or otherwise employed such that the Company may lawfully terminate their employment at any time, with or without cause, without creating any material cause of action against the Company or otherwise giving rise to any material Liability of the Company for wrongful discharge, Breach of contract or tort or any other similar cause at law or in equity. A true and correct copy of any form of non-competition, non-solicitation, proprietary rights or confidentiality agreement currently in force with any of the Representatives of the Company, and any material variances therefrom, has been delivered to the Initial Purchasers and the Buyer.

(d) All individuals providing services to the Company who are classified as exempt or as non-employee independent contractors have been correctly classified under applicable federal and state law. Each Person whom the Company has retained as an independent contractor qualifies or qualified as an independent contractor and not as an employee of the Company under all applicable Laws. Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby shall cause the Company to be in Breach of any Contract with any Representative or cause the Company to be liable to pay any severance or other amount to any Representative of the Company. The Company has not made any commitment to any of its Representatives in respect of any possible employment or increases in compensation by the Buyer following the Initial Closing or Option Closing.

Section 3.25    Affiliate Transactions. Except as set forth on **Schedule 3.25**, other than as contemplated by this Agreement or as explicitly discussed in the notes to the Audited Financial

Statements, neither the Company nor any of its Affiliates or Representatives has any direct or indirect interest (other than an equity interest of less than one percent (1%) of a publicly held company) in any competitor, supplier or customer of the Company, or in any Person from whom or to whom the Company has leased any Assets, or in any other Person with whom the Company has any business relationship. **Schedule 3.25** sets forth all Contracts between the Company and any Affiliates and/or Representatives of the Company or the Sellers (other than employment Contracts entered into in the ordinary course of business). **Schedule 3.25** sets forth the parties to and the date, nature and amount of each transaction involving the transfer of any cash, property or rights to or from the Company from, to or for the benefit of the Sellers or any Affiliate and/or Representative of the Sellers during the past three (3) years, and any existing commitments of the Company to engage in the future in any such transactions with Affiliates and/or Representatives. Except as set forth on **Schedule 3.25**, neither the Sellers nor any of its Affiliates and/or Representatives has provided or currently provides credit enhancements, guaranties, assets or rights to use assets as collateral or any other assistance to facilitate or support transactions or the Business of the Company. Except as set forth on **Schedule 3.25**, each Contract between the Company, on the one hand, and any Affiliate and/or Representative of the Company, on the other hand, is on commercially reasonable terms no more favorable to such Affiliate and/or Representative than what any third-party negotiating on an arms-length basis would expect.

Section 3.26   <u>Brokers</u>. No broker, finder or agent is entitled to any brokerage fees, finder's fees or commissions in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Company.

Section 3.27   <u>Banks</u>. **Schedule 3.27** contains a complete and correct list of the names and locations of all banks or other financial institutions in which the Company has accounts or safe deposit boxes, and the names of all Persons authorized to draw thereon or to have access thereto. **Schedule 3.27** sets forth the following information with respect to each such financial institution: (a) the name of the financial institution, (b) the location of the financial institution, (c) the identity of all accounts or safe deposit boxes, by number, at such financial institution, and (d) a list of all authorized signatories on such accounts or safe deposit boxes.

Section 3.28   <u>Customers and Suppliers</u>. Since the date of the Latest Balance Sheet, to the Company's Knowledge or the Sellers' Knowledge, no customer or supplier has terminated its relationship with the Company or materially reduced or changed in any significant manner the pricing, volume, timing or other terms of its business with the Company, and, to the Company's Knowledge or the Sellers' Knowledge, no customer or supplier has notified the Company that it intends to terminate or materially reduce or change in any significant manner the pricing, volume, timing or other terms of its business with the Company.

Section 3.29   <u>Full Disclosure</u>. The representations and warranties contained in this **Article III** are complete and correct as of the date hereof, and, subject to **Section 6.3**, will be complete and correct as of the Initial Closing Date and the Option Closing Date, as applicable. This Agreement and the Other Documents and their respective Schedules and Exhibits delivered by or on behalf of the Company and the Sellers hereunder and thereunder are complete and correct in all material respects. No representation or warranty of the Company or the Sellers contained in this Agreement or in the Other Documents, and no written statement made by or on behalf of the Company or the Sellers to the Initial Purchasers or the Buyer or any of their Affiliates pursuant to this Agreement or any of the Other Documents contains an untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading. To the Company's Knowledge, there is no fact or circumstance which the Company or the Sellers have not disclosed to the Initial Purchasers or the Buyer in writing which reasonably could be expected to have, give rise to or form the Basis for a Material Adverse Effect.

# ARTICLE IV
## REPRESENTATIONS AND WARRANTIES
## OF THE SELLERS

The Sellers hereby represent and warrant to the Initial Purchasers and the Buyer, jointly and severally, as follows:

Section 4.1    Authorization; Enforceability.  The Sellers have the requisite power and authority to execute and deliver this Agreement and the Other Agreements to which the Sellers are parties, to perform their obligations under this Agreement and the Other Agreements to which the Sellers are parties, and to consummate the transactions contemplated by this Agreement and the Other Agreements to which the Sellers are parties.  This Agreement has been duly executed and delivered by the Sellers, and the Other Agreements to which the Sellers are parties will be duly executed and delivered by the Sellers at the Closings, and, assuming the due authorization, execution and delivery by the other parties hereto and thereto, will constitute, upon such execution and delivery in each case thereof, legal, valid and binding obligations of the Sellers enforceable in accordance with their respective terms and conditions, except as such enforceability may be limited by the General Enforceability Exceptions.

Section 4.2    Title to Shares.  The Sellers are the holders of record and beneficial owner of the Shares and such Shares will, as of the Closings, be free and clear of any and all restrictions on transfer, Taxes or Liens (other than restrictions under the Securities Act or applicable state securities Law).  The Sellers have the sole voting power and the sole power of disposition and sole power to agree to all matters set forth in this Agreement with respect to the Shares, with no limitations, qualifications or restrictions on such rights and powers, and the Sellers will not grant such rights and powers to any other Person prior to the Closings.  There are no pending Legal Proceedings against any of the Sellers affecting its Shares or the right of any of the Sellers to execute, deliver and perform its obligations under this Agreement or the Other Agreements to which any of the Sellers is a party.  Upon delivery of the certificates representing the Firm Shares or Option Shares held by the Sellers as of the Initial Closing Date or Option Closing Date, as applicable, duly endorsed in blank or accompanied by a duly executed stock power with respect to the Firm Shares or Option Shares, as applicable, good and marketable title to the Firm Shares or Option Shares held by the Sellers will be sold, assigned, conveyed, transferred and delivered to the Buyer, free and clear of any and all restrictions on transfer, Taxes or Liens (other than restrictions under the Securities Act or applicable state securities Law, or Liens that may be imposed by the Initial Purchasers or the Buyer or in connection with the Buyer's financing arrangements).

Section 4.3    No Consents.  No Consent of, permit or exemption from, or declaration, filing or registration with, any Person or Governmental Authority is required to be made or obtained by the Sellers in connection with the execution, delivery and performance of this Agreement by the Sellers.

Section 4.4    Litigation.  There are no Legal Proceedings pending, or to the Sellers' Knowledge, Threatened, against the Sellers, nor are any of the Sellers subject to any judgment, order or decree of any court, judicial authority or Governmental Authority that would seek to prevent any of the transactions contemplated by this Agreement and the Other Agreements.

Section 4.5    No Violation.  Neither the execution and delivery of this Agreement or the Other Agreements to which each of the Sellers is a party, nor the performance by any of the Sellers of the transactions contemplated hereby or thereby, will (a) constitute a default under the Organizational Documents of any of the Sellers, (b) to the Sellers' Knowledge, result in a default, give rise to any right of termination, cancellation or acceleration, or require any Consent under any of the terms, conditions or provisions of any material mortgage, loan, license, agreement, lease or other instrument or obligation to which any of the Sellers is a party, or (c) to the Sellers' Knowledge, conflict with or violate any material Laws applicable to any of the Sellers or by which any of their Assets are bound.

Section 4.6    Brokers.  No broker, finder or agent is entitled to any brokerage fees, finder's fees or commissions in connection with the transactions contemplated by this Agreement and the Other Agreements based upon arrangements made by or on behalf of the Initial Purchasers or the Buyer.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE INITIAL PURCHASERS AND THE BUYER

The Initial Purchasers and the Buyer hereby represents and warrants to the Sellers as follows:

Section 5.1    Organization and Qualification.  The Buyer is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware.

Section 5.2    Authorization; Enforceability.  Each of the Initial Purchasers and the Buyer has the requisite power and authority to execute and deliver this Agreement and the Other Agreements to which it is a party, to perform its obligations under this Agreement and the Other Agreements to which it is a party, and to consummate the transactions contemplated by this Agreement and the Other Agreements to which it is a party.  This Agreement has been duly and validly executed and delivered by the Initial Purchasers and the Buyer, the Other Agreements to which the Initial Purchasers or the Buyer are a party will be duly executed and delivered by the Initial Purchasers or the Buyer at the Closings, and, assuming the due authorization, execution and delivery by the other parties hereto and thereto, will constitute, upon such execution and delivery in each case thereof, legal, valid and binding obligations of the Initial Purchasers and the Buyer, enforceable in accordance with their terms and conditions, except as such enforceability may be limited by the General Enforceability Exceptions.

Section 5.3    No Consents.  No material Consent of, permit or exemption from, or declaration, filing or registration with, any Person or Governmental Authority is required to be made or obtained by the Initial Purchasers or the Buyer in connection with the execution, delivery and performance of this Agreement by the Initial Purchasers or the Buyer,  and the consummation of the transactions contemplated hereby and thereby, which, if not made or obtained, (A) would result in a material violation of any Law, License or Permit, (B) would result in any material Liability to the Company, or (C) would prohibit the consummation of the transactions contemplated hereby and thereby.

Section 5.4    Litigation.  There are no Legal Proceedings pending, or to the Initial Purchasers' or the Buyer's knowledge, Threatened, against the Initial Purchasers or the Buyer, nor are the Initial Purchasers or the Buyer subject to any judgment, order or decree of any court, judicial authority or Governmental Authority that would seek to prevent, delay or burden any of the transactions contemplated by this Agreement.

Section 5.5    No Violation.  Neither the execution and delivery of this Agreement or the Other Agreements to which the Initial Purchasers or the Buyer are a party, nor the performance by it of the transactions contemplated hereby or thereby will (a) constitute a default under the Organizational Documents of the Buyer, (b) to the Initial Purchasers' or the Buyer's knowledge, result in a default, give rise to any right of termination, cancellation or acceleration, or require any Consent under any of the terms, conditions or provisions of any material mortgage, loan, license, agreement, lease or other instrument or obligation to which the Initial Purchasers or the Buyer are a party, or (c) to the Initial Purchaser's or the Buyer's knowledge, conflict with or violate any Laws applicable to the Initial Purchasers or the Buyer or by which any of its Assets is bound.

Section 5.6    Eligible as S Corporation Shareholders.  Each of the Initial Purchasers is a citizen or resident of the United States and eligible to be a shareholder of an S corporation.

Section 5.7    Brokers.  No broker, finder or agent is entitled to any brokerage fees, finder's fees or commissions in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Initial Purchasers or the Buyer.

## ARTICLE VI
## COVENANTS OF THE COMPANY AND THE SELLERS

Section 6.1    Conduct of Business.  Except as expressly contemplated by this Agreement, as set forth on **Schedule 6.1** or as otherwise consented to in writing by the Initial Purchasers from the date hereof through the Termination Date, the Company shall, and the Sellers shall cause the Company to, conduct the Business in the ordinary course of business, in substantially the same manner as heretofore conducted.  Subject to the terms and conditions of this Agreement, the Company shall use reasonable efforts to keep available the services of its present employees and Representatives, and preserve the goodwill, reputation and present relationships of the Business with suppliers, customers, licensors and Persons having business relations with it.  The Company shall provide the Buyer and its authorized representatives with access at reasonable times and upon reasonable notice to the Assets, books, records, Contracts and personnel of the Company in order for the Buyer to make such investigation as it shall reasonably desire.  Without limiting the generality of the foregoing, the Company and the Sellers covenant and agree that, without prior written consent of the Initial Purchasers, from the date hereof through the Termination Date, the Company shall not, and the Sellers shall cause the Company to not:

(a)    (i) increase in any manner the wages, salary, bonus, profit-sharing or other compensation payable to, or enter into any new bonus or incentive agreement or arrangement with, any of its Representatives, (ii) enter into any new employment, severance, consulting, or other compensation agreement with, or make any other material change in the position or job responsibilities of any of its Representatives, (iii) amend or enter into a new Employee Plan (except as required by Law), or any employment policy relating to vacation pay, sick pay, disability, severance pay or otherwise relating to any Representative, (iv) make or agree to make any bonus or profit-sharing payments to any Representative other than pursuant to requirements of pre-existing Contracts, (v) hire any new Representatives (other than to fill a vacancy or replace a terminated Representative), or (vi) fail to make contributions to any Employee Plan in the ordinary course of business;

(b)    make any change to its authorized or issued Equity Interests, or issue, deliver or sell, or authorize or propose the issuance, delivery, sale or grant of (i) any of its Equity Interests, (ii) any securities convertible into its Equity Interests, or (iii) any rights, warrants, calls, subscriptions or options to acquire its Equity Interests or synthetic equity, or purchase, redeem, retire or make any other acquisition of any Equity Interests or other securities;

(c)    amend any of its Organizational Documents;

(d)    merge or consolidate with, or purchase substantially all of the Assets of, or otherwise acquire any business of any Person; or sell, lease, transfer, license, encumber or otherwise dispose of, or agree to sell, lease, license, encumber or otherwise dispose of, any of its material Assets other than in the ordinary course of business, all of which Assets shall be maintained in their current condition, ordinary wear and tear excluded, with insurance in such amounts and of such kinds comparable to that in effect on the date of this Agreement;

(e)    make any capital expenditures other than pursuant to commitments in effect as of the date hereof or in the ordinary course of business;

23

(f)     alter its cash management customs and practices (including, without limitation, the timing of collection of receivables and payment of payables and other current liabilities), which receivables and payables shall continue to be collected and paid utilizing normal procedures and without discounting amounts collected or accelerating amounts paid;

(g)     alter the maintenance of its books and records other than in the ordinary course of business;

(h)     except in the ordinary course of business, incur, assume or guarantee any Indebtedness or guarantee any Indebtedness, or issue or sell any debt securities or warrants or rights to acquire any debt securities, or guarantee any debt securities of others, or create any new Lien on any of its Assets;

(i)     declare, set aside, or pay any dividends or otherwise make any distribution or payment on or in respect of its Equity Interests, other than (A) dividends of up to $375,000 per quarter for the third and fourth quarters of fiscal year 2015, on September 1 and December 1, 2015 and, if the Option Closing has not occurred by such date, for the first quarter of fiscal 2016, on March 1, 2016, and (B) the Special Dividend, in each case so long as such dividends do not constitute an event of default under the Company Credit Agreement;

(j)     enter into, amend, modify, terminate or grant any waiver under any Material Contract, or enter into, amend, modify, terminate or grant any waiver under any Material License or Permit, all of which Material Contracts and Material Licenses and Permits shall be complied with in all material respects;

(k)     amend, modify, extend, renew or terminate any of its Leases, nor enter into any new lease, sublease, license or other agreement for the use or occupancy of any Real Property;

(l)     take any action or omit to take any action that would cause the representations and warranties contained in **Article III** to be untrue or incorrect in any material respect;

(m)     enter into any Contract with any Seller or any Affiliate or Representative thereof;

(n)     make or change any Tax election, change any annual accounting period, change or adopt any accounting method for Taxes, file any amended Tax Return, enter into any closing agreement with respect to Taxes, settle any Tax claim or assessment, surrender any right to claim a refund for Taxes, consent to any extension or waiver of the limitation period applicable to any Tax claim or assessment, or take any similar action related to the filing of any Tax Return or the payment of any Tax, if such action would have the effect of increasing the Tax Liability of the Company for any taxable period ending on or after the Closing Date, or decreasing any Tax attribute of the Company otherwise existing on the Closing Date;

(o)     fail to comply in all material respects with any applicable Law;

(p)     engage in any other transaction which could reasonably be expected to have a Material Adverse Effect on the Business, operations, Assets, financial condition or prospects of the Company; or

(q)     agree or commit to do any of the foregoing.

Nothing contained in this Agreement shall be deemed to give the Buyer, directly or indirectly, the right to control or direct the Company's Business or operations prior to the Option Closing. Prior to the Option

Closing, the Company shall exercise, consistent with the terms and conditions of this Agreement, complete control over its Business and operations.

Section 6.2 <u>Further Assurances</u>. The Company and the Sellers shall use reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable in compliance with applicable Laws to consummate and make effective, as soon as reasonably practicable, the transactions contemplated hereby. Without limiting the generality of the foregoing, prior to the Termination Date, the Company shall give all material notices, make all material required filings with, or applications to, Governmental Authorities and use reasonable efforts to obtain all material Third Party Consents and Governmental Consents necessary for the Parties to consummate the transactions contemplated hereby. The Company will promptly take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable to promptly provide any Governmental Authority with any and all information reasonably requested in connection therewith. In addition, the Company agrees to use reasonable efforts to cause the conditions set forth in **Section 8.1** and **Section 8.2** to be satisfied and to consummate the transactions contemplated hereby.

Section 6.3 <u>Subsequent Events; Schedules Updates</u>. The Company, or the Sellers, as the case may be, shall promptly and accurately advise the Initial Purchasers and the Buyer in writing of the occurrence of any event or the existence of any fact which makes untrue in any material respect, or will make untrue in any material respect as of the Initial Closing or Option Closing, as applicable, or otherwise would constitute a Breach of, any representation or warranty of the Company or any Seller set forth in this Agreement or in any of the Other Agreements. Prior to the Option Closing, the Company and the Sellers shall supplement or amend the Schedules to this Agreement to the extent that the Company and/or the Sellers becomes aware of any matter heretofore existing or hereafter arising which, if existing, occurring or known as of the date of this Agreement, would have been required to be set forth or described in such Schedules or that is otherwise necessary to correct any information in such Schedules that has been rendered inaccurate thereby (collectively, the "**Schedules Updates**"). Each Schedules Update may describe facts, circumstances, events or conditions that: (a) did not exist on or have changed since the date hereof ("**New Information**"); or (b) existed on the date hereof ("**Correcting Information**"). For purposes of determining the accuracy of the representations and warranties of the Company and the Sellers contained in **Articles III** and **IV** and for purposes of determining satisfaction of the conditions set forth in **Section 8.2(b)(i)**: (i) the accuracy of the representation or warranty made on the date hereof or those representations and warranties that address matters only as of a particular date (other than the Initial Closing Date or Option Closing Date, as applicable) shall be assessed without reference to any Schedules Updates, and (ii) the accuracy of the representation or warranty made on or as of the Option Closing Date shall be assessed with reference to all New Information set forth in any Schedules Update (but not with respect to any Correcting Information set forth in any Schedules Update).

Section 6.4 <u>Regulatory Filings</u>. The Company shall use reasonable efforts to furnish to the Initial Purchasers and the Buyer all information required for any application or other filing to be made pursuant to any applicable Law in connection with the transactions contemplated by this Agreement.

Section 6.5 <u>Reasonable Access</u>. From and after the date hereof until the Termination Date and subject to applicable Law, Sellers shall cause the Company to give the Initial Purchasers, the Buyer and their Representatives, upon reasonable notice to Sellers, full and complete access, during normal business hours, to the Assets, books, records, Contracts and personnel of the Company and shall cause the Company to permit the Initial Purchasers and the Buyer to make such inspections as it may reasonably require and to furnish the Initial Purchasers and the Buyer during such period with all such information relating to the Company as the Initial Purchasers or the Buyer may from time to time reasonably request.

Section 6.6 <u>Company Press Releases and Public Disclosure</u>. Neither the Company nor the Sellers shall, without the prior written consent of the Initial Purchasers, or except as required by Law, issue any press release or otherwise make any public statement or other public disclosure regarding this Agreement, the Other Agreements or any of the transactions contemplated hereby or thereby. If the Company or any Seller is required by Law to issue such press release or otherwise make such public statement or disclosure, the Parties will consult with each other regarding the content thereof and cooperate in the making of such press release, public statement or other public disclosure.

Section 6.7 <u>Exclusivity; Proposed Acquisition Transactions</u>.

(a) <u>Exclusivity</u>. During the period from the date of this Agreement through (i) the expiration of the Call Option Period (if the Call Option is not exercised), or (ii) the Option Closing (if the Call Option or the Put Option is exercised), neither the Sellers nor the Company, nor any of their Representatives (including without limitation their attorneys and accountants), shall take or permit any other Person on its behalf to take, directly or indirectly, any action to encourage, initiate or engage in discussions or negotiations with, or provide any information to, any Person (other than the Initial Purchaser, the Buyer and their Representatives) concerning any purchase of the Option Shares, any merger, acquisition, consolidation, recapitalization, liquidation, or dissolution involving the Sellers or the Company, any sale of all or substantially all of the assets of the Company or any similar transaction involving the Company (each such transaction being referred to herein as a "**Proposed Acquisition Transaction**"). The Sellers shall, and shall cause the Company and its Representatives to, terminate any and all negotiations or discussions with any third party regarding any proposal concerning any Proposed Acquisition Transaction. Each of the Company and the Sellers hereby represents that it is not now engaged in discussions or negotiations with any Person other than the Initial Purchasers, the Buyer and their Affiliates with respect to any Proposed Acquisition Transaction. Each of the Company and the Sellers agree not to release any third party from, or waive any provision of, any confidentiality or stand-still agreement to which they (or any of them) are party.

(b) <u>Notification of Proposed Acquisition Transactions</u>. Before responding to any offer of a Proposed Acquisition Transaction, the Company and the Sellers shall (i) immediately notify the Initial Purchasers and the Buyer (orally and in writing) if any offer is made, any discussions or negotiations are sought to be initiated, any inquiry, proposal or contact is made, or any information is requested, with respect to any Proposed Acquisition Transaction, (ii) promptly notify the Initial Purchasers and the Buyer of the terms of any proposal that it may receive in respect of any such Proposed Acquisition Transaction, including, without limitation, the identity of the prospective purchaser or soliciting party, (iii) promptly provide the Initial Purchasers and the Buyer with a copy of any such offer, if written, or a written summary in reasonable detail of such offer, if not in writing, and (iv) keep the Initial Purchasers and the Buyer informed of the status of such offer and the offeror's efforts and activities with respect thereto.

(c) <u>Company's and the Sellers' Liability; Equitable Relief</u>. The Company and the Sellers hereby acknowledge and agree that they shall be liable for any actions taken by any Person in violation of this **Section 6.7**. Upon Breach of any provisions of this **Section 6.7**, in addition to any other remedies to which the Initial Purchasers or the Buyer may be entitled at law or in equity, the Initial Purchasers and the Buyer shall be entitled to injunctive relief. For the purposes of this **Section 6.7(c)**, the Parties agree that the Initial Purchasers and the Buyer would suffer irreparable harm, no adequate remedy at law would exist for the Initial Purchasers and the Buyer, and their damages would be difficult to ascertain.

Section 6.8 <u>Notification</u>. The Company shall promptly and accurately advise the Initial Purchasers and the Buyer in writing of the threat or commencement against the Company of any Legal Proceeding known to the Company, by, against or materially affecting the Company, or the

Company's operations, Assets or prospects, or which challenges or may affect the validity of this Agreement or any of the Other Agreements, or any action taken or to be taken by the Company or the Sellers in connection with this Agreement or any of the Other Agreements or the ability of the Company to consummate the transactions contemplated herein and therein.

Section 6.9    Termination of Affiliate Arrangements.  Effective immediately prior to the Initial Closing, the Sellers will cause (a) all Indebtedness, other than Permitted Indebtedness, owed to the Company by any of the Sellers or any Affiliate or Representative of the Company or the Sellers to be paid in full, (b) the Company to be fully and irrevocably released from all guaranties of Indebtedness or other guarantees of liabilities relating to the Sellers or any Affiliate or Representative of the Company, and (c) all intercompany and intracompany accounts or Contracts between the Company, on the one hand, and the Sellers and their Affiliates, on the other hand, to be cancelled, discharged or otherwise settled in the manner that is most Tax efficient for the Company.  Notwithstanding the foregoing, the parties acknowledge and agree that the lease of the Calexico Property, as in effect on the date hereof, shall remain in effect following the Initial Closing.

Section 6.10    Cooperation with the Buyer's Financing.  The Company shall, and the Sellers shall cause the Company to, provide such cooperation as may be reasonably requested by the Initial Purchasers or the Buyer in connection with the financing of the purchase of the Option Shares and the refinancing of the Senior Debt outstanding as of the Option Closing Date, including (i) causing the Company's Representatives to be available, upon reasonable notice, to meet with prospective lenders, (ii) furnishing promptly any financial data of the Company requested by the Initial Purchasers or the Buyer or prospective lenders and providing assistance with the preparation of any financial presentations, pro forma financials or projections required in connection therewith, (iii) providing any financing sources with full and complete access, during normal business hours, to the Assets, books, records, Contracts and personnel of the Company, and (iv) executing and delivering any customary certificates, pledge or security documents or other customary definitive financing documents and related documents and certificates as may be required in connection with such financing; provided, that the actions contemplated in the foregoing clause (iv) shall not require the Company to enter into any financing commitment which is binding prior to the occurrence of the Option Closing.

## ARTICLE VII
## COVENANTS OF THE INITIAL PURCHASERS AND THE BUYER

Section 7.1    Further Assurances.  The Initial Purchasers and the Buyer shall use reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable in compliance with applicable Laws to consummate and make effective, as soon as reasonably practicable, the transactions contemplated hereby.  Without limiting the generality of the foregoing, the Initial Purchasers and the Buyer shall cooperate with the Company to give all notices, make all material required filings with or applications to Governmental Authorities and use reasonable efforts to obtain all material Third Party Consents and Governmental Consents necessary for the parties to consummate the transactions contemplated herein.  The Initial Purchasers and the Buyer will use reasonable efforts to promptly take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable to promptly provide any Governmental Authority with any and all information reasonably requested in connection therewith.  In addition, the Initial Purchasers and the Buyer agrees to use reasonable efforts to cooperate with the Company to cause the conditions set forth in **Section 8.1** and **Section 8.3** to be satisfied and to consummate the transactions contemplated herein; provided, however, that in no event shall the Buyer be obligated to oppose, lift or rescind any injunctions or restraining orders or other orders adversely affecting the ability of the parties to consummate the transactions contemplated hereby.

Section 7.2    Regulatory Filings.   The Initial Purchasers and the Buyer shall use reasonable efforts to furnish to the Company and the Sellers all information required for any application or other filing to be made pursuant to any applicable Law in connection with the transactions contemplated by this Agreement.   The Initial Purchasers and the Buyer shall promptly inform the Company of any oral communication with, and provide copies of written communications with, any Governmental Authority regarding any such filings or any such transaction.   Notwithstanding anything to the contrary contained herein, the Buyer shall not be required to accept any divestitures of its business or Assets, or the business or Assets of its Subsidiaries, its Affiliates or the Company, or accept an argument to hold any such assets or businesses separately.

Section 7.3    Buyer Press Releases and Public Disclosure.   Prior to the Option Closing, neither the Initial Purchasers nor the Buyer shall, without the prior written consent of the Company and the Sellers (which will not be unreasonably withheld, delayed or conditioned), or except as required by Law, issue any press release or otherwise make any public statement or other public disclosure regarding this Agreement, the Other Agreements or any of the transactions contemplated hereby or thereby.

Section 7.4    WARN .   If the Option Closing occurs, for a period of twenty-four (24) months following the Option Closing, the Buyer shall not take any action that will cause any Liability to the Sellers under WARN.

## ARTICLE VIII
## CONDITIONS PRECEDENT TO THE CLOSINGS

Section 8.1    Conditions Precedent to Each Party's Obligations.   The respective obligations of each Party to consummate the transactions contemplated hereby will be subject to the satisfaction, as of the Closings, of all of the following conditions, any one or more of which may be waived in writing at the option of the affected Party:

(a)    No Legal Prohibition.   No Law shall exist or be enacted or promulgated by any Governmental Authority which would prohibit the consummation by such Party of the transactions contemplated hereby.

(b)    No Injunction.   Such Party shall not be prohibited, by any order, ruling, consent, decree, judgment or injunction of any court, judicial authority or Governmental Authority from consummating the transactions contemplated hereby.

Section 8.2    Conditions Precedent to Obligations of the Initial Purchasers and the Buyer.

(a)    The obligations of the Initial Purchasers under this Agreement to consummate the purchase of the Firm Shares will be subject to the satisfaction, as of the Initial Closing, of all of the following conditions, any one or more of which may be waived in writing at the option of the Initial Purchasers:

(i)    Accuracy of Representations and Warranties; Performance of Covenants. Except as expressly contemplated by this Agreement, the representations and warranties of the Company and the Sellers contained in this Agreement shall be true and correct in all material respects as of the Initial Closing with the same force and effect as though made on and as of the Initial Closing (other than those representations and warranties that address matters only as of a particular date or only with respect to a specific period of time, which need only be accurate as of such date or with respect to such period, and other than representations and warranties that are

qualified by materiality, Material Adverse Effect or correlative terms, which shall be true and correct in all respects). The Company and the Sellers shall have performed and complied, in all material respects, with all covenants and agreements required by this Agreement to be performed or complied with by them on or prior to the Initial Closing. The Initial Purchasers shall receive at the Initial Closing a certificate, dated as of the Initial Closing Date and executed by the Sellers' Representative and an executive officer of the Company, certifying the fulfillment of the conditions set forth in this **Section 8.2(a)(i)**, with respect to the Company and the Sellers.

(ii)     No Material Adverse Change. No (i) change, effect, event, occurrence, state of facts or development shall have occurred since the date of this Agreement, (ii) damage, destruction or other change shall have occurred to any of the Assets of the Company, or (iii) material adverse Legal Proceeding shall have been instituted against the Company or the Business, in each case, which individually or in the aggregate constitutes a Material Adverse Change.

(iii)     Closing Deliveries. The Initial Purchasers shall have received, or waived delivery of, the items to be delivered at the Initial Closing pursuant to **Section 9.1**.

(b)     The obligations of the Initial Purchasers or the Buyer (as applicable) under this Agreement to consummate the purchase of the Option Shares will be subject to the satisfaction, as of the Option Closing, of all of the following conditions, any one or more of which may be waived in writing at the option of the Initial Purchasers or the Buyer:

(i)     Accuracy of Representations and Warranties; Performance of Covenants. Except as expressly contemplated by this Agreement, the representations and warranties of the Company and the Sellers contained in this Agreement shall be true and correct in all material respects as of the Option Closing with the same force and effect as though made on and as of the Closing (including any New Information set forth in a Schedules Update pursuant to **Section 6.2** but not including any Correcting Information set forth in a Schedules Update pursuant to **Section 6.2**) (other than those representations and warranties that address matters only as of a particular date or only with respect to a specific period of time, which need only be accurate as of such date or with respect to such period, and other than representations and warranties that are qualified by materiality, Material Adverse Effect or correlative terms, which shall be true and correct in all respects). The Company and the Sellers shall have performed and complied, in all material respects, with all covenants and agreements required by this Agreement to be performed or complied with by them on or prior to the Option Closing. The Buyer shall receive at the Option Closing a certificate, dated as of the Option Closing Date and executed by the Sellers' Representative and an executive officer of the Company, certifying the fulfillment of the conditions set forth in this **Section 8.2(b)(i)**, with respect to the Company and the Sellers.

(ii)     No Material Adverse Change. No (i) change, effect, event, occurrence, state of facts or development shall have occurred since the date of this Agreement, (ii) damage, destruction or other change shall have occurred to any of the Assets of the Company, or (iii) material adverse Legal Proceeding shall have been instituted against the Company or the Business, in each case, which individually or in the aggregate constitutes a Material Adverse Change.

(iii)     Closing Deliveries. The Initial Purchasers or the Buyer (as applicable) shall have received, or waived delivery of, the items to be delivered at the Option Closing pursuant to **Section 9.1**.

(iv)     Third Party Consents. The Initial Purchasers or the Buyer (as applicable) shall have received from the Company an executed copy of all Third Party Consents identified on **Schedule 3.7(a)**.

(v)     Governmental Consents. The Initial Purchasers or the Buyer (as applicable) shall have received from the Company an executed copy of all Governmental Consents identified on **Schedule 3.7(b)**.

(vi)     Calexico Property. Simultaneously with the Option Closing, Meuchadim of California, Ltd. ("**Meuchadim**") shall acquire all right, title and interests in the Calexico Property from the Sellers pursuant to the terms and conditions of that certain Calexico Purchase Agreement.

(vii)     Termination of Employee Benefit Plans. The Initial Purchasers or the Buyer (as applicable) shall have received evidence or assurances satisfactory to it that the Employee Benefit Plans shall have been terminated or will be terminated prior to or simultaneously with the Option Closing, and that the Company shall have no remaining or further obligations under any Employee Benefit Plan.

Section 8.3     Conditions Precedent to Obligations of the Sellers. The obligations of the Sellers under this Agreement to consummate the transactions contemplated hereby will be subject to the satisfaction, as of the Closings, of all the following conditions, any one or more of which may be waived in writing at the option of the Sellers:

(a)     Accuracy of Representations and Warranties; Performance of Covenants. Except as expressly contemplated by this Agreement, the representations and warranties of the Initial Purchasers and the Buyer contained in this Agreement shall be true and correct in all material respects as of the Closings with the same force and effect as though made on and as of the Closings (other than representations and warranties that are qualified by materiality, Material Adverse Effect or correlative terms which shall be true and correct in all respects). The Initial Purchasers and the Buyer shall have performed and complied, in all material respects, with all covenants and agreements required by this Agreement to be performed or complied with by the Buyer on or prior to the Closing. The Sellers shall receive at the Closings a certificate, dated as of the Initial Closing Date or Option Closing Date, as applicable, and executed by the Initial Purchasers or an executive officer of the Buyer, as applicable, certifying the fulfillment of the conditions set forth in this **Section 8.3(a)** with respect to the Buyer.

(b)     Closing Deliveries. The Sellers shall have received, or waived delivery of, the items to be delivered pursuant to **Section 9.2.**

## ARTICLE IX
## DELIVERIES AT CLOSINGS

Section 9.1     Deliveries by the Company and the Sellers.

(a)     At the Initial Closing, the Company and the Sellers shall deliver or cause to be delivered to the Initial Purchasers and the Buyer:

(i)     Instruments of Transfer. Certificates representing the Firm Shares, duly endorsed in blank or accompanied by duly executed stock powers;

(ii)     Corporate Documents.  A copy of the Certificate of Incorporation of the Company, as amended, certified by the Secretary of State of the State of California as of a date not more than ten (10) days prior to the Initial Closing Date;

(iii)     Good Standing Certificate.  A certificate of good standing with respect to the Company, issued by the Secretary of State of California as of a date not more than ten (10) days prior to the Initial Closing Date;

(iv)     Board Resolutions.  A copy of the resolutions of the Company's board of directors, certified by the secretary of the Company as having been duly and validly adopted and being in full force and affect, authorizing the execution and delivery of this Agreement and the Other Agreements to which the Company is a party and the performance by the Company of its obligations hereunder and thereunder;

(v)     Company and Sellers Certificate.  A certificate, dated as of the Initial Closing Date and executed by the Sellers' Representative and an executive officer of the Company, certifying the fulfillment of the conditions set forth in **Section 8.2(a)** as of the Initial Closing Date; and

(vi)     Other Documents.  Such other documents and instruments as the Buyer, or its counsel, may reasonably request to consummate the transactions contemplated hereby.

(b)     At the Option Closing, the Company and the Sellers shall deliver or cause to be delivered to the Buyer:

(i)     Instruments of Transfer.  Certificates representing the Option Shares, duly endorsed in blank or accompanied by duly executed stock powers;

(ii)     Corporate Documents.  A copy of the Certificate of Incorporation of the Company, as amended, certified by the Secretary of State of the State of California as of a date not more than ten (10) days prior to the Option Closing Date;

(iii)     Minute Books.  Constructive possession of all of the minute books, stock ledgers and similar corporate records, and corporate seal of the Company (which shall be held at the Company's principal executive office);

(iv)     Good Standing Certificate.  A certificate of good standing with respect to the Company, issued by the Secretary of State of California as of a date not more than ten (10) days prior to the Option Closing Date;

(v)     Company and Sellers Certificate.  A certificate, dated as of the Option Closing Date and executed by the Sellers' Representative and an executive officer of the Company, certifying the fulfillment of the conditions set forth in **Section 8.2(b)** as of the Option Closing Date;

(vi)     Third Party Consents.  Evidence that the Third Party Consents referred to in **Section 8.2(b)(iv)** have been obtained by the Company and/or the Sellers;

(vii)     Governmental Consents.  Evidence that the Governmental Consents referred to in **Section 8.2(b)(v)** have been obtained by the Company and/or the Sellers;

(viii) <u>Resignations</u>.  Resignations effective as of the Option Closing Date of those directors and officers of the Company as the Buyer may request to resign not less than five (5) days before the Option Closing Date;

(ix) <u>338(h)(10) Election</u>.  Executed elections under Code Section 338(h)(10) for the Company on IRS Form 8023 (and any corresponding state or local income tax elections), in accordance with its instructions and the Treasury Regulations issued pursuant to Code Section 338(h)(10); and

(x) <u>FIRPTA Certificate</u>.  A certificate, in such form as is reasonably satisfactory to the Buyer, certifying that each Seller is not a foreign person for purposes of Code Section 1445 or that the purchase is otherwise exempt from withholding under Code Section 1445; and

(xi) <u>Other Documents</u>.  Such other documents and instruments as the Buyer, or its counsel, may reasonably request to consummate the transactions contemplated hereby.

Section 9.2  <u>Deliveries by the Initial Purchasers and the Buyer</u>.  The Initial Purchasers and the Buyer (as applicable) will deliver or cause to be delivered to the Sellers:

(a) At the Initial Closing, the Initial Purchasers will deliver or cause to be delivered to the Sellers:

(i) <u>The Firm Share Price</u>.  Payment of the Firm Share Price as provided in **Section 2.1;**

(ii) <u>Proxy</u>.  A proxy in the form attached hereto as **Exhibit A**.

(iii) <u>Initial Purchasers Certificate</u>.  The certificate required by **Section 8.3(a)**;

(iv) <u>Other Documents</u>.  Such other documents and instruments as the Company or the Sellers, or their respective counsel, shall deem reasonably necessary to consummate the transactions contemplated hereby.

(b) At the Option Closing, the Initial Purchasers or, if the Buyer is acquiring the Option Shares, the Buyer will deliver or cause to be delivered to the Sellers:

(i) <u>The Option Price</u>.  Payment of the Option Price as provided in **Section 2.4;**

(ii) <u>Buyer Certificate</u>.  The certificate required by **Section 8.3(a)**;

(iii) <u>Good Standing Certificate</u>.  A certificate of good standing with respect to the Buyer, issued by the Secretary of State of the State of Delaware, as of a date not more than ten (10) days prior to the Option Closing;

(iv) <u>Board Resolutions</u>.  A copy of the resolutions of the Buyer's board of directors, certified by the secretary of the Buyer as having been duly and validly adopted and being in full force and affect, authorizing the execution and delivery of this Agreement and the Other Agreements to which the Buyer is a party and the performance by the Buyer of its obligations hereunder and thereunder; and

(v)    Other Documents.  Such other documents and instruments as the Company or the Sellers, or their respective counsel, shall deem reasonably necessary to consummate the transactions contemplated hereby.

### ARTICLE X
### POST CLOSING COVENANTS

Section 10.1    Tax Covenants.

(a)    Indemnification.  The Sellers shall indemnify the Buyer Indemnified Parties and the Company and hold them harmless from and against any Losses arising or resulting from (i) all Taxes (or the non-payment thereof) of the Company for all taxable periods ending on or before the Initial Closing Date or, if the Option Closing occurs, the Option Closing Date and the portion through the end of the Initial Closing Date or, if the Option Closing occurs, the Option Closing Date for any Straddle Period, a "**Pre-Closing Tax Period**"), (ii) any and all Taxes of any member of an affiliated, consolidated, combined, or unitary group of which the Company (or any predecessor) is or was a member on or prior to the Initial Closing Date or, if the Option Closing occurs, the Option Closing Date, including pursuant to Treasury Regulation Section 1.1502-6 or any analogous or similar state, local, or foreign law or regulation, (iii) any and all Taxes of any Person (other than the Company) imposed on the Company as a transferee or successor, by contract or pursuant to any law, rule or regulation, which Taxes relate to an event or transaction occurring before the Initial Closing Date or, if the Option Closing occurs, the Option Closing, and (iv) any payroll, social security, unemployment or similar Taxes that become payable by the Buyer, the Company resulting from any payments that are contingent upon or payable as a result of the transactions contemplated under this Agreement.

(b)    Straddle Period.  In the case of any Straddle Period, the amount of any Taxes based on or measured by income or receipts of the Company for the Pre-Closing Tax Period shall be determined based on an interim closing of the books as of the close of business on the Initial Closing Date or, if the Option Closing occurs, the Option Closing Date, and the amount of other Taxes of the Company for a Straddle Period which relate to the Pre-Closing Tax Period shall be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction the numerator of which is the number of days in the taxable period ending on the Closing Date and the denominator of which is the number of days in the Straddle Period.

(c)    Responsibility for Filing Tax Returns for Periods through the Option Closing Date.  If the Option Closing occurs, the Buyer shall prepare or cause to be prepared and file or cause to be filed all Tax Returns for the Company that are filed after the Option Closing Date.  The Buyer shall permit the Sellers' Representative to review and comment on each such Tax Return with respect to a Pre-Closing Tax Period prior to filing and shall make such revisions as are reasonably requested by the Sellers' Representative.

(d)    Cooperation.  The Buyer, the Company, and the Sellers shall cooperate fully, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns pursuant to this **Section 10.1** and any audit, litigation or other proceeding with respect to Taxes.  Such cooperation shall include the retention and (upon the other Party's request) the provision of records and information which are reasonably relevant to any such audit and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.  The Company and the Sellers agree (i) to retain all books and records with respect to Tax matters pertinent to the Company relating to any taxable period beginning before the Initial Closing Date or, if the Option Closing occurs, the Option Closing Date until the expiration of the statute of limitations (and, to the extent notified by the Buyer or the Sellers, any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any taxing authority, and (ii) to

give the other Party reasonable written notice prior to transferring, destroying or discarding any such books and records and, if the other Party so requests, the Company or the Sellers, as the case may be, shall allow the other Party to take possession of such books and records. The Buyer and the Sellers further agree, upon request, to use their best efforts to obtain any certificate or other document from any governmental authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including, but not limited to, with respect to the transactions contemplated hereby).

(e)     <u>Section 338(h)(10) Election</u>. At the Buyer's election, following the Option Closing the Company and each Seller shall join with the Buyer in making an election under Code Section 338(h)(10) (and any corresponding election under state, local, and non-US Tax Law) with respect to the purchase and sale of the Option Shares hereunder (collectively, the "**Section 338(h)(10) Election**"). Each Seller shall include any income, gain, loss, deduction, or other tax item resulting from the Section 338(h)(10) Election on their Tax Returns to the extent required by applicable Law.

(f)     <u>Purchase Price Allocation</u>. If Buyer elects to have a 338(h)(10) Election made for the Company, within 120 days of the Option Closing Date, the Buyer shall provide the Sellers' Representative with an allocation of the Option Price and the liabilities of the Company (plus other relevant items) to the assets of the Company for all purposes (the "**Allocation**"). The Sellers' Representative may, within 30 days after delivery of the Allocation, review and comment on the Allocation and the Buyer shall make such revisions as are reasonably requested by the Sellers' Representative. The Buyer, the Company, and the Sellers shall file all Tax Returns (including amended returns and claims for refund) and information reports in a manner consistent with the Allocation.

(g)     <u>Indemnification of the Sellers for Increased Tax Liability as a Result of Section 338(h)(10) Election</u>. In the event a Section 338(h)(10) Election will be made in connection with the transactions contemplated by this Agreement, the Buyer will reimburse the Sellers for the difference, if any, between (i) the net state and federal income tax liability of the Sellers arising from the sale of the Option Shares as a result of the Section 338(h)(10) Election and (ii) the net state and federal income tax liability that would have arisen from a sale of the Option Shares without such election (the "**Tax Reimbursement Amount**"). Within 30 days following the delivery of the Allocation, the Sellers' Representative shall provide the Buyer with a calculation of any Tax Reimbursement Amount, which shall be certified by Armanino LLP, who shall prepare the income tax returns for the Sellers. The Tax Reimbursement Amount shall be subject to the review, comment and written approval of the Buyer, not to be unreasonably withheld. In the event the Company files Form 8023 to make the Section 338(h)(10) Election, payment of the Tax Reimbursement Amount shall be made not later than five (5) days after such filing . Payment by the Buyer of the Tax Reimbursement Amount to the Sellers shall constitute payment in full of all amounts owed by the Buyer to the Sellers pursuant to this **Section 10.1(g)** and the Buyer shall have no additional liability to the Sellers under this Agreement with respect to the Taxes resulting from the Section 338(h)(10) Election.

(h)     <u>Termination of Tax Arrangements</u>. If the Option Closing occurs, all Tax sharing, Tax allocation and similar agreements and arrangements to which the Company is a party and pursuant to which the Company or the Buyer may have any obligations or responsibilities with respect to Taxes shall be terminated prior to the Option Closing, and the Company shall have no further obligations or responsibilities thereunder following the Option Closing.

(i)     <u>Withholding</u>. Notwithstanding any other provision in this Agreement, the Buyer shall have the right to deduct and withhold any required Taxes from any payments to be made hereunder. To the extent that amounts are so withheld and paid to the appropriate taxing authority, such withheld amounts shall be treated for all purposes of this Agreement as having been delivered and paid to the

applicable Seller or any other recipient of payment in respect of which such deduction and withholding was made.

Section 10.2  Access to Books and Records. From and after the Option Closing, the Buyer shall, and shall cause the Company to, provide the Sellers' Representative and its agents with reasonable access (for the purpose of examining and copying), during normal business hours, to the books and records of the Company with respect to periods or occurrences prior to the Option Closing Date in connection with legitimate business purposes of the Sellers' Representative, expressed to the Company in writing.

Section 10.3  Non-Competition; Non-Solicitation; Confidentiality.

(a)  Non-Disclosure of Confidential Information. None of the Restricted Parties shall, directly or indirectly, disclose or use at any time (and shall cause their respective Affiliates and Representatives not to use or disclose) any Confidential Information (whether or not such information is or was developed by any of the Restricted Parties), except to the extent that such disclosure or use is directly related to and required by the performance of the Restricted Party's duties to the Company or the Buyer or as required by Law or as otherwise provided hereunder. The Restricted Parties each further agrees to take commercially reasonable steps, to the extent within its control, to safeguard such Confidential Information and to protect it against disclosure, misuse, espionage, loss and theft. In the event any of the Restricted Parties is required by Law to disclose any Confidential Information, such Restricted Party shall promptly notify the Buyer in writing, which notification shall include the nature of the legal requirement and the extent of the required disclosure, and shall cooperate with the Buyer's reasonable requests to preserve the confidentiality of such Confidential Information consistent with applicable Law. For purposes of this Agreement, "**Confidential Information**" means all information of a confidential or proprietary nature (whether or not specifically labeled or identified as "confidential"), in any form or medium, that relates to the Business, the Company, or its suppliers, distributors, customers, independent contractors or other business relations. Confidential Information includes the following as they relate to the Company or the Business and, in each case, to the extent the Company or the Business obtains a commercial benefit from the secret nature of such information: internal business information (including information relating to strategic and staffing plans and practices, business, training, marketing, promotional and sales plans and practices, cost, rate and pricing structures, accounting and business methods and potential acquisition candidates); identities of, individual requirements of, and specific contractual arrangements with, the Company's suppliers, distributors, customers, independent contractors or other business relations and their confidential information; trade secrets, know-how, compilations of data and analyses, techniques, systems, formulae, research, records, reports, manuals, documentation, models, data and data bases relating thereto; and inventions, innovations, improvements, developments, methods, designs, analyses, drawings, and reports. Notwithstanding the foregoing, Confidential Information does not include such information which: (A) at the time of disclosure is publicly available or thereafter becomes publicly available through no act or omission of a Restricted Party; (B) is thereafter disclosed or furnished to the Restricted Party by a third party who is not known by such Restricted Party to have acquired the information under an obligation of confidentiality; (C) is independently developed by the Restricted Party without the use of or reference to Confidential Information after the Option Closing Date; or (D) is disclosed by the Restricted Party (subject to compliance with the applicable provisions of this subsection (a)) under compulsion of applicable Law.

(b)  Non-Competition.

(i)  Each Restricted Party is familiar with the trade secrets related to the Company and the Business, and with other Confidential Information concerning the Company and the Business, including all (A) inventions, technology and research and development related to the Business, (B) customers and clients and customer and client lists related to the Business,

(C) products (including products under development) and services related to the Business and related costs and pricing structures and manufacturing techniques, (D) accounting and business methods and practices related to the Business, and (E) similar and related confidential information and trade secrets related to the Business. Each Restricted Party acknowledges and agrees that the Company would be irreparably damaged if any of the Restricted Parties were to directly or indirectly provide services to any Person competing with the Business or engaging in a similar business and that such direct or indirect competition by any Restricted Party would result in a significant loss of goodwill by the Company.

(ii)    In further consideration for the Buyer's payment of the Option Price under this Agreement (in respect of which payment each of the Restricted Parties expressly acknowledges that it derives a substantial and direct benefit), and in order to protect the value of the Company and the Business acquired by the Buyer hereunder (including the goodwill inherent in the Company and the Business as of the date hereof), each Restricted Party hereby agrees that during the period commencing on the Option Closing Date and ending on the third (3rd) anniversary of the Option Closing Date (the "**Non-Competition Period**"), such Restricted Party shall not acquire or hold any economic or financial interest in, act as a partner, member, shareholder, or Representative of, render any services to, or otherwise operate or hold an interest in any Person (other than the Sellers) having any location in any country in which the Business currently operates which entity, enterprise or other Person primarily engages in, or engages in the management or operation of any Person that primarily engages in any business that competes with the Business; provided, however, that nothing contained herein shall be construed to prohibit any Restricted Party from purchasing up to an aggregate of two percent (2%) of any class of the outstanding voting securities of any other Person whose securities are listed on a national securities exchange (but only if such investment is held on a purely passive basis).

(c)    Non-Solicitation; Non-Disparagement.  During the period commencing on the Option Closing Date and ending on the third (3rd) anniversary of the Option Closing Date (the "**Non-Solicitation Period**"), none of the Restricted Parties shall, directly or indirectly, either individually or acting in concert with another Person or Persons:

(i)    request, induce or attempt to influence any distributor, supplier or customer of goods or services of the Business to curtail, cancel or refrain from maintaining or increasing the amount or type of business such distributor, supplier or customer of goods or services is currently transacting, or may be transacting during the Non-Solicitation Period, with the Business or modify its pricing or other terms of sale with the Business;

(ii)    solicit for employment or retention or hire, employ or retain any Person who is an employee of the Business during the Non-Solicitation Period (provided that following the first (1st) anniversary of the Option Closing Date, any Restricted Party and their respective Affiliates shall be entitled to hire, employ or retain any such Person so long as such Restricted Party did not directly or indirectly solicit such Person, other than through general advertisements not intended to be specifically directed at such Person (for the avoidance of doubt, the Restricted Parties shall not be deemed to have violated this provision by hiring, employing or retaining any Person who contacts a Restricted Party on an unsolicited basis following the first (1st) anniversary of the Option Closing Date);

(iii)    influence or attempt to influence any Person who is an employee of the Business during the Non-Solicitation Period to terminate his or her employment with the Company or the Business (for purpose of clarity, if any Restricted Party exercises its right to hire in accordance with the terms of the proviso set forth in subsection (ii) above, such action shall not be deemed to be a violation of this subsection (iii)); or

(iv)    make any negative, derogatory or disparaging statements or communications regarding the Initial Purchasers, the Buyer, the Business, the Company, or their respective Affiliates or employees.

(d)    Severability.  Notwithstanding anything to the contrary in this Agreement, if at any time, in any judicial or arbitration proceeding, any of the restrictions stated in this **Section 10.3** are found by a final order of a court of competent jurisdiction or arbitrator to be unreasonable or otherwise unenforceable under circumstances then existing, the Parties each agree that the period, scope or geographical area, as the case may be, shall be reduced to the extent necessary to enable the court to enforce the restrictions to the extent such provisions are allowable under applicable Law, giving effect to the agreement and intent of the Parties that the restrictions contained herein shall be effective to the fullest extent permissible.  In the event of a Breach or violation by any Restricted Party of any of the provisions of this **Section 10.3**, the Non-Competition Period or Non-Solicitation Period, as the case may be, will be tolled for so long as such Restricted Party was in violation of such provision.  Each Restricted Party agrees that the restrictions contained in this Agreement are reasonable in all respects and necessary to protect the Buyer's interest in, and the value of, the Business.

(e)    Specific Performance; Injunctive Relief.  Each Restricted Party acknowledges and agrees that in the event of a Breach by any Restricted Party of any of the provisions of this **Section 10.3**, the Buyer would suffer irreparable harm, no adequate remedy at law would exist for the Buyer, and damages would be difficult to determine.  Consequently, in the event of any such Breach, the Buyer or its successors or assigns may, in addition to other rights and remedies existing in their favor, apply to any court of law or equity of competent jurisdiction for specific performance or injunctive or other relief in order to enforce or prevent any violations of the provisions hereof, in each case without the requirement of posting a bond or proving actual damages.

Section 10.4    Preservation of Records.  Subject to **Section 10.1(d)** hereof (relating to the preservation of Tax records) and **Section 10.6** hereof (relating to the Sellers' access to books and records generally), the Sellers and the Buyer agree that each of them shall (and shall cause the Company to) preserve and keep the records held by them relating to the Business of the Company for a period of three (3) years from the Option Closing Date and shall make such records and personnel available to the other Parties as may be reasonably required by such Party in connection with, among other things, any insurance claims by, legal proceedings against or governmental investigations of the Sellers, the Company, or the Buyer, or any of their Affiliates, or in order to enable the Sellers, the Company or the Buyer to comply with their respective obligations under this Agreement and each Other Agreement.

Section 10.5    Use of Name.  The Sellers hereby acknowledge and agree that upon the consummation of the transactions contemplated hereby, the Buyer and the Company shall have the sole right to the use of the name "Fairn & Swanson" or any service marks, trademarks, trade names, identifying symbols, logos, emblems, signs or insignia related thereto or containing or comprising the foregoing, including any name or mark confusingly similar thereto (collectively, the "**Company Marks**").  The Sellers shall not, and shall cause their respective Affiliates not to, use such name or any variation or simulation thereof or any of the Company Marks.  The Sellers shall, and shall cause their respective Affiliates to, immediately following the Option Closing, cease to hold themselves out as stockholders, Affiliates or Representatives of the Company or any of its Affiliates.

Section 10.6    General.  In case at any time after the Closings any further actions are necessary or desirable to carry out the purposes of this Agreement, each of the Parties shall take such further actions (including the execution and delivery of such further instruments and documents) as any other Party may reasonably request, all at the sole cost and expense of the requesting Party (unless the requesting Party is entitled to indemnification therefor under **Article XI** below).  The Sellers acknowledge and agree that from and after the Option Closing, the Buyer will be entitled to all

documents, books and records (including Tax records), agreements, and financial data of any sort relating to the Company.

Section 10.7    Certain Agreements.  From and after the later of expiration of the Call Option Exercise Period (if the Call Option is not exercised) or the Put Option Exercise Period (if neither the Call Option nor the Put Option are exercised) until the Termination Date, the Parties agree to comply with the provisions of Annex A attached hereto.

## ARTICLE XI
## INDEMNIFICATION

Section 11.1    Survival of the Company's and the Sellers' Representations, Warranties and Covenants; Time Limits on Indemnification Obligations.  All representations and warranties and Pre-Closing Covenants of the Company and the Sellers contained in, or arising out of, this Agreement shall survive for a period of twelve (12) months after the Initial Closing Date or, if the Option Closing occurs, the Option Closing Date; provided, however, that (i) the representations and warranties set forth in **Section 3.13** (Taxes), **Section 3.22** (Employee Benefit Plans) and **Section 3.23** (Labor Matters) (each of the foregoing, a "**Statutory Representations**") shall survive until ninety (90) days following the expiration of the applicable statute of limitations, (ii) the representations and warranties set forth in **Section 3.1** (Organization and Qualification), **Section 3.2** (Authorization; Enforceability), **Section 3.3** (Organizational Documents), **Section 3.4** (Capitalization), **Section 3.5** (Options), **Section 3.20** (Compliance with Applicable Laws; Regulatory Compliance), **Section 3.26** (Brokers), **Section 4.1** (Authorization; Enforceability) and **Section 4.2** (Title to Shares) and **Section 4.6** (Brokers) (each of the foregoing, a "**Fundamental Representation**") shall survive the Closings indefinitely, and (iii) the representations and warranties set forth in **Section 3.21** (Compliance with Environmental, Health and Safety Requirements) (the "**Environmental Representations**") shall survive the Initial Closing Date or, if the Option Closing occurs, the Option Closing Date for a period of twenty-four (24) months; provided, however, that the foregoing survival periods shall not apply in respect of any claims that have been asserted in writing prior to the expiration of the applicable survival period.  All Pre-Closing Covenants and Post-Closing Covenants of the Company and the Sellers will survive the Closings in accordance with their terms.  If the Initial Purchasers or the Buyer provide notice of a claim in accordance with the terms of this Agreement prior to the end of the applicable period of survival set forth in this **Section 11.1**, then the liability for such claim will continue until such claim is fully resolved.

Section 11.2    Survival of the Buyer's Representations, Warranties and Covenants; Time Limits on Indemnification Obligations.  All representations and warranties and Pre-Closing Covenants of the Buyer contained in, or arising out of, this Agreement shall survive for a period of twelve (12) months after the Initial Closing Date or, if the Option Closing occurs, the Option Closing Date; provided, however, that the representations and warranties in **Section 5.1** (Organization and Qualification) and **Section 5.2** (Authorization; Enforceability) shall survive indefinitely; provided, however, that the foregoing survival periods shall not apply in respect of any claims that have been asserted in writing prior to the expiration of the applicable survival period.  All Pre-Closing covenants of the Buyer will expire at the earlier of the Option Closing or if the Call Option and the Put Option are not exercised, on the Termination Date.  All Post-Closing Covenants of the Buyer will survive the Closings in accordance with their terms.  If the Seller provides notice of a claim in accordance with the terms of this Agreement prior to the end of the applicable period of survival set forth in this **Section 11.2**, then the liability for such claim will continue until such claim is fully resolved.

Section 11.3    Indemnification by the Sellers and the Company Relating to the Company.  Subject to the terms, conditions and limitations set forth in this **Article XI**, the Sellers, jointly and severally and without any right of contribution from the Company (and, if the Option Closing does not occur, the Company also) shall indemnify, defend and hold harmless each of the Buyer Indemnified

Parties, from and against, and shall promptly pay or reimburse each Buyer Indemnified Party for, any and all Losses sustained or incurred (including any Losses sustained or incurred after the end of the applicable survival period, provided that a claim is made prior to the end of the applicable survival period in accordance with the terms of this Agreement) by any Buyer Indemnified Party resulting from or arising out of:

        (a)     any Breach of a representation or warranty made by the Company in this Agreement, in any Other Agreement or in any certificate delivered by the Company pursuant to this Agreement; provided, however, that such Buyer Indemnified Party shall have asserted its claim for indemnification in writing with reasonable supporting details, to the extent then known, before the expiration of any applicable survival period specified in **Section 11.1**;

        (b)     any Breach of a Pre-Closing Covenant made by the Company;

        (c)     any Indebtedness, other than Permitted Indebtedness, of the Company that is not paid in full at the Initial Closing; or

        (d)     the TTB Matters.

        Section 11.4     Indemnification by the Sellers.  Subject to the terms, conditions and limitations set forth in this **Article XI**, the Sellers, jointly and severally, shall indemnify, defend and hold harmless the Buyer Indemnified Parties from and against, and shall promptly pay or reimburse each Buyer Indemnified Party for, any and all Losses sustained or incurred by any Buyer Indemnified Party resulting from or arising out of:

        (a)     any Breach of a representation or warranty made by any Seller in this Agreement or any Other Agreement; provided, however, that such Buyer Indemnified Party shall have asserted its claim for indemnification in writing with reasonable supporting details, to the extent then known, before the expiration of any applicable survival period specified in **Section 11.1**;

        (b)     any Breach of a Pre-Closing Covenant or a Post-Closing Covenant made by any Seller; or

        (c)     any claim or assertion for broker's or agent's fees or expenses arising out of the transactions contemplated by this Agreement by a Person claiming to have been engaged by such Seller or its Affiliates.

        Section 11.5     Indemnification by the Initial Purchasers and the Buyer.  Subject to the terms, conditions and limitations set forth in this **Article XI**, from and after the Initial Closing, the Initial Purchasers and the Buyer, jointly and severally, shall indemnify, defend and hold harmless the Seller Indemnified Parties from and against, and shall promptly pay to a Seller Indemnified Party or reimburse a Seller Indemnified Party for any and all Losses sustained or incurred by any Seller Indemnified Party resulting from:

        (a)     any Breach of a representation or warranty made by the Initial Purchasers or the Buyer in **Article V** of this Agreement or in any certificate delivered by the Initial Purchasers or the Buyer pursuant to this Agreement; provided, however, that such Seller Indemnified Party shall have asserted its claim for indemnification in writing with reasonable supporting details, to the extent then known (including (i) the specific facts and circumstances giving rise to and forming the basis of such claim, (ii) the legal theory upon which such claim is based, referencing the specific provisions of this Agreement at issue, and (iii) the nature and scope of the Losses claimed and the Seller Indemnified Party's best estimate

of the dollar amount thereof), promptly upon discovering any such Breach, and in any event, before the expiration of any applicable survival period specified in **Section 11.2**;

(b)     any Breach of a Pre-Closing Covenant or a Post-Closing Covenant made by the Initial Purchasers or the Buyer in this Agreement; or

(c)     any claim or assertion for broker's or finder's fees or expenses arising out of the transactions contemplated by this Agreement by any Person claiming to have been engaged by the Initial Purchasers, the Buyer or any of their Affiliates.

Section 11.6     <u>Indemnification Procedure for Third Party Claims</u>.     In the event that subsequent to the Closings, any Person that is or may be entitled to indemnification under this Agreement (an "**Indemnified Party**") receives notice of the assertion of any claim, issuance of any order or the commencement of any action or proceeding by any Person who is not a Party or an Affiliate of a Party, including, without limitation, any domestic or foreign court or Governmental Authority (a "**Third Party Claim**"), against such Indemnified Party and for which a Party is or may be required to provide indemnification under this Agreement (an "**Indemnifying Party**"), such Indemnified Party shall give written notice thereof, together with a statement of any available information regarding such Third Party Claim to such Indemnifying Party within one hundred twenty (120) days after learning of such Third Party Claim; <u>provided, however</u>, that failure to give such written notice within any particular time period shall not adversely affect the Indemnified Party's right to indemnification except, and to the extent that, the Indemnifying Party can show that the failure to give such notification on a timely basis directly and adversely affected the Indemnifying Party's ability to defend such Third Party Claim. The Indemnified Party shall have the right upon written notice to the Indemnifying Party (the "**Defense Notice**"), to conduct, at the Indemnifying Party's expense, the defense against such Third Party Claim and the Indemnifying Party will cooperate with and make available to the Indemnified Party such assistance and materials as may be reasonably requested by the Indemnified Party. In the event that the Indemnified Party does not elect to conduct the defense of the subject Third Party Claim, then the Indemnifying Party shall conduct the defense of the subject Third Party Claim in its own name, or if necessary, in the name of the Indemnified Party, and the Indemnified Party will cooperate with and make available to the Indemnifying Party such assistance and materials as may be reasonably requested by it. Without the prior written consent of the Indemnified Party, the Indemnifying Party will not enter into any settlement of any Third Party Claim or cease to defend against such Third Party Claim, if pursuant to or as a result of such settlement or cessation, (i) injunctive or other equitable relief would be imposed against the Indemnified Party, or (ii) each claimant or plaintiff in such Third Party Claim has not given to the Indemnified Party an unconditional release from all Liability with respect to such Third Party Claim. The Indemnifying Party shall not be entitled to control, and the Indemnified Party shall be entitled to have sole control over, the defense or settlement of any Third Party Claim solely in the event of a proceeding to which the Indemnifying Party is also a party and the Indemnified Party provides a legal opinion that a material conflict exists as a result of the Indemnifying Party's control over such proceedings. The provisions of **Section 11.7**, and not this **Section 11.6**, shall govern the defense of the TTB matters,

Section 11.7     <u>TTB Matters</u>

(a)     The Sellers and the Company shall use commercially reasonable efforts to resolve the TTB Matters as soon as practicable and in a manner that does not adversely affect the Company's business. The Sellers will be responsible for any liability and expense, including penalties and interest and attorneys' fees associated with the TTB Matters, and shall reimburse the Company for any amounts paid or incurred by the Company after the date hereof in respect thereof.

(b)     The Sellers shall cause the Company's counsel to (i) keep the Initial Purchasers and the Buyer and their counsel fully apprised of the status of the TTB Matters, (ii) consult with the Initial

Purchasers' and the Buyer's counsel prior to taking any material action, including filing any pleadings or submitting any settlement proposals, in connection therewith and (iii) include the Initial Purchaser's and the Buyer's counsel in all discussions and negotiations to the extent feasible.

(c)     The Sellers shall (i) pay, directly and on a timely basis, all fees and expenses incurred by or on behalf of the Company, the Sellers and the Sellers' Representative in connection therewith, and (ii) post any necessary bond and/or provide the Company funds to take such other action as may be necessary to prevent execution of any assessment, award or judgment in respect of the TTB Matters or any Lien being placed on the Company's assets in connection with such assessment, award, judgment or appeal. If the Sellers fail to timely pay such fees and expenses, post any necessary bond or provide the Company funds pursuant to the preceding sentence, if such failure continues uncured more than five (5) business days after written notice from the Buyer, the Buyer shall have the right to control of the defense and/or prosecution of, and negotiate on behalf of the Company a settlement of, the TTB Matters.

(d)     Without the prior written consent of the Initial Purchasers and the Buyer, each in their sole discretion, the Sellers will not agree or cause the Company to agree to any settlement of, compromise or consent to the entry of any judgment in or other termination (each and collectively, a "**Settlement**") of the TTB Matters (i) if as a result of such Settlement either injunctive or other equitable relief would be imposed against the Company and (ii) unless Settlement includes an unconditional release of the Company from all penalties, fines and other monetary liability associated with all of the TTB Matters. In addition, the Sellers shall not permit the Company to effect any Settlement unless, prior thereto, the Sellers have paid to the Company in immediately available funds the full amount the TTB Losses (as hereinafter defined) payable as a result thereof (or, if the Escrow Account has been established, the excess of the TTB Losses, over the balance of the funds then held in the Escrow Account (the "**Escrow Balance**")). Subject to compliance with this **Section 11.7**, if a Settlement occurs after the Option Closing, the Buyer agrees to cause the Company to execute such documents, including settlement agreements, as the Sellers may reasonably request in connection with a Settlement of the TTB Matters.

(e)     For purposes of this **Section 11.7**, the term "**Final Determination**" means either a Settlement effected pursuant to **Section 11.7(d)**, or the entry of a final, non-appealable award or judgment in respect of all of the TTB Matters. Upon a Final Determination, the Sellers shall (i) if such Final Determination is by way of a Settlement, prior to the date thereof, or (ii) otherwise, not later than the Business Day following such Final Determination:

(i)     if funds are then held in the Escrow Account, cause the Sellers' Representative to provide the Escrow Agent with a Joint Release Instruction (as such term is defined in the Escrow Agreement) to disburse and pay to the Company from the Escrow Balance an amount equal to the lesser of (A) the full amount of the judgment, award or Settlement amount due and payable by the Company as a result of such Final Determination ("**TTB Losses**"), and (B) the Escrow Balance; and

(ii)     unless such amount has already been paid to the Company by the Sellers pursuant to **Section 11.7(c)**, pay to the Company the full amount of the TTB Losses (or, if funds are then held in the Escrow Account, the excess, if any, of the TTB Losses over the Escrow Balance.

If the Escrow Balance exceeds the TTB Losses payable upon a Final Determination, then upon issuance by the Sellers' Representative of the authorization contemplated by clause (i) of this **Section 11.7(d)**, the Buyer will provide the Escrow Agent with a Joint Release Instruction (as such term is defined in the Escrow Agreement) to disburse and pay to the Sellers the remainder of the Escrow Balance after payment to the Company pursuant to the authorization contemplated by clause (i).

(f)     Nothing in this **Section 11.7** shall limit the right of the Buyer or the Company to be indemnified by the Sellers in respect of the TTB Matters pursuant to **Section 11.3(d)** hereof.

Section 11.8     Limitation as to Certain Qualifiers.     For purposes of determining the existence of any inaccuracy in or Breach of any representation, warranty or covenant set forth in this Agreement, or calculating the amount of any Losses incurred in connection therewith, any and all references to "material" or "Material Adverse Effect" (or other correlative or similar terms or qualifiers) shall be disregarded.

Section 11.9     Limitation on Indemnification.

(a)     Notwithstanding anything to the contrary set forth in this Agreement, the Sellers shall not be liable hereunder to the Buyer Indemnified Parties pursuant to **Section 11.3(a)** or **Section 11.4(a)**, as a result of any Breach of any of the representations or warranties of the Company or the Sellers as set forth in **Article III** or **Article IV** (other than Breaches of any Fundamental Representation, Statutory Representation or Environmental Representation), except to the extent that the Losses incurred by the Buyer Indemnified Parties as a result of such Breaches shall exceed in the aggregate $50,000 (the "**Basket**"), after which all Losses incurred by the Buyer Indemnified Parties as a result of such Breaches shall be recoverable.

(b)     The aggregate amount required to be paid by the Sellers pursuant to **Section 11.3(a)** and **Section 11.4(a)** as a result of any Breach of any of the representations and warranties of the Company or the Sellers as set forth in **Article III** or **Article IV** (other than Breaches of any Fundamental Representation, Statutory Representation or Environmental Representation) shall not exceed in the aggregate $6,000,000 (the "**Cap Amount**").

(c)     All indemnification payments made under this Agreement shall be treated by all Parties as an adjustment to the Firm Share Price and (if the Option Closing has occurred), the Option Price.

Section 11.10     Exclusion of Other Remedies.     The Parties agree that, from and after the Option Closing Date, the indemnification or reimbursement obligations of the Parties set forth in this **Article XI** and in **Section 10.1** shall constitute the sole and exclusive remedies of the Parties for any monetary Losses based upon, arising out of or otherwise in respect of the matters set forth in this Agreement and the Other Agreements and the transactions contemplated hereby and thereby.     The provisions of this **Section 11.10** will not, however, prevent or limit a cause of action (a) on account of fraud, or (b) under **Section 14.15** to obtain an injunction or injunctions to prevent Breaches of any covenants set forth in this Agreement and to enforce specifically the terms and provisions hereof.

Section 11.11     **No Right of Contribution.**     Each Seller hereby waives, and acknowledges and agrees that such Seller shall not exercise or assert (or attempt to exercise or assert), any right of contribution, right of indemnity or other right or remedy against the Company in connection with any indemnification obligation or any other Liability to which such Seller may become subject under this Agreement or any of the Other Agreements.

## ARTICLE XII
## TERMINATION OF OPTIONS; LIQUIDATED DAMAGES

Section 12.1    Termination. Between the date of exercise of the Call Option or the Put Option, as the case may be, and the Option Closing, the Initial Purchasers' and the Buyer's rights and obligations (as the case may be) to purchase the Option Shares and the Sellers' rights and obligations to sell the Option Shares may be terminated at any time:

(a)    by the mutual written consent of the Initial Purchasers or the Buyer (as the case may be) and the Sellers' Representative;

(b)    by the Initial Purchasers in writing, without Liability of the Initial Purchasers or the Buyer on account of such termination (provided that neither the Buyer nor any Initial Purchaser is otherwise in material default or in material Breach of this Agreement), if (i) the Option Closing shall not have occurred on or before ninetieth day following the exercise of the Call Option or the Put Option, as applicable (the "**Outside Date**");

(c)    by the Sellers' Representative in writing, without Liability of the Sellers on account of such termination (provided that neither the Company nor any Seller is otherwise in material default or in material Breach of this Agreement), if the Option Closing shall not have occurred on or before the Outside Date;

(d)    by the Initial Purchasers in writing, if satisfaction of any of the conditions in **Section 8.1** or **Section 8.2** is or becomes impossible (other than by reason of the Initial Purchasers' or the Buyer's failure to comply with its obligations under this Agreement) and the Initial Purchasers have not waived in writing such condition on or before the Option Closing;

(e)    by the Sellers in writing, if satisfaction of any of the conditions in **Section 8.1** or **Section 8.3** is or becomes impossible (other than by reason of the Company's or any Seller's failure to comply with any of their respective obligations under this Agreement) and the Sellers have not waived in writing such condition on or before the Closing;

(f)    by the Initial Purchasers in writing, in the event of any material Breach of this Agreement by the Company or any Seller, which Breach remains uncured ten (10) days following written notice by the Initial Purchasers to the Sellers of such Breach;

(g)    by the Sellers in writing, in the event of any material Breach of this Agreement by the Initial Purchasers or the Buyer, which Breach remains uncured ten (10) days following written notice by the Sellers to the Initial Purchasers or the Buyer, as applicable, of such Breach; or

(h)    by any Party if any court, judicial authority or Governmental Authority of competent jurisdiction shall have enacted, promulgated, enforced or entered any injunction, order, decree or ruling, taken any other action or failed to take any other action which, in any such case, has become final and non-appealable and has the effect of making the consummation of the transactions contemplated by this Agreement illegal, or otherwise preventing or prohibiting consummation of such transactions; provided, however, that the provisions of this **Section 12.1(h)** shall not be available to any Party unless such Party shall have used commercially reasonable efforts to oppose any such action or to have such action vacated or made inapplicable to the transactions contemplated by this Agreement.

Section 12.2    Effect of Termination. Upon termination of the Initial Purchasers' and the Buyer's rights and obligation to acquire the Option Shares and the Sellers' rights and obligation to sell the Option Shares pursuant to **Section 12.1**, all rights and obligations of the Parties under **Article II** of

this Agreement with respect to the purchase and sale of the Option Shares shall terminate and shall be of no further force or effect; provided, however, that subject to **Section 12.3**, (a) the rights and obligations of the Parties under the other Articles of this Agreement, including **Article XI**, shall survive such termination, and (b) no such termination by the Initial Purchasers shall release, or be construed as releasing, the Sellers from any Liability which may have arisen as a result of a breach of this Agreement. In addition, unless the Sellers are entitled to receive the Option Deposit pursuant the first sentence of **Section 12.3**, upon any such termination of this Agreement, the Option Deposit shall be returned to the Initial Purchasers or the Buyer (as applicable).

Section 12.3    Liquidated Damages.  If the Sellers terminate the Initial Purchasers' and the Buyer's rights and obligations to purchase the Option Shares pursuant to **Section 12.1(c)**, **Section 12.1(e)** or **Section 12.1(g)**, the Sellers shall be entitled to receive the Option Deposit. The Sellers and the Buyer acknowledge and agree that that the payment to the Sellers of the Option Deposit shall constitute payment of liquidated damages and not a penalty and that such liquidated damages amount is reasonable in light of the substantial but indeterminate harm anticipated to be caused by the failure of the Initial Purchasers or the Buyer (as applicable) to acquire the Option Shares following exercise of the Call Option or the Put Option, the difficulty of proof of loss and damages, the inconvenience and non-feasibility of otherwise obtaining an adequate remedy, and the value of the transactions to be consummated hereunder. The Sellers acknowledge and agree that, notwithstanding anything to the contrary herein, the Sellers' sole and exclusive remedy hereunder for the Initial Purchasers' or the Buyer's failure to purchase the Option Shares shall be the right (if any) to receive the Option Deposit pursuant to this **Section 12.3**.

**ARTICLE XIII**
**DEFINITIONS**

Definitions.  As used in this Agreement,

**"Accounts Receivable"** of any Person means (a) all trade accounts receivable and other rights to payment from customers of such Person and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of good shipped, products sold or services rendered to customers of such Person, (b) all other accounts or notes receivable of such Person and the full benefit of all security for such accounts or notes, and (c) any claim, remedy or other right related to any of the foregoing.

**"Affiliate"** means, with respect to any Person, any other Person directly or indirectly Controlling or Controlled by, or under direct or indirect common Control with, such Person. For purposes of this definition, a Person shall be deemed to Control another Person if such Person owns or Controls, directly or indirectly, more than twenty five percent (25%) of the voting Equity Interests of the other Person.

**"Assets"** of any Person means all assets and properties of any kind, nature, character and description (whether real, personal or mixed, whether tangible or intangible, whether accrued, contingent, fixed or otherwise, and wherever located), including the good will related thereto, operated, owned or leased by such Person.

**"Basis"** means any past or present fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction that forms or could form the basis for any specified consequence.

**"Breach"** means (a) the violation of any covenant, agreement, Law, right, obligation, engagement or duty, whether by commission or omission, (b) the failure to perform, refusal to perform, or prevention or hindrance of performance of, any covenant, agreement, obligation, engagement or duty, (c) the performance of any act which by covenant, agreement or duty must not be performed, (d) any breach,

inaccuracy or misstatement in any representation or warranty, or (e) any event which, with the passage of time or provision of notice, would constitute any of the above.

"**Business**" means the business of distribution of duty-free merchandise and such other businesses as the Company is engaged on the date hereof.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which the banks in the city of New York are permitted or required by applicable Law to close.

"**Buyer Indemnified Parties**" means (a) if the Option Closing occurs, the Initial Purchasers, the Buyer, the Company and their respective Representatives, successors and assigns, and (b) if the Option Closing does not occur, the Initial Purchasers, the Buyer and its Representatives, successors and assigns.

"**Calexico Property**" means that certain property located at 245 Imperial Avenue, Calexico, California, designated as Assessor's Parcel Numbers 058-473-04, -05 & -06.

"**Calexico Purchase Agreement**" means that certain Purchase Agreement, by and among Meuchadim and Elke Uhlig and Andrew J. Armanino, Jr., as Trustees, or the successor Trustee or Trustees, of the Survivor's Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended, and Elke Uhlig and Andrew J. Armanino, Jr., as Trustees, or the successor Trustee or Trustees, of the Non-Exempt Marital Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended, for the purchase by Meuchadim of the Calexico Property.

"**COBRA**" means the Consolidated Omnibus Budget Reconciliation Act of 1986, as amended.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Company's Knowledge**" or "**Knowledge of the Company**" means any matter, fact, or thing that is, as of the date hereof or the Option Closing Date, actually known to Nicole Uhlig, Joel Sjostrom, Dean Kisieu, Irene Koep and Rick New after making due inquiry and reasonable investigation.

"**Company Credit Agreement**" means that certain Accounts Receivable and Inventory Loan Agreement, dated as of October 4, 2013, by and among the Company, as borrower, and the Senior Lender, as amended or supplemented from time to time.

"**Consent**" means any approval, consent, ratification, waiver, notice or other authorization.

"**Contract**" means any written or oral agreement, note, guarantee, mortgage, indenture, lease, deed of trust, license, plan, instrument or other contract or legally binding arrangement or commitment.

"**Employee Benefit Plan**" means any retirement, group health, severance, other welfare, change of control, equity purchase, equity option, restricted equity, phantom equity, equity appreciation rights, fringe benefit, collective bargaining, bonus, incentive, deferred compensation, employee loan or other employee benefit or compensatory plan, program, policy, practice, Contract or fund (including any "employee benefit plan," as defined in Section 3(3) of ERISA) or any employment, consulting or personal services contract, whether written or oral, funded or unfunded or domestic or foreign, (a) sponsored, maintained or contributed to by the Company or to which the Company is a party, (b) covering or benefiting any current or former employee, agent, director or independent contractor of the Company (or any dependent or beneficiary of any such individual) or (c) with respect to which the Company has (or could have) any obligation or liability.

"**Equity Interests**" means (a) any partnership interests, (b) any membership interests or units, (c) any shares of capital stock, (d) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distribution of assets of, the issuing entity, (e) any subscriptions, calls, warrants, options, or commitments of any kind or character relating to, or entitling any Person or entity to purchase or otherwise acquire membership interests or units, capital stock, or any other equity securities, (f) any securities convertible into or exercisable or exchangeable for partnership interests, membership interests or units, capital stock, or any other equity securities, or (g) any other interest classified as an equity security of a Person.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Escrow Agent**" means City National Bank, a national banking association, or another Person that the Initial Purchasers and the Seller's Representative mutually agree shall serve as escrow agent.

"**Estimated TTB Losses**" means the total amount of fines, penalties and interest that, at the time of determination, have been proposed or assessed with respect to the TTB Matters and with respect to which no Final Determination has occured. The parties agree that the amount of Estimated TTB Losses as of the date hereof is $1,219,195.54.

"**GAAP**" means United States generally accepted accounting principles, as in effect from time to time, consistently applied.

"**General Enforceability Exceptions**" means those exceptions to enforceability due to applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally, and general principles of equity (regardless of whether such enforceability is considered in a proceeding at law or in equity).

"**Governmental Authority**" means the United States or any state, provincial, county, municipal, city, local or foreign government, or any instrumentality, division, subdivision, department, agency or authority of any thereof having competent jurisdiction over any of the Company, the Initial Purchasers, the Buyer or the transactions contemplated by this Agreement, as applicable.

"**Indebtedness**" means, with respect to any Person, all Liabilities in respect of: (a) borrowed money; (b) indebtedness evidenced by bonds, notes, debentures or similar instruments (c) financed and capitalized lease obligations (including any equipment financing arrangements); (d) the deferred purchase price of assets, services or securities (other than ordinary trade accounts payable); (e) conditional sale or other title retention agreements; (f) the factoring or discounting of accounts receivable; (g) swap or hedging agreements or arrangements, (h) reimbursement obligations, whether contingent or matured, with respect to letters of credit, bankers' acceptances, bank overdrafts, surety bonds, other financial guarantees and interest rate protection agreements (without duplication of other indebtedness supported or guaranteed thereby); (i) interest, premium, penalties and other amounts owing in respect of the items described in the foregoing clauses (a) through (h) after giving effect to the Closing, (j) all Indebtedness of the types referred to in clauses (a) through (b) guaranteed in any manner by such Person, whether or not any of the foregoing would appear on a consolidated balance sheet prepared in accordance with GAAP; (k) any unfunded pension liabilities; and (l) any so-called "change of control" payments.

"**Intellectual Property**" means all of the following in any jurisdiction throughout the world: (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions, and reexaminations thereof, (b) all trademarks, service marks, trade dress, logos, designs, shapes, configurations, slogans, trade names, corporate names, Internet domain names, and rights in telephone numbers, together with all translations,

adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (c) all copyrightable works, all copyrights, and all applications, registrations, and renewals in connection therewith, (d) all mask works and all applications, registrations, and renewals in connection therewith, (e) all trade secrets and confidential business information (including ideas, research and development, know-how, recipes, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals), (f) all computer software (including source code, executable code, data, databases, and related documentation), (g) all advertising and promotional materials, (h) all other proprietary rights, and (i) all copies and tangible embodiments of any of the foregoing (in whatever form or medium).

"**Inventory**" of any Person means all finished goods, all work-in-process, intermediaries, raw materials or ingredients, spare parts and all other materials or supplies used or held for use by such Person in the production of finished goods.

"**Labor Code**" means the California Labor Code, which is part of the California Labor Code Private Attorneys General Act of 2004, as amended.

"**Law**" means each provision of any currently implemented federal, state or local or foreign law, statute, ordinance, order, code, rule or regulation, promulgated or issued by any Governmental Authority.

"**Lease**" means (a) any lease, sublease, license, concession or other Contract relating to the occupancy of any improved space on any Real Property, (b) any long-term Contract to lease Real Property in which most of the rights and benefits comprising ownership of the Real Property, if any, are transferred to the tenant for the term thereof, (c) any Contract, license, or right to use pertaining to the possession or use of any Tangible Personal Property, in each case, together with all amendments, extensions, renewals, modifications, alterations, guaranties and other changes thereto, and including the right to all security deposits and other amounts and instruments deposited thereunder.

"**Liability**" means any liability or obligation of whatever kind or nature (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, due or to become due), including without limitation any liability for Taxes.

"**Licenses and Permits**" means any licenses, permits, certificates, certifications, privileges, immunities, notifications, exemptions, classifications, registrations, easements, franchises, approvals, authorizations, orders and other similar rights (or any waivers of the foregoing) issued by any Governmental Authority, and all pending applications therefor or renewals thereof.

"**Lien**" means any mortgage, pledge, hypothecation, hypothec, right of others, claim, security interest, encumbrance, lease, sublease, license, occupancy agreement, adverse claim or interest, easement, covenant, encroachment, burden, title defect, title retention agreement, voting trust agreement, proxy, interest, equity, option, lien, preemptive right, right of first offer or refusal, charge or other restrictions or limitations of any nature whatsoever, other than (i) restrictions on the offer and sale of securities under federal and state securities Laws and (ii) any Permitted Liens.

"**Loss**" or "**Losses**" means, with respect to any Person, all Liabilities, obligations, deficiencies, demands, claims, suits, actions, or causes of action, assessments, losses, Taxes, fines, penalties, damages (including punitive, special and consequential damages), lost profits, diminution in value (based on a multiple of earnings or otherwise), costs and expenses (including reasonable attorneys' fees) sustained or incurred by such Person.

"**Material Adverse Effect**" or "**Material Adverse Change**" means any change, effect, event, occurrence, state of facts or development that, individually or in the aggregate, is materially adverse to the business, operations, Assets, condition (financial or otherwise), results of operations or prospects (including the achievement or the ability to achieve forecasts of revenue and/or earnings) of the Company or the Business; provided, however, that none of the following shall be deemed in itself, or in any combination, to constitute, and none of the following shall be taken into account in determining whether there has been or will be, a Material Adverse Effect or Material Adverse Change: (a) any adverse change, effect, event, occurrence, state of facts or development arising from or relating to (i) the announcement or pendency of the transactions contemplated by this Agreement; (ii) conditions affecting the industry in which the Company participates, the United States economy as a whole or the capital markets in general or the markets in which the Company operates; (iii) changes in GAAP; (iv) changes in Law, rules, regulations, orders, or other binding directives issued by any Governmental Authority; (v) performance of compliance with the terms of, or the taking of any action required by, this Agreement; or (vi) national or international political or social conditions, including, the commencement, continuation or escalation of a war, armed hostilities or other international or national calamity or act of terrorism directly or indirectly involving the United States of America, it being understood and agreed that in the case of any of clauses (ii) or (iii) above, only if and to the extent not affecting the Company in a disproportionate manner relative to the Company's competitors; and (b) any adverse change in or effect on the Business that is cured before the earlier of (1) the Option Closing Date and (2) the date on which this Agreement is terminated pursuant to **Section 12.1** hereof.

"**Organizational Documents**" means (a) with respect to a corporation, the certificate or articles of incorporation and bylaws; (b) with respect to any other entity, any charter or similar document adopted or filed in connection with the creation, formation or organization of such entity; and (c) any amendment to any of the foregoing.

"**Other Agreements**" means each agreement, document, certificate and instrument being delivered pursuant to this Agreement, including, without limitation, the documents and agreements to be delivered by the Parties pursuant to **Article IX** hereof.

"**Permitted Indebtedness**" means (a) the aggregate principal and interest and all other amounts (including penalties, fees and expenses) owed by the Company under the Company Credit Agreement, and (b) trade payables, accrued expenses and other current liabilities incurred in the ordinary course of business and set forth on the Financial Statements.

"**Permitted Liens**" means, collectively, (a) Liens for Taxes not yet payable or the validity of which are being contested in good faith by appropriate proceedings and for which adequate reserves are reflected in the Latest Balance Sheet as required by GAAP, (b) mechanics', workmen's, repairmen's, warehousemen's, processor's, landlord's, carrier's, maritime, materialmen's, consignee's or other like Liens, including all statutory Liens arising or incurred in the ordinary course of business, for which adequate reserves are reflected in the Latest Balance Sheet as required by GAAP, (c) Liens arising in connection with worker's compensation, unemployment insurance, old age pensions and social security benefits which are not overdue or are being contested in good faith by appropriate proceedings and for which provision for the payment of such Liens has been reflected in the Latest Balance Sheet as required by GAAP, (d) Liens (i) incurred or deposits made in the ordinary course of business to secure the performance of bids, tenders, statutory obligations, fee and expense arrangements with trustees and fiscal agents (exclusive of obligations incurred in connection with the borrowing of money or the payment of the deferred purchase price of property) and (ii) securing surety, indemnity, performance, appeal and release bonds, (e) any imperfection of title, easements, encroachments, covenants, rights of way, defects, irregularities or encumbrances on title or similar Lien which does not and would not reasonably be expected to impair in any material respect the operations of the Business of the Company, (f) licenses, leases and subleases of property and assets in the ordinary course of business, (g) customary rights of set-

off, revocation, refund or chargeback, (h) Liens arising by operation of law on insurance policies and proceeds thereof to secure premiums thereunder, (i) any conditions that shown by a current, accurate survey, (j) Liens to secure capital lease obligations to the extent the incurrence of such obligations does not violate this Agreement, (k) any Liens incurred pursuant to equipment leases in the ordinary course of business, (l) Liens incurred pursuant to actions of the Buyer, (n) Liens disclosed on the Schedules hereto and (m) Liens that, individually or in the aggregate, do not and would not reasonably be expected to materially impair or affect the use, value or merchantability of title of the underlying asset to the Company.

"**Person**" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated association, corporation, limited liability company, entity or Governmental Authority, in each case including, without limitation, such Person's successors and permitted assigns (or, in the case of a Governmental Authority, Persons succeeding to the relevant function of such Governmental Authority).

"**Post-Closing Covenant**" means any covenant, promise, commitment or other obligation (or any portion thereof) made or undertaken by any Party, in this Agreement or any Other Agreement, to or in favor of another relevant Party, to the extent performance or fulfillment thereof is required by its terms to be accomplished after the Initial Closing or the Option Closing, as applicable.

"**Pre-Closing Covenant**" means any covenant, promise, commitment or other obligation (or any portion thereof) made or undertaken by any Party, in this Agreement or any Other Agreement, to or in favor of another relevant Party, to the extent performance or fulfillment thereof is required by its terms to be accomplished at, or prior to, the Option Closing.

"**Real Property**" means all parcels and tracts of land, together with all buildings, structures, fixtures and improvements located thereon (including those under construction), and all privileges, rights, easements, hereditaments and appurtenances belonging to or for the benefit of such land, including all easements appurtenant to and for the benefit of such land, and all rights existing in and to any streets, alleys, passages and other rights-of-way included thereon or adjacent thereto (before or after vacation thereof) and vaults beneath any such streets.

"**Representative**" means, with respect to any Person, any director, officer, principal, attorney, employee, agent, consultant, accountant, or any other Person acting in a representative capacity for such Person.

"**Restricted Party**" or "**Restricted Parties**" means the Sellers and the Sellers' Representative.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Sellers' Knowledge**" or "**Knowledge of the Sellers**" means any matter, fact, or thing that is, as of the date hereof or the Option Closing Date, actually known to the Sellers, any individual Seller, Sellers' Representative or any other Representative of the Sellers, after making due inquiry and reasonable investigation, or which should have been known by such individuals after making reasonable inquiry.

"**Senior Debt**" means all Indebtedness owed by the Company pursuant to the Company Credit Agreement.

"**Senior Lender**" means City National Bank, a national banking association.

"**Straddle Period**" means any taxable period that includes the Closing Date and ends after the Closing Date.

"**Subsidiary**" means, with respect to any Person, any corporation, limited liability company, partnership, association, or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof or (b) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director or general partner of such business entity (other than a corporation); and the term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"**Tax**" or "**Taxes**" means (a) any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the Code), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, escheat, value-added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not and including any obligations to indemnify or otherwise assume or succeed to the Tax liability of any other Person, (b) any amounts described in clause (a) above owed by another party for which a taxpayer is liable pursuant to any statute or regulation imposing joint or several liability to taxpayers filing consolidated, combined, unitary or other similar Tax Returns and (c) any amounts described in clauses (a) or (b) above for which a taxpayer is liable pursuant to a tax indemnification agreement, tax sharing agreement, tax allocation agreement or other similar agreement.

"**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement filed or required to be filed with any Taxing Authority.

"**Taxing Authority**" means any governmental authority, domestic or foreign, having jurisdiction over the assessment, determination, collection, or other imposition of any Taxes.

"**Termination Date**" means (i) if the Call Option or the Put Option is exercised, the date on which the Option Closing occurs or (ii) if the Option Closing does not occur for any reason, including termination of the Initial Purchasers' and the Buyer's rights and obligation to acquire the Option Shares and the Sellers' rights and obligation to sell the Option Shares pursuant to **Section 12.1**, the date on which the Initial Purchasers no longer own any Firm Shares.

"**Threatened**" means that a demand or statement has been made or any notice of commencement of an action or suit has been given.

"**Treasury Regulation**" means the regulations of the U.S. Department of the Treasury promulgated under the Code, as such Treasury Regulations may be amended from time to time. Any reference herein to a particular Treasury Regulation means, where appropriate, the corresponding successor provision.

"**TTB**" means the Alcohol and Tobacco Tax and Trade Bureau of the Department of Treasury, United States.

"**TTB Matters**" means (a) the Notice of Violations (2WESD2014086: SLD) issued by the TTB on September 3, 2014, (b) the Inquiry Letter (502030400: RAG) issued by the TTB on September 16,

2014, and (c) Fairn and Swanson, Inc. v. United States of America, et al., Case Number 1:15-cv-00047-RJL, United States District Court, District of Columbia, and, in each case, the matters covered thereby and any actions by the Company or TTB arising therefrom.

## ARTICLE XIV
## MISCELLANEOUS

Section 14.1    Notices, Consents, etc..  Any notices, consents or other communications required to be sent or given hereunder by any of the Parties shall in every case be in writing and shall be deemed properly served if and when (a) delivered by hand, (b) transmitted by facsimile, E-mail or other means of electronic transmission, or (c) delivered by Federal Express or other express overnight delivery service, or registered or certified mail, return receipt requested, to the Parties at the addresses as set forth below or at such other addresses as may be furnished in writing:

**If to the Company:**

Fairn & Swanson Inc.
400 Lancaster Street
Oakland, CA 94601
Attention:  Nicole Uhlig
Facsimile:  (510) 533-8260
E-mail:  nicoleu@fairn.com

with a copy to:

Thompson, Welch, Soroko & Gilbert LLP
450 Pacific Avenue, Suite 200
San Francisco, CA 94133
Attention:  Charles M. Thompson
Facsimile:  (415) 262-1212
E-mail:  cthompson@twsglaw.com

**If to the Sellers' Representative:**

Andrew J. Armanino, Jr.
706 Escalona Drive
Capitola, CA 95010
Attention:  Andrew J. Armanino, Jr.
Facsimile:  (831) 475-5510
E-mail: ARMANINO6@aol.com

with a copy to:

Thompson, Welch, Soroko & Gilbert LLP
450 Pacific Avenue, Suite 200
San Francisco, CA 94133
Attention:  Charles M. Thompson
Facsimile:  (415) 262-1212
E-mail:  cthompson@twsglaw.com

**If to the Buyer:**

Faim & Swanson Holdings, Inc.
6100 Hollywood Blvd., 7th Floor
Hollywood, FL 33024
Attention: Simon Falic
E-mail: Simon@Falic.Com

with a copy to:

Greenberg Traurig, P.A.
333 S.E. 2nd Avenue, Suite 4400
Miami, FL 33131
Attention: Ken Hoffman
Facsimile: (305) 961-5809
E-mail: hoffmank@gtlaw.com

Date of service of such notice shall be (i) the date such notice is delivered by hand or by facsimile, E-mail or other form of electronic transmission, (ii) one Business Day following the delivery by express overnight delivery service, (iii) the date confirmation of transmission is received if sent by facsimile during any Business Day, or the next succeeding Business Day if confirmation of transmission is not received on a Business Day, or (iv) three (3) days after the date of mailing if sent by certified or registered mail.

Section 14.2  Severability.  The unenforceability or invalidity of any provision of this Agreement shall not affect the enforceability or validity of any other provision.  Upon such determination that any term or other provision is unenforceable or invalid, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a legally acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

Section 14.3  Successors; Assignment.  This Agreement will be binding upon, and inure to the benefit of, the Parties hereto and their respective successors and permitted assigns, but will not be assignable or delegable by the Sellers without the prior written consent of the Buyer or by the Buyer without the prior written consent of the Sellers' Representative; provided, however, that the Buyer may assign this Agreement in whole or in part to any of its Affiliates or to any Person which becomes a successor in interest (by purchase of assets or equity, or by merger or otherwise) to all or any portion of the Buyer, its Assets or its Subsidiaries, and the Buyer may assign its rights under this Agreement and the Other Agreements to its financing sources or secured lenders.

Section 14.4  Counterparts; Facsimile Signatures.  This Agreement may be executed simultaneously in multiple counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  This Agreement, any and all agreements and instruments executed and delivered in accordance herewith, along with any amendments hereto or thereto, to the extent signed and delivered by means of E-mail, a facsimile machine or other means of electronic transmission, shall be treated in all manner and respects and for all purposes as an original signature, agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

Section 14.5  Expenses.  Except as otherwise provided in this Agreement, each of the Sellers and the Buyer shall bear and pay for all of its own costs, fees and expenses (including legal, accounting, investment banking, broker's, finder's and other professional or advisory fees and expenses)

incurred or to be incurred by it, in each case, in negotiating and preparing this Agreement and the Other Agreements and in closing and carrying out the transactions contemplated hereby and thereby. The Sellers shall also be responsible for all costs, fees and expenses (including legal, accounting, investment banking, broker's, finder's and other professional or advisory fees and expenses) incurred or to be incurred by the Company in negotiating and preparing this Agreement and the Other Agreements and in closing and carrying out the transactions contemplated hereby and thereby. Without limiting the generality of the foregoing, all transfer, documentary, sales, use, stamp, registration and other such Taxes, and all conveyance fees, recording charges and other fees and charges (including any penalties and interest) incurred in connection with the consummation of the transactions contemplated by this Agreement shall be paid by the Sellers when due, and the Sellers shall file all necessary Tax Returns and other documentation with respect to all such Taxes, fees and charges, and, if required by applicable Law, the Parties will, and will cause their respective Affiliates to, join in the execution of any such Tax Returns and other documentation.

Section 14.6    Governing Law.  All matters relating to the interpretation, construction, validity and enforcement of this Agreement shall be governed by and construed in accordance with the domestic laws of the State of California without giving effect to any choice or conflict of law provision or rule (whether of the State of California or any other jurisdiction) that would cause the application of laws of any jurisdiction other than the State of California.

Section 14.7    Table of Contents and Headings.  The table of contents and section headings of this Agreement are included for reference purposes only and shall not affect the construction or interpretation of any of the provisions of this Agreement.

Section 14.8    Entire Agreement.  This Agreement, the Recitals, the Schedules and the Exhibits attached hereto and the Other Agreements (all of which shall be deemed incorporated in this Agreement and made a part hereof), set forth the entire understanding of the Parties with respect to the transactions contemplated hereby, supersede all prior discussions, understandings, agreements and representations (including that certain Letter of Intent, by and between Elke Uhlig and Andrew J. Armanino, Jr., as Trustees of the Sellers and Leon Falic, dated March 18, 2015, as amended) and shall not be modified or affected by any offer, proposal, statement or representation, oral or written, made by or for any Party in connection with the negotiation of the terms hereof. This Agreement may be modified only by subsequent instruments signed by the Buyer and the Sellers' Representative.

Section 14.9    Third Parties.  Other than **Section 10.3**, nothing herein expressed or implied is intended or shall be construed to confer upon or give to any Person, other than the Parties to this Agreement, the Buyer Indemnified Parties and their respective successors and permitted assigns, any rights or remedies under or by reason of this Agreement. This Agreement and all provisions and conditions hereof are intended to be, and shall be, for the sole and exclusive benefit of such Persons and for the benefit of no other Person.

Section 14.10    Disclosure Generally.  All Schedules attached hereto (and any Schedules Updates) are incorporated herein and expressly made a part of this Agreement as though completely set forth herein. All references to this Agreement herein or in any of the Schedules shall be deemed to refer to this entire Agreement, including all Schedules. Except in accordance with the terms and conditions of **Section 6.3** hereof, references to any of the Schedules shall not be deemed to include any Schedules Updates. Information furnished in any particular Schedule shall not be deemed to be included in all other Schedules in which the information is required to be included unless specifically designated with a cross-reference.

Section 14.11    Interpretive Matters.  Unless the context otherwise requires, (a) all references to Articles, Sections, Schedules or Exhibits shall mean and refer to Articles, Sections,

Schedules or Exhibits in this Agreement, (b) each accounting term not otherwise defined in this Agreement has the meaning assigned to it in accordance with GAAP, (c) words in the singular or plural include the singular and plural, and pronouns stated in either the masculine, feminine or neuter gender shall include the masculine, feminine and neuter, (d) the term "including" shall mean "including without limitation" (*i.e.*, by way of example and not by way of limitation), (e) all references to statutes and related regulations shall include all amendments of the same and any successor or replacement statutes and regulations, (f) references to "hereof", "herein", "hereby" and similar terms shall refer to this entire Agreement (including the Schedules, Schedules Updates and Exhibits hereto) (g) references to "records" shall refer to all information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form, (h) "or" is used in the inclusive sense of "and/or," and (i) whenever this Agreement refers to a number of days, such number shall refer to calendar days, unless such reference is specifically to "Business Days." The Parties intend that each representation, warranty and covenant contained herein shall have independent significance. If any Party has Breached any representation, warranty or covenant contained herein in any respect, the fact that there exists another representation, warranty or covenant relating to the same subject matter (regardless of the relative levels of specificity) that the Party has not Breached shall not detract from or mitigate the fact that the Party is in Breach of such representation, warranty or covenant.

      Section 14.12  Construction.  Each of the Parties acknowledges that it has been represented by independent counsel of its choice throughout all negotiations that have preceded the execution of this Agreement and that it has executed the same with consent and upon the advice of said independent counsel. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise, or rule of strict construction applied, favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. Accordingly, any rule of law or any legal decision that would require interpretation of any ambiguities in this Agreement against the Party that drafted it is of no application and is hereby expressly waived by the Parties hereto.

      Section 14.13  Submission to Jurisdiction.  EACH OF THE PARTIES SUBMITS TO THE EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT SITTING IN SAN FRANCISCO, CALIFORNIA, IN ANY ACTION OR PROCEEDING ARISING OUT OF, OR RELATING TO, THIS AGREEMENT, AGREES THAT ALL CLAIMS IN RESPECT OF THE ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT AND AGREES NOT TO BRING ANY ACTION OR PROCEEDING ARISING OUT OF, OR RELATING TO, THIS AGREEMENT IN ANY OTHER COURT. EACH OF THE PARTIES WAIVES ANY DEFENSE OF INCONVENIENT FORUM TO THE MAINTENANCE OF ANY ACTION OR PROCEEDING SO BROUGHT AND WAIVES ANY BOND, SURETY OR OTHER SECURITY THAT MIGHT BE REQUIRED OF ANY OTHER PARTY WITH RESPECT THERETO. EACH PARTY AGREES THAT SERVICE OF SUMMONS AND COMPLAINT OR ANY OTHER PROCESS THAT MIGHT BE SERVED IN ANY ACTION OR PROCEEDING MAY BE MADE ON SUCH PARTY BY SENDING OR DELIVERING A COPY OF THE PROCESS TO THE PARTY TO BE SERVED AT THE ADDRESS OF THE PARTY AND IN THE MANNER PROVIDED FOR THE GIVING OF NOTICES IN **SECTION 14.1**. NOTHING IN THIS **SECTION 14.13**, HOWEVER, SHALL AFFECT THE RIGHT OF ANY PARTY TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW. EACH PARTY AGREES THAT A FINAL JUDGMENT IN ANY ACTION OR PROCEEDING SO BROUGHT SHALL BE CONCLUSIVE AND MAY BE ENFORCED BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

      Section 14.14  Waiver of Jury Trial.  TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, EACH PARTY HEREBY IRREVOCABLY WAIVES, AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF,

DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING IN WHOLE OR IN PART UNDER, RELATED TO, BASED ON OR IN CONNECTION WITH THIS AGREEMENT OR THE SUBJECT MATTER HEREOF, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN TORT OR CONTRACT OR OTHERWISE. ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS **SECTION 14.14** WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

Section 14.15   Specific Performance.   The Parties agree that if any provision of this Agreement is not performed in accordance with its terms or is otherwise Breached, irreparable harm would occur, no adequate remedy at law would exist, and damages would be difficult to determine. Accordingly, it is agreed that the Party or Parties not in Breach shall be entitled to an injunction or injunctions to prevent Breaches of this Agreement, and to the remedy of specific performance of the terms and conditions hereof, in addition to any other remedies that may be available, at law or in equity, by reason of such Breach.

Section 14.16   Arbitration.   In the event of any dispute, controversy or claim after the Closing between any of the Parties hereto arising out of or relating to this Agreement, the Parties shall attempt to resolve such dispute among themselves within thirty (30) calendar days from the date either Party sends written notice of such dispute to the other Party. If the Parties fail to resolve the dispute within such period, such dispute shall be finally and exclusively resolved by arbitration in San Francisco, California in accordance with the then prevailing JAMS Streamlined Arbitration Rules and Procedures, except as modified herein (the "Rules"). There shall be a single arbitrator. The parties shall have five Business Days from commencement of the arbitration in accordance with the Rules to agree on a single arbitrator. Failing timely agreement, the arbitrator shall be selected by JAMS. All arbitration pursuant to this **Section 14.16** shall be confidential and shall be treated as compromise and settlement negotiations, and no oral or documentary representations made by the Parties during such arbitration shall be admissible for any purpose in any subsequent proceedings. There shall be no discovery in the arbitration and the Parties shall only be required to produce in advance of the hearing on the merits any documents which they plan to introduce in evidence at the hearing. The arbitral tribunal is not empowered to award damages in excess of compensatory damages, and each Party hereby irrevocably waives any right to recover punitive, exemplary or similar damages with respect to any claim. Any arbitration proceedings, decision or award rendered hereunder and the validity, effect and interpretation of this arbitration agreement shall be governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. The award shall be final and binding upon the Parties and shall be the sole and exclusive remedy between the Parties regarding any claims, counterclaims, issues or accounting presented to the arbitral tribunal. Judgment upon any award may be entered in any court having jurisdiction.

Section 14.17   Press Releases and Communications.   Following the Option Closing, any Party hereto may issue a press release or public announcement regarding this Agreement or the transactions contemplated herein; provided, that any such press release or public announcement shall not describe, include or otherwise refer to the economic terms of the transactions contemplated by this Agreement.

Section 14.18   Sellers' Representative.   Each Seller hereby irrevocably appoints Andrew J. Armanino, Jr. (the **"Sellers' Representative"**) as such Seller's representative, attorney-in-fact and agent, with full power of substitution to act in the name, place and stead of such Seller with respect to the transfer of such Seller's Shares to the Buyer in accordance with the terms and provisions of this Agreement, and to act on behalf of such Seller in any amendment of or litigation or arbitration involving this Agreement and to do or refrain from doing all such further acts and things, and to execute all such

documents, as the Sellers' Representative shall deem necessary or appropriate in conjunction with any of the transactions contemplated by this Agreement, including without limitation the power:

(a)     to take all action necessary or desirable in connection with the waiver of any condition to the obligations of the Sellers to consummate the transactions contemplated by this Agreement;

(b)     to negotiate, execute or deliver all ancillary agreements, statements, certificates, notices, approvals, extensions, waivers, undertakings, amendments and other documents required or permitted in connection with the consummation of the transactions contemplated by this Agreement (it being understood that such Seller shall execute and deliver any such document which the Sellers' Representative agrees to execute);

(c)     to terminate this Agreement if the Sellers are entitled to do so;

(d)     to give and receive all notices and communications to be given or received under this Agreement and to receive service of process in connection with any claims under this Agreement, including service of process in connection with arbitration; and

(e)     to take all actions which under this Agreement may be taken by the Sellers and to do or refrain from doing any further act or deed on behalf of the Sellers which the Sellers' Representative deems necessary or appropriate in his sole discretion relating to the subject matter of this Agreement as fully and completely as such Seller could do if personally present.

If Andrew J. Armanino, Jr. becomes unable to serve as Sellers' Representative such other Person or Persons as may be designated by the Sellers holding a majority of the Shares, shall succeed as the Sellers' Representative.

Section 14.19   Waiver; Remedies Cumulative.  The rights and remedies of the Parties are cumulative and not alternative.  Neither any failure nor any delay by any Party in exercising any right, power or privilege under this Agreement or any of the Other Agreements will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.  To the maximum extent permitted by applicable Law, (a) no claim or right arising out of this Agreement or the Other Agreements can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless such waiver or renunciation is in writing and signed by the other Parties, (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given, and (c) no notice or demand by one Party will be deemed to be a waiver of any obligation of that Party, or a waiver of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Other Agreements.

Section 14.20   Time of the Essence.  Time is of the essence with respect to all time periods and dates set forth in or referenced in this Agreement and the Other Agreements.

Section 14.21   Release.  In the event that the Option Closing occurs, each of the Sellers, for itself and its Representatives (collectively, the "**Releasors**") hereby forever fully and irrevocably releases and discharges the Initial Purchasers, the Buyer, the Company and each of their respective Subsidiaries, and each of their respective predecessors, successors, direct or indirect Subsidiaries and past and present stockholders, members, managers, directors, officers, employees, agents and other Representatives (collectively, the "**Released Parties**") from any and all actions, suits, claims, demands, debts, agreements, obligations, promises, judgments, or liabilities of any kind whatsoever in law or equity and causes of action of every kind and nature, or otherwise (including, claims for damages,

costs, expenses, and attorneys', brokers' and accountants fees and expenses) arising out of or related to events, facts, conditions or circumstances existing or arising prior to the Option Closing Date, which the Releasors can, shall or may have against the Released Parties, whether known or unknown, suspected or unsuspected, unanticipated as well as anticipated (collectively, the "**Released Claims**"), and hereby irrevocably agree to refrain from directly or indirectly asserting any claim or demand or commencing (or causing to be commenced) any suit, action, or proceeding of any kind, in any court or before any tribunal, against any Released Party based upon any Released Claim. Notwithstanding the preceding sentence of this **Section 14.21**, "Released Claims" does not include, and the provisions of this **Section 14.21** shall not release or otherwise diminish the obligations of any Party set forth in or arising under any provisions of this Agreement or the agreements contemplated in connection herewith.

**[Signature Pages Follow]**

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

COMPANY:

**FAIRN & SWANSON INC.**

By: _Nicole Uhlig_

Name: NICOLE UHLIG

Title: PRESIDENT

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**SELLERS:**

Survivor's Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended

By: _Elke Uhlig_
Name: ELKE UHLIG
Title: TRUSTEE

Marital GST Non-Exempt Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended

By: _Elke Uhlig_
Name: ELKE UHLIG
Title: TRUSTEE

Marital GST Exempt Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended

By: _Elke Uhlig_
Name: ELKE UHLIG
Title: TRUSTEE

Bypass Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended

By: _Elke Uhlig_
Name: ELKE UHLIG
Title: TRUSTEE

[SIGNATURE PAGE TO STOCK PURCHASE AND OPTION AGREEMENT]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**SELLERS:**

Survivor's Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended

By: _____
Name: ANDREW J ARMANIVD JR
Title: TRUSTEE

Marital GST Non-Exempt Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended

By: _____
Name: ANDREW J ARMANIVD JR
Title: TRUSTEE

Marital GST Exempt Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended

By: _____
Name: ANDREW J ARMANIVD JR
Title: TRUSTEE

Bypass Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended

By: _____
Name: ANDREW J ARMANIVD JR
Title: TRUSTEE

[SIGNATURE PAGE TO STOCK PURCHASE AND OPTION AGREEMENT]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

INITIAL PURCHASERS:

_____
Jerome Falic


_____
Simon Falic


_____
Leon Falic


**BUYER:**

**FAIRN & SWANSON HOLDINGS, INC.**

By: _____
Name: Leon Falic
Title: President, Secretary and Treasurer

[SIGNATURE PAGE TO STOCK PURCHASE AND OPTION AGREEMENT]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

INITIAL PURCHASERS:

_____
Jerome Falic

_____
Simon Falic

_____
Leon Falic

BUYER:

FAIRN & SWANSON HOLDINGS, INC.

By: _____
Name: Leon Falic
Title: President, Secretary and Treasurer

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

INITIAL PURCHASERS:

_____
Jerome Falic

_____
Simon Falic

_____
Leon Falic

BUYER:

FAIRN & SWANSON HOLDINGS, INC.

By: _____
Name:   Leon Falic
Title:  President, Secretary and Treasurer

[SIGNATURE PAGE TO STOCK PURCHASE AND OPTION AGREEMENT]

## ACCEPTANCE AND AGREEMENT OF SELLERS' REPRESENTATIVE

The undersigned, being the Sellers' Representative designated in Section 14.18 of the foregoing Stock Purchase and Option Agreement, agrees to serve as the Sellers' Representative and to be bound by the terms of the Stock Purchase and Option Agreement pertaining thereto.

By: _____
Andrew J. Armanino, Jr.

[SIGNATURE PAGE TO STOCK PURCHASE AND OPTION AGREEMENT]

## SCHEDULE I

## FIRM SHARES AND OPTION SHARES

| Sellers | Shares | Firm Shares | Option Shares |
|---|---|---|---|
| Survivor's Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended | 307.50 | 123.00 | 184.50 |
| Marital GST Non-Exempt Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended | 158.23 | -- | 158.23 |
| Marital GST Exempt Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended | 20.78 | -- | 20.78 |
| Bypass Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended | 128.49 | -- | 128.49 |
| TOTAL: | 615.00 | 123.00 | 492.00 |

| Initial Purchasers | Firm Shares | Option Shares |
|---|---|---|
| Jerome Falic | 41 | 164 |
| Simon Falic | 41 | 164 |
| Leon Falic | 41 | 164 |
| TOTAL: | 123 | 492 |

[SCHEDULE I]

**ANNEX A**

**CERTAIN RIGHTS**

The following provisions shall govern the Parties rights with respect to the Firm Shares and the Option Shares in the event that (a) neither the Call Option nor the Put Option is exercised, or (b) the Call Option or the Put Option is exercised, but the Initial Purchasers' and the Buyer's rights and obligation to acquire the Option Shares and the Sellers' rights and obligation to sell the Option Shares are terminated pursuant to **Section 12.2** of the Agreement.

Section 1.        Right of First Offer; Tag Along Right.

(a)        If one or more of the Sellers (the "Prospective Seller(s)") desires to sell, assign, transfer or otherwise dispose of (each, a "Transfer") all or any portion of the Option Shares it owns, the Prospective Seller(s) shall deliver a written notice (a "ROFO Notice") to the Buyer setting forth the number of Option Shares to be Transferred (the "Initial ROFO Shares") and the minimum price per Option Share (the "ROFO Price") at which the Prospective Seller(s) proposes to Transfer the ROFO Shares (the "ROFO Offer"). A ROFO Notice shall constitute an exclusive offer by the Prospective Seller(s) to sell the ROFO Shares to the Buyer at the ROFO Price.

(b)        For a period of ten (10) Business Days following the Buyer's receipt of the ROFO Notice (the "ROFO Period"), the Buyer shall have an irrevocable and exclusive option to purchase all (but not less than all) of the *ROFO* Shares at the ROFO Price and otherwise on the same terms and conditions as the purchase of the Firm Shares provided for herein. If the Buyer elects to exercise such option, the Prospective Seller(s) and the Buyer shall promptly enter into an agreement to consummate (or amend this Agreement to provide for consummation of) the purchase and sale of the ROFO Shares at a closing to occur no later than ninety (90) days after the expiration of the ROFO Period. If the Buyer does not elect to purchase all of the ROFO Shares during the ROFO Period, the Prospective Seller(s) shall have the right, for a period of ninety (90) days from the earlier of (i) the expiration of the ROFO Period and (ii) the date on which the Prospective Seller(s) shall have received written notice from the Buyer stating that the Buyer does not intend to exercise its right to purchase the ROFO Shares, to enter into a binding agreement to Transfer all (but not less than all) of the ROFO Shares to any third party for a price not lower than the ROFO Price.

(c)        If, during the 90-day period described in Section 1(b), the Prospective Seller(s) intends to accept an offer to Transfer all or part of the ROFO Shares at a price that is not equal to or greater than ninety five percent (95%) of the ROFO Price, then the Prospective Seller(s) shall deliver a written notice (the "Second ROFO Notice") to the Buyer setting forth the name and address of the proposed transferee, the number of ROFO Shares proposed to be Transferred and the proposed sale price and payment terms, and shall enclose a copy of the offer received with respect thereto. For a period of ten (10) Business Days following the Buyer's receipt of the Second ROFO Notice (the "Second ROFO Period"), the Buyer shall have an irrevocable and exclusive option to purchase all (but not less than all) of such ROFO Shares at the same price and on the same payment terms as specified in the Second ROFO Notice. If the Buyer elects to exercise such option, the Prospective Seller(s) and the Buyer shall promptly enter into an agreement to consummate (or amend this Agreement to provide for consummation of) the purchase and sale of such ROFO Shares on the terms set forth in the Second ROFO Notice at a closing to occur no later than ninety (90) days after the expiration of the Second ROFO Period. If the Second ROFO Period elapses without the Buyer having exercised such option, the Prospective Seller(s) shall have the right to Transfer all (but not less than all) of the ROFO Shares strictly in accordance with the terms and conditions set forth in the Second ROFO Notice and to the proposed transferee identified therein within

ninety (90) days from the earlier of (i) the expiration of the Second ROFO Period and (ii) the date on which the Prospective Seller(s) shall have received written notice from the Buyer stating that the Buyer does not intend to exercise its option to purchase such ROFO Shares.

(d)     If the Prospective Seller(s) deliver a ROFO Notice or Second ROFO Notice to the Buyer and the Buyer does not elect to purchase all of the ROFO Shares offered to it in accordance with Section 1(b) or 1(c), as applicable, then not later than the tenth (10th) Business Day prior to the consummation by the Prospective Seller(s) of a Transfer of the ROFO Shares permitted by such provisions, the Prospective Seller(s) shall deliver a written notice (the "Tag-Along Notice") to the Initial Purchasers setting forth the name and address of the proposed transferee, the proposed sale price and payment terms, and shall enclose a copy of the offer received with respect thereto together with the proposed form of any definitive agreements to be entered into with respect thereto. Upon receipt of such notice, each Initial Purchaser shall have ten (10) days to irrevocably elect to Transfer all of the Firm Shares then owned by him to the proposed transferee on the terms and subject to the conditions set forth in Tag-Along Notice; provided that the Transfer contemplated by the Tag-Along Notice closes. Failure by an Initial Purchaser to make an election pursuant to this Section 1(d) within the 10-day election period shall constitute an election to decline to participate in the transaction contemplated by the Tag-Along Notice. If an Initial Purchaser elects to participate in the transaction contemplated by the Tag-Along Notice, no Prospective Seller shall effect a Transfer of any ROFO Shares pursuant to such transaction unless all of the Firm Shares of such Initial Purchaser are simultaneously Transferred.

(e)     An Initial Purchaser who elects to Transfer his Firm Shares pursuant to Section 1(d), will take all lawful action reasonably requested by the Prospective Seller(s) to complete the Transfer contemplated by the Tag-Along Notice including, without limitation, surrendering at the closing of such Transfer any stock certificates representing such shares properly endorsed for transfer against payment of the sale price therefor, and if so reasonably requested by the Prospective Seller(s), executing a sale agreement in respect of such Transfer; provided, that (i) the Initial Purchasers shall not be required to make or provide any representations, warranties, covenants or indemnities in connection with such Transfer except with respect to their power and authority to transfer the Firm Shares they own free and clear of all Liens, their unencumbered title to such Firm Shares, and the absence of any litigation, laws or agreements to which they are bound which would impede the transfer of such Firm Shares, (ii) any such representations, warranties, covenants and indemnities made by an Initial Purchaser shall be made severally and not jointly with the Sellers or any other Initial Purchaser, and (iii) in no event shall any Initial Purchaser be required to enter into or agree to any non-competition or other agreement that limits in any manner such Initial Purchaser's freedom to compete freely in any line of business or in any geographic area.

(f)     If (i) the Buyer does not elect to purchase any ROFO Shares offered to it in accordance with the provisions of Section 1(b) or 1(c), as applicable, and (ii) the Transfer of such ROFO Shares (together with any Firm Shares to be included in such Transfer in accordance with Section 1(d)) does not close during the 90-day period described in Section 1(b) or 1(c), as applicable, the Tag-Along Notice shall be deemed to have been withdrawn and the rights and obligations of the Parties shall continue to be governed by this Section 1, which shall apply in connection with any subsequent Transfer by the Prospective Seller(s) of all or any portion of the Option Shares.

Section 2.     Drag-Along Right.

(a)     If, pursuant to Section 1, the Sellers have delivered a ROFO Notice to the Buyer in which they propose to Transfer all (but not less than all) of the Option Shares to a third party (a "Drag-Along Transfer"), then provided that the purchase price in the Drag-Along Transfer (the "Drag-Along Price") is (i) payable in full in cash at closing and (ii) not less than the greater of the ROFO Price and an amount

that will result in the Initial Purchasers realizing a return on their investment in the Firm Shares of at least 3% per annum, compounded annually (based upon the Firm Share Price and calculated from the Initial Closing Date through the date of the Drag-Along Notice (as defined below)), during the 90-day period described in the last sentence of Section 1(b), the Sellers shall have the right to require the Initial Purchasers to participate in the Drag-Along Transfer and sell all (but not less than all) of the Firm Shares they then own to such third party for the Drag-Along Price. If the Drag-Along Transfer is structured as a merger, consolidation or similar business combination, the Initial Purchaser take all actions necessary to waive any dissenters, appraisal or other similar rights with respect to the transaction.

(b)     If the Sellers elect to exercise their rights pursuant to Section 2(a), then not later than the tenth (10th) Business Day prior to the consummation of the Transfer contemplated by the Drag-Along Transfer they shall deliver a written notice (the "Drag-Along Notice") to the Initial Purchasers setting forth setting forth the name and address of the proposed transferee, the Drag-Along Price, and shall enclose a copy of the offer received with respect thereto together with the proposed form of any definitive agreements to be entered into with respect thereto.

(c)     The Initial Purchasers will take all lawful action reasonably requested by the Sellers to complete the Drag-Along Transfer including, without limitation, surrendering at the closing of such Transfer any stock certificates representing such shares properly endorsed for transfer against payment of the sale price therefor, and if so reasonably requested by the Prospective Seller(s), executing a sale agreement in respect of such Transfer; provided, that (i) the Initial Purchasers shall not be required to make or provide any representations, warranties, covenants or indemnities in connection with a Drag-Along Transfer except with respect to their power and authority to transfer the Firm Shares they own free and clear of all Liens, their unencumbered title to such Firm Shares, and the absence of any litigation, laws or agreements to which they are bound which would impede the transfer of such Firm Shares, (ii) any such representations, warranties, covenants and indemnities made by an Initial Purchaser shall be made severally and not jointly with the Sellers or any other Initial Purchaser, and (iii) in no event shall any Initial Purchaser be required to enter into or agree to any non-competition or other agreement that limits in any manner such Initial Purchaser's freedom to compete freely in any line of business or in any geographic area.

(d)     The Sellers shall have ninety (90) days from following the later of (i) the date of the Drag-Along Notice in which to consummate the Drag-Along Transfer, on the terms set forth in the Drag-Along Notice. If at the end of such period the Sellers have not completed the Drag-Along Transfer, the Sellers may not then effect a transaction subject to this Section 2 without again fully complying with the provisions of Section 1 and this Section 2.

Section 3.     S Corporation Status.

(a)     So long as a Seller or the Initial Purchaser continues to be a shareholder of the Company, and unless all such Sellers or the Initial Purchasers shall otherwise agree, each such Seller and the Initial Purchaser shall (i) refrain from taking any action to revoke the election of the Company to be treated as an S corporation for federal income tax purposes or that would result in the Company ceasing to be an S corporation for federal income tax purposes, and (ii) take all such action as may be necessary with respect to it or him to continue the status of the Company as an S corporation for federal income tax purposes.

(b)     To the extent that the Company is an S corporation for federal income tax purposes at the time of a proposed Transfer pursuant to Section 1, without the consent of each Initial Purchaser who will continue to be a shareholder of the Company following such Transfer, the Prospective Seller(s) effecting such Transfer shall ensure that upon such Transfer the Company shall continue to have the status of an S corporation. In connection with any such Transfer or proposed Transfer, if requested by any such Initial

3

Purchaser, the Company shall obtain an opinion of counsel reasonably satisfactory to such Initial Purchaser that such Transfer or proposed Transfer is in compliance with the provisions of this <u>Section 3</u>.

Section 4.     <u>Information Rights; Confidentiality</u>.

The Company shall deliver the following information and documents to the Initial Purchasers at the following times:

(a)     <u>Annual Statements</u>. As soon as practicable, but in any event within ninety (90) days after the end of each fiscal year, the audited balance sheet of the Company and the related audited statement of income, statement of stockholders' equity and statement of cash flows for the Company, in each case prepared in accordance with GAAP, except as specifically disclosed therein.

(b)     <u>Monthly Statements</u>. Within fifteen (15) days after the end of each month, (i) the unaudited balance sheet of the Company, and the related unaudited statement of income, statement of stockholders' equity and statement of cash flows for the Company as of the end of such month, in each case prepared in accordance with GAAP, except as specifically disclosed therein, (ii) key customer and product sales forecasts and margins, and (iii) projections of increases or decreases in (A) workforce, (B) personnel costs, (C) capital expenditures and (D) working capital.

(c)     <u>Budget</u>. With respect to each fiscal year, the annual budget of the Company that is approved by the Company's board of directors for such fiscal year within ten (10) days after the approval thereof.

(d)     <u>Other Reports and Records</u>. All other material reports and records of the Company (as determined in good faith by the Company's board of directors) within ten (10) days after such determination by the Company's board of directors.

(e)     <u>Confidentiality</u>. None of the Initial Purchasers shall, directly or indirectly, disclose or use at any time (and shall cause their respective Affiliates and Representatives not to use or disclose) any Confidential Information disclosed to the Initial Purchasers pursuant to this Section 4, except to the extent that such disclosure or use is directly related to the Initial Purchasers' investment in the Firm Shares or enforcement of the Agreement or as required by Law or as otherwise provided hereunder. In the event any of the Initial Purchasers is required by Law to disclose any Confidential Information, such Initial Purchaser shall promptly notify the Company in writing, which notification shall include the nature of the legal requirement and the extent of the required disclosure, and shall cooperate with the Company's reasonable requests to preserve the confidentiality of such Confidential Information consistent with applicable Law.

Section 5.     <u>Nonsolicitation</u>.

During the period ending on the first (1st) anniversary of the Termination Date (the "Non-Solicitation Period"):

(a)     none of the Initial Purchasers shall, directly or indirectly, either individually or acting in concert with another Person or Persons solicit for employment or retention or hire, employ or retain any Person who is an employee of the Business during the Non-Solicitation Period (provided that following the first (1st) anniversary of the Termination Date, any of the Initial Purchasers and their respective Affiliates shall be entitled to hire, employ or retain any such Person so long as such Initial Purchaser did not directly or indirectly solicit such Person, other than through general advertisements not intended to be specifically directed at such Person

(for the avoidance of doubt, the Initial Purchasers shall not be deemed to have violated this provision by hiring, employing or retaining any Person who contacts a the Initial Purchasers on an unsolicited basis following the first (1st) anniversary of the Termination Date); or

(b)     influence or attempt to influence any Person who is an employee of the Business during the Non-Solicitation Period to terminate his or her employment with the Company or the Business (for purpose of clarity, if any Initial Purchasers exercises its right to hire in accordance with the terms of the proviso set forth in clause (a) above, such action shall not be deemed to be a violation of this clause (b).

# EXHIBIT A

## PROXY

Pursuant to that certain Stock Purchase and Option Agreement (the "Agreement") dated as of August 4, 2015, by and among Jerome Falic, Simon Falic and Leon Falic (each an "Initial Purchaser" and collectively, the "Initial Purchasers"), Fairn & Swanson Holdings, Inc., a Delaware corporation (the "Buyer"), Fairn & Swanson Inc., a California corporation (the "Company"), the holders of the Equity Interests thereof whose signatures appear on the signature pages thereof, and Andrew J. Armanino, Jr., as the Sellers' representative (the "Sellers' Representative"), each of the Initial Purchasers hereby appoints the Sellers' Representative as his true and lawful proxy and attorney-in-fact, with full power of substitution, to vote all Firm Shares owned by him (whether now owned or hereafter acquired) with respect to any matter upon which a vote of the shareholders of the Company may be made pursuant to the California Corporations Code, as may be in effect from time to time; provided, however, that any exercise by the Sellers' Representative of such proxy shall be consistent with the approval requirements of **Section 6.1** of the Agreement.

The foregoing proxy shall be irrevocable until the Termination Date, at which time this proxy shall terminate automatically, and be of no further force and effect.

Capitalized terms used in this Proxy and not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

Dated _____, 2015

**[Signature Page Follows]**

IN WITNESS WHEREOF, this Proxy is executed as of the date first written above.

_____
Jerome Falic


_____
Simon Falic


_____
Leon Falic

**EXHIBIT 2**

June ___, 2005

Mr. Wolfgang Uhlig
Fairn & Swanson
400 Lancaster Street
Oakland, California 94601

Dear Wolfgang:

We (Simon, Leon and Jerome Falic) are pleased to set forth in this letter agreement your and our agreement and understanding of the essential terms and conditions for the acquisition (the "Acquisition") of all outstanding stock of Fairn & Swanson Inc., a California corporation ("F&S"), and South Seas Distribution Inc, an American Samoa corporation ("SSD" and, collectively with F&S, and their respective subsidiaries and affiliates, including Baja Duty Free (F&S's fictitious business name), the "Companies"), from Wolfgang Uhlig and/or the Uhlig Family Trust (collectively, "Sellers") by a newly formed entity ("Buyer") controlled by us and affiliated with DFA Holdings, Inc. The parties intend this letter agreement to be binding and enforceable (to the extent set forth herein), and that it will inure to the benefit of the parties and their respective predecessors, successors and assigns. Until such time as this letter agreement is terminated as set forth herein or the parties enter into Definitive Agreements (as defined in paragraph 3, below), the parties shall use good faith efforts to negotiate and enter into Definitive Agreements in accordance with the terms set forth herein.

Our agreement is as follows:

1.    Purchase and Consideration; Deposit.

Buyer will acquire from Sellers and Sellers will sell to Buyer 100% of the outstanding capital stock of the Companies (including any securities convertible or exercisable into their capital stock, the "Shares"), free and clear of all liens and encumbrances. The parties agree that no Internal Revenue Code Section 338 election shall pertain to the Acquisition.

The purchase price (the "Purchase Price") for the Shares will be US$12 million, of which US$5 million will be payable in cash in immediately available funds to Sellers at closing and the US$7 million balance will be paid by Buyer's issuance to Sellers of a promissory note bearing interest at a prime rate (to be specified) less 0.25% per annum, with equal monthly scheduled payments to fully amortize the principal balance over the 5-year period following the closing of the Acquisition (the "Note"). The other terms of the Note shall be reasonably satisfactory to Sellers and shall include (among other terms) no right of offset. The Note will be secured by the personal guarantees of payment of Simon, Leon and Jerome Falic, and of DFA and DFA Holdings, Inc. The undersigned and the parties agree to continue to discuss any additional security (e.g., guarantees, collateral, pledges of stock, and/or letters of credit) which Sellers (in their sole discretion) may require. Notwithstanding anything to the contrary in this letter agreement, including but not limited to paragraph 5 but excluding paragraph 7(d), below, if the parties do not reach consensus on such terms prior to execution of the Definitive Agreements,

Sellers may terminate this letter agreement by notifying the undersigned in writing without any liability or further obligations to the undersigned or Buyer.

In addition, at the closing Sellers will grant Buyer a five-year option to purchase that certain real property located at 245 Imperial Avenue, Calexico, California (the "Calexico Property") for $1.5 million, payable upon exercise of the option. The option shall be in a form and shall have such other provisions mutually agreeable to Buyer and Sellers.

Within three business days after execution of this letter agreement by Sellers, Buyer shall place in escrow with Greenberg Traurig, P.A. cash in the sum of One Hundred Thousand Dollars ($100,000) as a good faith deposit to serve as liquidated damages (as described below) for Buyer's failure to perform its obligations under this letter agreement (the "Deposit").

Upon execution of the Definitive Agreements, Buyer shall increase the amount of the Deposit in escrow to the sum of One Million Dollars ($1,000,000) as a good faith deposit to serve as liquidated damages for Buyer's failure to perform its obligations under the Definitive Agreements as provided therein. If, prior to closing, Buyer defaults under the terms of the Definitive Agreements and fails to cure such default within three (3) days of notice thereof, then Sellers shall have the right to elect to either terminate the Definitive Agreements by written notice to Buyer, whereupon the Deposit and all interest accrued thereon shall be paid immediately to Sellers, or to seek specific performance of Buyer's obligations under the Definitive Agreements. Upon closing, the Deposit (and all interest earned thereon) shall be delivered to Sellers and credited to Buyer.

The parties agree that Sellers' actual damages as a result of Buyer's default under this agreement or under the Definitive Agreements would be difficult or impossible to determine, but could include damage to the reputation of the Companies as a viable ongoing business, jeopardized relationships with key suppliers and customers, depressed employee morale and an increased risk of employee turnover, and lost opportunities. The parties therefore agree that the Deposit is the best estimate of the amount of damages Sellers would suffer as a result of such defaults. The payment of the Deposit as liquidated damages is not intended as a forfeiture or penalty within the meaning of California Civil Code sections 3275 or 3369, but is intended to constitute liquidated damages to Sellers pursuant to California Civil Code sections 1671(a) and (b). Other than specific performance, Seller's sole and exclusive remedy for breach of this letter agreement or the Definitive Agreements, other than a breach of paragraph 7(d) or 7(e), after expiration of any applicable cure period shall be termination of this letter agreement or the Definitive Agreements, respectively, and receipt of the Deposit (in such amount as applicable at the time of termination) as Sellers' liquidated damages; and each Seller waives any and all other rights and remedies, at law or in equity, to which such Seller may otherwise be entitled by reason of breach of this letter agreement (other than a breach of paragraph 7(d) or 7(e)) or the Definitive Agreements prior to closing. This paragraph is not intended to limit Sellers' recovery of damages or to waive any of Sellers' rights or remedies under the Definitive Agreements (including any agreements referenced therein), the Note, any personal guarantees of Simon, Jerome or Leon

Falic, or any other security-related agreements or instruments after the closing of the Acquisition.

2.  Material Terms and Conditions of Proposal.

(a)  Companies' Debt.  All of Companies' outstanding debt, including but not limited to its line of credit and term loans with Bank of the West ("BoW") and advances from Sellers, will remain outstanding as of the closing of the Acquisition, except as provided herein.  Sellers represent and warrant that as of March 31, 2005, the Companies' outstanding debt (excluding leases, trade payables, accrued expenses and current liabilities incurred in the ordinary course) consisted of (i) F&S' outstanding debt to BoW of $5.1 million under its line of credit and $1.1 million in term loans; (ii) F&S' approximately $600,000 liability to Sellers, all of which will be paid in connection with the transfer of the Calexico Property referred to in paragraph 2(b), below; and (iii) SSD's $250k liability to Seller, which last amount will be repaid by SSD prior to closing.  On the closing date of the Acquisition, Buyer will either satisfy all of F&S' debt with BoW, or will otherwise cause BoW to release Sellers from their personal guarantees of such debt.

(b)  F&S currently is in the process of transferring ownership of the Calexico Property to Sellers for a purchase price of not less than $1,225,000.  Of this amount, $600,000 shall be paid as a reduction of F&S' liability to Sellers and the balance will be paid by Sellers in cash and used to reduce the outstanding balance of F&S' BoW line of credit.  Following the closing of the purchase, Sellers will enter into a lease agreement (substantially on an AIR Commercial Real Estate Association Standard Industrial/Commercial Single Tenant Lease – Net form) with F&S for the Calexico Property at a rental of $12,000 per month, with annual rent increases based on an appropriate Consumer Price Index.  The lease shall be for a term of five years with two five-year extension options at the election of F&S.  F&S shall continue to benefit from the existing sublease of the Calexico Property to a money exchange on the same terms and conditions as are currently in effect.  Notwithstanding anything to the contrary in this letter agreement, Sellers make no representations or warranties with respect to the creditworthiness or other characteristics of the subtenant.

(c)  The following shall be the sole conditions precedent to Buyer's obligations to consummate the Acquisition (any of which may be waived in Buyer's sole discretion):

(i)  Wolfgang Uhlig will enter into mutually satisfactory agreements with Buyer pursuant to which he agrees (A) to consult with Buyer for a minimum of 90 days following the closing of the Acquisition to assist with the transition of ownership and integration of the Companies' operations into the Buyer's and/or its affiliated businesses (for which he will be compensated at his current compensation), and (B) to refrain from competing with Buyer or its affiliates for a period of five years following the closing.

(ii)  Buyer shall have received reasonably satisfactory evidence or assurances that:

    A.  as of the closing, the Companies will be current in their obligations and will have no indebtedness or other liabilities, other than (1) the debts referred to in paragraph 2(a) above (less the repayments referred to in paragraph 2(a)) plus such additional debt under the BoW line of credit, if any, as may have been incurred by the Companies between March 31, 2005 and the closing of the Acquisition in the ordinary and normal course of business consistent with past practices, and (2) trade payables, leases extant as of the effective date of the Definitive Agreements, accrued expenses and other current liabilities incurred in the ordinary and normal course of business consistent with past practices; and

    B.  the Companies own all of their properties and assets free and clear of all liens and encumbrances, other than liens securing the Companies' indebtedness to BoW .

    (iii)  Sellers and the Companies shall have used commercially reasonable efforts to obtain all necessary third-party and government consents (including all certificates, licenses, permits, consents and approvals required in connection with the Companies' operations) to the Acquisition. Buyer agrees that obtaining such consents shall not be a condition to closing the Acquisition.

    (iv)  The absence as of the closing date of the Acquisition of any material adverse changes with respect to the Companies since March 31, 2005 (other than changes in conditions affecting the duty-free and/or cruise ship industries (or either of them) as a whole, changes due to actions taken at Buyer's written request, employee attrition because of the pending Acquisition, third-party cancellations of agreements with any of the Companies where such third party(ies) refused to consent to an assignment or deemed assignment under any such agreement, the cancellation of supplier or customer contracts because of the pending Acquisition, and the short-term financial condition of the Companies (or either of them)) or any injunction, order or other decree by any court or governmental body or any pending or threatened litigation or proceeding prohibiting, restraining or otherwise preventing the Acquisition.

    (v)  Sellers' representations and warranties contained in the Definitive Agreements shall be true and correct in all material respects, and Sellers shall have performed in all material respects all covenants required by the Definitive Agreements to be performed at or prior to the closing.

    (vi)  Buyer shall have received customary closing certificates and an opinion of Sellers' counsel as to the matters described in paragraph 3(e), below.

    (vii)  No proceeding in which either of Sellers or the Companies shall be a debtor, defendant or party seeking an order for its own relief or reorganization shall have been brought or be pending by or against such person under any bankruptcy or insolvency law.

(viii) BoW shall have provided Buyer a "payoff" or "estoppel" letter setting forth the amount of F&S' debt then outstanding and BoW's agreement to terminate all guarantees, liens and encumbrances securing such debt upon payment of such amount.

(ix) Sellers shall fully release the Companies from any and all claims Sellers have against the Companies other than the obligations set forth in paragraph 2(c)(i), the lease referenced in paragraph 2(b), and the obligations described in paragraph 2(a)(ii) and (iii) (but only to the extent not previously discharged as so described), above.

(d) The following shall be conditions precedent to Sellers' obligations to consummate the Acquisition:

(i)     Buyer's representations and warranties contained in the Definitive Agreements shall be true and correct in all material respects, and Buyer shall have performed in all material respects all covenants required by the Definitive Agreements to be performed at or prior to the closing.

(ii)    Buyer shall have reasonably cooperated with Seller in obtaining and, where appropriate, initiated requests for all necessary third-party and governmental consents (including all certificates, licenses, permits, consents and approvals required in connection with the Companies' operations) to the Acquisition.

(iii)   Buyer shall have sufficient funds available to satisfy, among other things, the obligation to pay (a) the purchase price and (b) all expenses incurred by Buyer in connection with the Acquisition.

(iv)   Buyer will have satisfy all of F&S' debt with BoW, or will otherwise cause BoW to release Sellers from their personal guarantees of such debt.

(e)     The closing of the Acquisition shall take place no later than the ninety day anniversary of the date hereof, or such other time as the parties may mutually agree.

3.     Definitive Agreements. Buyer and Seller will make good faith efforts to negotiate and enter into definitive agreements for the Acquisition as soon as practicable after the date hereof but in no event later than the date specified in paragraph 3(d) below ("Definitive Agreements"). The Definitive Agreements will be in mutually agreed form and, subject to and in addition to the other matters addressed in this letter agreement, will contain usual and customary representations, warranties, covenants and indemnities for a transaction of this nature and size (including carve-outs, caps, and deductibles described herein). The Acquisition will be subject to customary closing conditions, including the delivery of customary closing certificates, assignment and transfer documents. In addition to matters addressed elsewhere in this letter agreement, the Definitive Agreements shall include the following terms:

(a)   <u>Representations and Warranties</u>.

      (i)   The parties shall provide reciprocal representations and warranties with respect to:

- corporate organization and existence;

- due authorization;

- no violations of Buyer's and Companies' respective articles (or certificates) of incorporation or bylaws; and

- absence of any breaches or violations of their respective agreements to which they are parties (other than any possible breaches by any of the Companies of any of their obligations to obtain third party consents to the assignment of agreements to which they are a party), or any applicable laws, regulations or court orders as a result of the execution of the Definitive Agreements or consummation of the Acquisition.

      (ii)   Sellers shall provide usual and customary representations and warranties (other than as qualified in appropriate schedules) as follows:

- as to the Companies' capitalization;

- as to the Companies' power to own and operate the business and properties and execute and deliver the Definitive Agreements;

- as to the Companies' qualifications in foreign jurisdictions;

- as to the Companies' records regarding share ownership, charter documents and minute books;

- as to the Companies' ownership of any subsidiaries and the capitalization of such subsidiaries;

- as to Sellers' title to the Shares;

- as to the Companies' title or rights to properties and assets owned, leased, or licensed to the Companies;

- as to material agreements and the absence of any material breaches or violations thereof by the Companies or known breaches by third-parties;

- as to the Companies' compliance with laws;

- as to any pending or threatened litigation;

- as to any tax matters;

- as to any related party transactions;

- as to the Companies' financial statements and condition, (x) that F&S's two most recent annual financial statements for and as of the years then ended, accompanied by the report of the Company's independent public accountants thereon and delivered to Buyer and SSD's unaudited financial statements for such periods, are prepared from and in accordance with the respective books and records of F&S and SSD in accordance with generally accepted accounting principles consistently applied (except as indicated in the notes thereto) and fairly present in all material respects the financial condition and results of operation of F&S or SSD, as the case may be, as of and for the periods indicated and (y) the absence of undisclosed liabilities;

- as to the absence of certain events or material changes since March 31, 2005;

- as to the absence of certain business practices and improper benefits or payments; and

- that neither the execution and delivery of the Definitive Agreements nor the consummation of the Acquisition will (x) entitle any current or former employee of the Companies to severance pay, unemployment compensation or any similar payment, or (y) accelerate the time of payment or vesting or increase the amount of any compensation due to any such employee or former employee.

(iii)    Buyer shall provide usual and customary representations and warranties including the following:

- as to title to its stock and capitalization;

- as to its investment experience and the purchase of the Shares for investment;

- as to the personal financial statements of Simon, Leon and Jerome Falic provided to Seller;

- that Simon, Leon and Jerome Falic's two most recent annual personal financial statements for and as of the years then ended fairly present in

all material respects their respective personal financial conditions as of and for the periods indicated; and

- as to the sufficiency of its resources to pay the Purchase Price and other obligations in connection with the Acquisition.

(iv)     Neither Sellers nor Buyer will be required to make any representations or warranties, express or implied, other than as set forth in this Section 3(a). None of the representations or warranties need include matters not reasonably likely to have a material adverse effect on the Companies' businesses, operations, assets, financial condition or prospects taken as a whole.

(v)     Except as set forth above, Buyer agrees that the assets and businesses of the Companies being acquired shall be on an "as is" "where is" basis as of the closing.

(vi)     Sellers' and Buyer's representations and warranties shall be for the period of eighteen (18) months from the date of closing.

(vii)     Sellers ("Indemnifying Party") will indemnify Buyer ("Indemnified Party") for all third party liabilities of the Companies arising prior to the closing date which are not included in the Companies' Balance Sheet as of March 31, 2005, other than those which: (A) have been disclosed to Buyer or Buyer has otherwise become aware of but has not disclosed to Sellers prior to execution of the Definitive Agreements; (B) are not material in amount; (C) were or are incurred in the ordinary course of business prior to the closing date; (D) are related to tobacco products of any kind; (E) Buyer becomes aware of more than eighteen (18) months after the closing date. Sellers' indemnity obligations, where covered by any liability insurance policy or policies, may be satisfied fully by tendering the claim to the respective insurer(s). Notwithstanding anything to the contrary in this letter agreement, Sellers shall not be required to indemnify Buyer for any liabilities asserted by Buyer (or any affiliated company or any of the undersigned) against the Companies or either of them.

(viii)     Buyer ("Indemnifying Party") will indemnify Sellers ("Indemnified Party") for the liabilities of the Companies (including but not limited to, any claims arising out of the operations of the Companies) after the closing date, and with respect to any claims, liabilities, losses, damages, costs, or expenses arising out of any inaccuracies in any representation or warranty or breach of any covenant made by Buyer.

(ix)     The Definitive Agreements shall provide that in the event an Indemnified Party desires to make a claim against an Indemnifying Party in connection with any action, suit, proceeding or demand by any third party for which it is entitled to be so indemnified as described in paragraphs 3(a)(vii) or (viii), above, and 3(b), below ("Third Party Claim"), the former shall notify the latter within thirty (30) days after receipt of a Third Party Claim, and shall prior to such notice take all reasonable steps not to prejudice the defense of the claim. A failure to promptly provide such notice shall relieve the Indemnifying Parties' obligations with respect to such Third Party Claim. Within a reasonable time after such notice, the Indemnifying Party

shall notify the Indemnified Party that it is willing to undertake the defense of the Third Party Claim, and shall thereafter be entitled to conduct and control the defense (including selection of defense counsel) at their own (or their insurer's) expense. Until the Indemnifying Party provides such notice, or if it fails to provide such notice, the Indemnified Party shall be entitled to assume the defense of the Third Party Claim at the expense of the Indemnifying Party; provided, however, the Indemnified Party may not settle any Third Party Claim without the Indemnifying Party's consent, which consent shall not be unreasonably withheld.

(b)     Limitation on Sellers' Liability for Breaches of Representations and Warranties. The Definitive Agreements will provide for a cap on Sellers' liability to Buyer, including liability to indemnify Buyer for breaches of the representations and warranties, and any indemnities, contained in the Definitive Agreements, equal in the aggregate to the amount of the Purchase Price, other than claims that result from or arise out of: (i) any fraudulent conduct, fraudulent misrepresentation or other intentional misconduct on the part of Sellers, (ii) any failure of a Seller to have (A) good, valid and marketable title to the Shares that such Seller purports to own immediately prior to the closing of the Acquisition, free and clear of all liens and encumbrances or (B) the full right, capacity and authority to sell such Shares to Buyer, and (iii) any failure of the Companies' to have good, valid and marketable title to properties and assets. As to the categories of claims described in subparts (i) through (ii) of the preceding sentence, the Definitive Agreements will not provide a dollar cap on Sellers' liability to indemnify Buyer, but this paragraph 3(b) shall otherwise apply. Sellers shall not be liable for any breaches of their representations or warranties unless and until they exceed separately or in the aggregate a deductible amount of One Hundred Thousand Dollars ($100,000), net of associated tax and insurance benefits to Buyer, and shall not be responsible for consequential or punitive damages, or to damages attributable to Buyer's negligence or willful misconduct.

(c)     Scope and Procedures for Buyer's Due Diligence Investigation. Subject to paragraph 6, below, Buyer shall have the right, at any time during the period commencing on the date of acceptance of this letter agreement by Sellers, and ending at 5:00 p.m. Pacific Daylight Savings Time on the twentieth (20th) day after such date (the "Due Diligence Period"), to conduct a review of the Due Diligence Information (defined in paragraph 6, below). Buyer may terminate this letter agreement without liability to Sellers or the Companies (except for the Deposit, unless the termination is for good cause consistent with Buyer's obligations hereunder to use good faith efforts to negotiate and enter into the Definitive Agreements) by written notice to Sellers by facsimile (with a copy by certified mail or recognized overnight courier) prior to the end of the Due Diligence Period (a "Termination Notice"). If Buyer fails to provide Sellers with a Termination Notice prior to the expiration of the Due Diligence Period, then (i) Buyer shall be deemed to have approved the results of Buyer's review of the Due Diligence Information, (ii) the Deposit shall become non-refundable (subject to the other provisions of this letter agreement or the Definitive Agreements regarding the return of the Deposit to Buyer) and (iii) Buyer's right to terminate this letter agreement and the Definitive Agreements without liability to Sellers for liquidated damages shall automatically lapse and the parties shall proceed with the closing in accordance with the terms of this letter agreement and the Definitive Agreements.

(d)     Sellers' Right to Terminate. Sellers may terminate this letter agreement without liability to Buyer or any of its principals (including Simon, Jerome and Leon Falic) by written notice to

Buyer and Simon Falic by facsimile (with a copy by certified mail or recognized overnight courier) if Buyer fails through no fault of Sellers to execute the Definitive Agreements and related documents on the terms and conditions set forth herein within forty-five (45) days after the date of acceptance of this letter agreement by Sellers. Upon the exercise of Sellers' right to terminate under the immediately preceding sentence of this paragraph 3(d), Buyer shall forfeit the Deposit then held in escrow (and all interest earned thereon) which shall be paid immediately to Sellers.

(e)     Opinion of Counsel. The parties' respective opinion(s) of counsel shall contain solely opinions that: (i) Buyer, F&S and SSD are corporations incorporated, existing, and in good standing under the laws of their respective states or territories of incorporation; (ii) the Definitive Agreements have been duly authorized, executed and delivered (as of the closing) by the parties, and are binding on them in accordance with their terms except as enforcement thereof may be limited by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditor's rights or the relief of debtors generally, and to the application of general equitable principles by a court of competent jurisdiction; and (iii) the execution and delivery of the Definitive Agreements and consummation of the transactions contemplated thereby, do not violate the respective charter documents of the parties or applicable law. The opinion of Sellers' counsel shall also contain opinions that: to the best actual knowledge of such counsel, with no duty of inquiry, there is no material proceeding by or before any court or governmental body pending or overtly threatened against or involving the Companies except as previously disclosed by Sellers. Nothing in the foregoing is intended to preclude either parties' counsel from including standard (i.e., typical in their respective geographical areas) qualifying language in their respective opinions.

4.     Ordinary Course of Business. Until the execution of the Definitive Agreements or such earlier date as we mutually agree to terminate negotiations, the Companies will conduct their businesses only in the normal and ordinary course and consistent with good business practices and use their commercially reasonable efforts to preserve their business organizations intact and to preserve their existing business relationships. Without limiting the foregoing, during such period the Companies will not (i) create, incur or assume any indebtedness for borrowed money, except in the ordinary and normal course of business consistent with past practices, (ii) sell, encumber or otherwise dispose of any of their assets, except for the sale of the Calexico Property referred to in paragraph 2(b), above, and sales of inventory in the ordinary and normal course of business consistent with past practice, (iii) enter into or amend, terminate, cancel or waive the provisions of any material contract or agreement (except for the lease with Sellers of the Calexico Property), (iv) pay any dividends or make any distributions (except the loan repayments referred to in paragraph 2(b)) or loans to the Sellers or their affiliates (except short-term loans to Sellers in the ordinary and normal course of business consistent with past practices, which loans shall be repaid, or deducted from the purchase price, at closing), or redeem or issue any capital stock or securities convertible or exercisable into their capital stock, (v) except as otherwise provided herein, enter into any transactions with Sellers or their affiliates or increase any compensation or benefit arrangement for or make loans to any employee or consultant, or (vi) engage in any other transaction which has or could reasonably be expected to have a material adverse effect on their businesses, operations, assets, financial condition or

prospects. The Definitive Agreements shall provide customary covenants that Buyer agrees on and after the closing it shall: (x) cause the Companies in good faith to honor all written employment-related agreements to which they are presently a party; (y) continue in full force and effect all rights to indemnification or exculpation now existing in favor of the directors, officers, employees, and agents of the Companies (or either Company) for a period of not less than five years from the closing (with all rights to indemnification respecting any claims asserted within such period continuing until disposition); and (z) not take, and shall cause the Companies not to take, or cause to be taken any action which could result in a determination that the Companies or either of them were insolvent at the time of the closing, became insolvent as a result of the Acquisition, were left with unreasonably small capital with which to engage in their respective businesses, or incurred debts beyond their respective abilities to pay such debts as they mature, such that the payment of the Purchase Price may be deemed a "fraudulent conveyance" or impermissible dividend or distribution under applicable law.

5.   Nonsolicitation.  As consideration for the expenditures of time, effort, and money Buyer will incur in connection with the Acquisition, Sellers, for themselves and for the Companies and their respective officers, directors, employees and agents, agree not to, directly or indirectly, prior to termination of this letter agreement as provided herein: (i) negotiate or have substantive discussions with, or enter into any agreement or understanding with, any other person or entity for the sale, transfer or disposition of the assets (other than sales of inventory or immaterial portions of the Companies' (or either of their) assets in the ordinary course) or the capital stock of the Companies (an "Acquisition Proposal"), (ii) take any action reasonably expected to solicit, initiate or encourage an Acquisition Proposal, or (iii) continue, initiate or engage in negotiations with, disclose any non-public information relating to the Companies or afford access to the properties, books or records of the Companies to any person or entity (except Buyer and its principals) that may be considering or has made an Acquisition Proposal.

If we terminate this letter agreement due to a breach of the provisions of paragraph 4, Sellers shall pay to Buyer One Hundred Thousand Dollars ($100,000) in cash, and we and Buyer shall fully release and waive any and all other claims, rights and remedies, at law or in equity, to which we or Buyer may otherwise be entitled by reason of breach of this letter agreement. Alternatively, if we terminate this letter agreement due to a breach of the provisions of the preceding paragraph and Sellers or the Companies thereafter enter into or accept any offer with respect to an Acquisition Proposal within six (6) months after termination of this letter then, immediately upon such occurrence, Sellers shall pay to Buyer One Million Dollars ($1,000,000) in cash, and we and Buyer shall fully release and waive any and all other claims, rights and remedies, at law or in equity, to which we or Buyer may otherwise be entitled by reason of breach of this letter agreement.

6.   Access to Information.  For the purpose of permitting Buyer to carry out its due diligence investigation, Sellers shall cause the Companies to afford Buyer's representatives (with a reasonable need to know) full access during normal business hours to their offices, properties, books and records, including copies of all relevant financial and tax records, contracts and agreements and other relevant documents ("Due Diligence Information"). Notwithstanding the

preceding sentence, Buyer's representatives shall not be entitled to review or have access to pricing and costing information respecting Companies' suppliers or customers until after Buyer and Sellers shall have entered into the Definitive Agreements. Buyer's right to terminate this letter agreement pursuant to paragraph 3(c), above, shall be extended for one week from the date the parties enter into the Definitive Agreements, but only for good cause with respect to such pricing and costing information to which Buyer was not provided access during the Due Diligence Period. Each of Simon, Leon and Jerome Falic shall allow Sellers to examine such personal financial statements and other information as Sellers may reasonably request in order for Sellers to assess their personal guarantees as security for the Note.

   7.   Miscellaneous.

   (a)   This letter agreement is subject to acceptance by Sellers on or before the close of business on _____, 2005.

   (b)   Except as required by law, neither Buyer, Seller nor their affiliates or representatives will disclose publicly—i.e., to any person (including third-parties, affiliates, or either party's employees) who does not have a need to know for purposes reasonably related to the Acquisition—the existence of this letter agreement or the subject matter hereof without the prior written approval of the other party hereto. If any party is required to make such a disclosure by law, it will notify the other party in advance.

   (c)   This letter agreement is an agreement to proceed with the drafting of the Definitive Agreements and collateral documents contemplated thereby in accordance with the principles stated herein and is a binding contract to the extent mentioned above. To the extent this letter agreement is binding and enforceable, it will bind and inure to the benefit of the parties and their respective successors and assigns.

   (d)   Prior to the execution of this letter agreement by the parties, Simon Falic and F&S entered into a Mutual Confidentiality and Nondisclosure Agreement, a copy of which is attached hereto (the "NDA"). Each of the undersigned agrees to abide by the terms and conditions of the NDA as if he was a party thereto. Prior to consummation of the Acquisition, (i) Buyer and its affiliates (including the undersigned) will keep all information obtained about the Companies during Buyer's due diligence investigation or negotiations strictly confidential, shall not use any Due Diligence Information to compete with Sellers, or to solicit or hire any of Sellers' employees, and shall return or destroy upon Sellers' request all documents in their possession relating to the Companies and (ii) Sellers and their affiliates will keep all information obtained about Simon, Leon and Jerome Falic during Sellers' due diligence investigation or negotiations strictly confidential, and shall return or destroy upon their request all documents in their possession relating to Simon, Leon and Jerome Falic. This letter agreement supplements but does not supplant or amend the NDA, which shall continue in full force and effect. The NDA shall control in the event of a conflict with this paragraph 7(d), and survive termination of this letter agreement.

(e)    Buyer, Sellers, and Companies will be responsible for their own expenses with respect to this letter agreement and the Acquisition, including legal, accounting, consulting, financial advisory, investment banking, broker's or finder's fees and expenses. Any such fees or expenses incurred by and on behalf of the Companies shall be deemed expenses of the Companies. Without limiting the generality of the foregoing, Sellers shall be responsible for any fees and expenses payable to Geneva Companies, legal expenses incurred in negotiating and counseling with respect to this letter agreement and the Definitive Agreements, and the like; and Companies shall be responsible for fees or expenses incurred in seeking third-party consents, Company accounting matters, responding to Buyer's due diligence requests, and the like. Notwithstanding anything to the contrary in this letter agreement, in the event any suit or other legal proceeding is brought for the enforcement of any of the provisions of this letter agreement or the NDA the prevailing party or parties shall be entitled to recover from the other party or parties upon final judgment on the merits reasonable attorneys' fees reasonable attorneys' fees, including attorneys' fees for any appeal, and costs incurred in bringing such suit or proceeding.

*        *        *        *        *

The above proposal is based on the information made available to us to date. We are prepared to commence our due diligence review of the Companies as soon as possible and, following satisfactory completion, immediately take the necessary steps to complete the Acquisition.

If the foregoing is acceptable, please sign and return a copy of this letter agreement to our attention.

Sincerely,

Simon Falic

Jerome Falic

Leon Falic

AGREED AND ACCEPTED:

_____          Dated: _____, 2005
Wolfgang Uhlig, individually and as
trustee of the Uhlig Family Trust

**EXHIBIT 3**

Nicole Uhlig
400 Lancaster Street
Oakland, CA 94601
Email: nicoleu@fairn.com

November 21, 2019

***Via FedEx and Email***
Fairn & Swanson Holdings, Inc.
Attention: Simon Falic and Leon Falic
6100 Hollywood Blvd., 7th Floor
Hollywood, FL 33024
Email: Simon@falic.com

Re:    **Right of First Offer Notice**

Dear Simon and Leon:

    This shall serve as formal notice that the Bypass Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended, the Marital GST Exempt Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended, the Marital GST Non-Exempt Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended, and the Survivor's Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended (collectively, the "**Sellers**") under the Stock Purchase and Option Agreement dated August 4, 2015 ("**SPA**") intend to market all of their 492 shares of common stock of Fairn & Swanson Inc., a California corporation ("**ROFO Shares**"). Sellers will offer the ROFO Shares at a price of $52,032.52 per share (the "**ROFO Price**"), an aggregate price for all ROFO Shares equal to $25,600,000.

    Pursuant to Section 1 of Annex A to the SPA, prior to marketing the ROFO Shares, Sellers are obligated to deliver to Fairn & Swanson Holdings, Inc., a Delaware corporation ("**Buyer**"), this Right of First Offer Notice, which grants Buyer a period of ten (10) business days to accept the offer of ROFO Shares. If Buyer elects to purchase the ROFO Shares on or before December 10, 2019 ("**ROFO Period Expiration Date**"), then the closing of the ROFO Shares shall occur within ninety (90) days after the ROFO Period Expiration Date. If Buyer elects not to purchase the ROFO Shares, Sellers request that Buyer execute the attached Waiver of Right of First Offer ("**ROFO Waiver**") and deliver the executed ROFO Waiver to the undersigned representative of the Sellers.

Sincerely,

_____
Nicole Uhlig

cc:    Ken Hoffman (hoffmank@gtlaw.com)
       Charles M. Thompson (cthompson@twsglaw.com)

# WAIVER OF RIGHT TO FIRST OFFER

WHEREAS, pursuant to Section 1 of Annex A of the Stock Purchase and Option Agreement dated August 4, 2015 ("**SPA**"), by and among Jerome Falic, Simon Falic, Leon Falic (together, "**Initial Purchasers**"), Fairn & Swanson Holdings, Inc. ("**Buyer**"), Fairn & Swanson Inc. ("**Company**"), and Sellers named in the SPA ("**Sellers**"), Sellers granted to Buyer a right of first offer ("**Right of First Offer**") to purchase Sellers' 492 shares of common stock of the Company owned by Sellers (the "**ROFO Shares**").

WHEREAS, Buyer has reviewed Sellers' Right of First Offer Notice dated November 21, 2019 ("**ROFO Notice**"), which sets forth the minimum purchase price for the ROFO Shares, and Buyer does not desire to exercise its Right of First Offer.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer does hereby vacate, waive, and release the Right of First Offer and Sellers may proceed with the sale of the ROFO Shares on terms set forth in the SPA and Sellers' ROFO Notice.

TO HAVE AND TO HOLD, the Right of First Offer to purchase the ROFO Shares is fully vacated, released, and discharged.

EXECUTED this ___ day of _____ 2019.


BUYER:

Fairn & Swanson Holdings, Inc.,
A Delaware corporation

By: _____
    Leon Falic
Its: President, Secretary, and Treasurer

**EXHIBIT 4**

| From: | Leon Falic <Leon@Falic.Com> |
| --- | --- |
| Sent: | Tuesday, March 3, 2020 7:04 AM |
| To: | Nicole Uhlig |
| Subject: | FW: |
| Attachments: | Loi 3.2.20 final.pdf; ATT00001.htm |

Nicole

Attached is the signed LOI. This does not waive any rights we have to the 2015 Stock Purchase and option agreement.

Please send the transfer account for the deposit.

best

Leon

---

CONFIDENTIALITY NOTICE: This e-mail and all attachments may contain material that is confidential and/or privileged, and is intended only for the use of the person(s) named above. Any review, reliance, distribution or copying of this e-mail by others without express permission is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by e-mail reply and destroy all copies of the original message.

Letter of Intent

Dear Leon:

I am pleased to set forth in this letter of intent ("LOI") our agreement and understanding of the essential terms and conditions for the acquisition (the "Acquisition") by Fairn & Swanson Holdings, Inc.,("Buyer") of 80% of the outstanding capital stock of Fairn & Swanson Inc., a California corporation ("F&S") (the "Shares") from the following trusts, of which we are trustees: the Survivor's Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998 (the "Survivor's Trust"); the Marital GST Non-Exempt Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended (the "Marital GST Non-Exempt Trust"); the Marital GST Exempt Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended ("Marital GST Exempt Trust"); and the Bypass Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended ("Bypass Trust"). The Survivor's Trust, the Marital GST Exempt Trust, the Marital GST Non-Exempt Trust and the ByPass Trust are collectively referred to herein as the "Sellers"). The parties intend this LOI agreement to be binding and enforceable only to the extent specifically set forth herein). As provided herein the purchase by Buyer of the real property commonly known as 237 and 241 S. Imperial Road, Calexico, California (the "Calexico Property") shall be part of this transaction.

Our agreement is as follows:

1.    Purchase.

        (a)    Purchase Price and Consideration.

                (i)    Buyer will acquire from Sellers the Shares and the Calexico Property, free and clear of all liens and encumbrances, for a net cumulative purchase price of $5,000,000 payable to Sellers in full at closing. Payments shall be allocated between (a) purchase of the Shares, (b) repayment of the full of unsecured loans from Sellers to F & S and (c) payment on the close of the Calexico Property of a net amount of $800,000.

                (ii)    Sellers will be responsible for all income, transfer and other taxes associated with the sale of the Shares. Buyer shall be responsible for all documentary transfer taxes, title insurance, escrow fees and recording fees associated with the sale of the Calexico Property.

                (iii)    On closing of the purchase of the Shares Buyer shall cause F&S to pay in full or assume if agreeable to Wells Fargo Bank NA: (A) all indebtedness of F&S from Wells Fargo Bank NA, (B) any other indebtedness of F & S which is guaranteed by one or more of Sellers, and (C) all subordinated debt of F&S (including all loans from Sellers) in the amount of $2,400,000 on payment terms agreeable to Sellers in accordance with subparagraph (a)(i) above, it being understood that the total payment due Sellers for the purchase of shares, the purchase of the Calexico Property and payment of subordinated debt shall not exceed $5,000,000.

(b) **Deposit**. Not later than two business days after the execution of this LOI by Buyer, Buyer shall deposit with an escrow or other entity acceptable to Sellers the amount of $1,000,000 as a non-refundable deposit.

(c) **Closing**. The execution of the Definitive Agreements (as defined in paragraph 4) will occur on or before March 17, 2020 and close of the purchase of the Shares contemplated herein will occur on or before March 24, 2020.

2.  **Additional Material Terms and Conditions**.

(a) The following are material conditions precedent to Buyer's obligations to consummate the purchase of the Shares:

(i) Buyer has had a reasonable opportunity to complete, and has completed to its satisfaction, its due diligence and there shall be no due diligence condition.

(ii) As of the closing, F&S will have no indebtedness or other liabilities, other than (1) indebtedness and liabilities existing on March17, 2020, including loans made by Buyer, (and accrued interest on such loans) and (2) trade payables, accrued expenses and other current liabilities incurred in the ordinary and normal course of business consistent with past practices.

(iii) The absence, as of the closing date of the Acquisition, of any injunction, order or other decree by any court or governmental body or any pending or threatened litigation or proceeding prohibiting, restraining or otherwise preventing or adversely affecting the consummation of such Acquisition.

(b) F&S shall be in 'as is" condition on date of close and Sellers shall make no representations as to the condition of F&S except as set forth in this LOI. The condition of the Calexico Property shall be AS IS with no representations or warranties from Seller.

3.  **Definitive Agreements**. Buyer and Sellers will make a good faith effort to negotiate and enter into definitive agreements for the Acquisition prior to March 17, 2020 ("Definitive Agreements"). The Definitive Agreements will be in mutually agreed form and, in addition to matters addressed in this letter, will contain representations and warranties limited to and substantially the same as those in Article IV and Article V of the Agreement of Purchase and Sale and Escrow Instructions dated as of August 4, 2015 subject to the limitations contained in this LOI, specifically and without limitation that the condition of F&S be "as is". Sellers will not be required to provide warranties beyond such representations and warranties or any indemnities.

4.  **Ordinary Course of Business**. Until the closing, F&S will conduct its business only in the normal and ordinary course and consistent with good business practices and use its best efforts to preserve its business operations intact and to preserve its existing business relationships. Except in the ordinary course of the business, without limiting the foregoing, F&S will not without the notice to Buyer (i) create, incur or assume any indebtedness for borrowed money, except in the ordinary and normal course of business consistent with past practices, (ii) except in the ordinary course of business, sell, encumber or otherwise dispose of any of its assets, except sales of inventory in the ordinary and normal course of business consistent with past practice, (iii) enter into or amend, terminate, cancel or waive the provisions of any material contract or agreement, (iv) pay any

dividends or make any distributions or loans to the Sellers or their affiliates, or redeem or issue any capital stock or securities convertible or exercisable into their capital stock, (v) enter into any transactions with Sellers or their affiliates or increase any compensation or benefit arrangement for or make loans to any employee or consultant (except for health care), or (vi) engage in any other transaction which has or could reasonably be expected to have a material adverse effect on its businesses, operations, assets, financial condition or prospects.

5.    Nonsolicitation.  As consideration for the expenditures of time, effort, and money Buyer will incur in connection with the Acquisition, Sellers, for themselves and for F&S and their respective officers, directors, employees and agents, agree, until the earlier of March 17, 2020 or the date the Definitive Agreements are executed and all conditions set forth in paragraph 2 of this LOI have been satisfied or waived, not to, directly or indirectly, (i) negotiate or have substantive discussions with, or enter into any agreement or understanding with, any other person or entity for the sale, transfer or disposition of the assets or the capital stock of F&S (an "Acquisition Proposal"), (ii) take any action to solicit, initiate or encourage an Acquisition Proposal, or (iii) continue, initiate or engage in negotiations with, disclose any non-public information relating to F&S or afford access to the properties, books or records of F&S to any person or entity (except Buyer) that may be considering or has made an Acquisition Proposal.

6.    Access to Information.  Sellers shall continue to cause F&S to (i) afford Buyer's representatives full access during normal business hours to its offices, properties, books and records, including copies of all financial and tax records, contracts and agreements and other relevant documents, (ii) furnish Buyer and its representatives with such financial, operating and other data and information related to F&S (including the TTB Matters) and (iii) make the management, accountants and attorneys of F&S available to discuss the foregoing solely for the purpose of Buyer's intended acquisition of the Shares.

7.    Miscellaneous.

(a)    This proposal letter will remain in effect until 5:00 PM (PST), March 3, 2020, unless accepted or rejected by Seller, or withdrawn by Buyer prior to that time.

(b)    Except as required by law, neither Buyer, Sellers, nor their affiliates or representatives will disclose publicly—i.e., to any person (including third-parties, affiliates, or their respective employees) who does not have a need to know for purposes reasonably related to the Acquisitions—the existence of this LOI or the subject matter hereof without the prior written approval of the other party hereto.  If any party is required to make such a disclosure by law, it will notify the other party in advance.

(c)    This LOI is an expression of mutual intent to proceed with the sale and drafting of the Definitive Agreements and collateral documents contemplated thereby in accordance with the principles stated herein and is intended to be a binding contract.  This agreement is not contingent on the preparation of the Definitive Agreements.  To the extent this LOI is binding and enforceable, it will bind and inure to the benefit of the parties and their respective successors and assigns.

(d)    Buyer agrees not to use any information concerning F&S obtained pursuant to paragraph 6 of this LOI for any purpose except for the purpose stated in paragraph 6 (the "Permitted Purpose").  Buyer further agrees not to disclose any information received under paragraph 6 or this

LOI, except to those who are required to have the information in order to evaluate or engage in discussions concerning the Permitted Purpose. Buyer further agrees not to convey any such information without the express written permission of Sellers. Should the Acquisitions not be consummated, Buyer and its affiliates will keep all information obtained about F&S during Buyer's due diligence investigation or negotiations strictly confidential, shall not use any such information for any purpose, and shall return or destroy upon Sellers' request all documents in their possession relating to F&S.

      (e)     This LOI shall be governed by and construed in accordance with internal laws of the state of California, without giving effect to any choice or conflict of law provision or rule (whether of the state of California or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the state of California.

      (f)     Except as specifically set forth or referred to herein, nothing herein is intended or shall be construed to confer upon any person or entity other than the parties and their successors or assigns, any rights or remedies under or by reason of this LOI.

      (g)     Buyer and Sellers will be responsible for their own expenses with respect to this LOI and the Acquisition, including legal, accounting, consulting, financial advisory, investment banking, broker's or finder's fees and expenses. This LOI may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one agreement. The headings of the various sections of this LOI have been inserted for reference only and shall not be deemed to be a part of this LOI.

      If the foregoing is acceptable, please sign and return a copy of this LOI to my attention.

                Sincerely,

**SELLERS**

**Survivor's Trust**

By: _Nicole Uhlig_

    Nicole Uhlig, Trustee

**Marital GST Exempt Trust:**

By: _Nicole Uhlig_

    Nicole Uhlig, Trustee

**Marital GST Non-Exempt Trust:**

By: _Nicole Uhlig_

    Nicole Uhlig, Trustee

**Bypass Trust:**

By: _Nicole Uhlig_

    Nicole Uhlig, Trustee

**AGREED AND ACCEPTED:**

BUYER

Fairn & Swanson Holdings, Inc.

By: _____     By:_____
Leon Falic, _____           Simon Falic, _____

By: _____
Jerome Falic _____

By: _____    By: _____
Leon Falic, _____         Simon Falic, _____


By: _____
Jerome Falic _____

By: _____
Leon Falic, _____

By: _____
Jerome Falic _____

By: _____
Simon Falic, _____

By: _____
Leon Falic, _____

By: _____
Simon Falic, _____

By: _____
Jerome Falic _____

100558J3B09012v.1

**EXHIBIT 5**

**EXHIBIT 5**

**INTENTIONALLY OMITTED**

**EXHIBIT 6**

Anfang der weitergeleiteten Nachricht:

**Von:** Leon Falic <Leon@Falic.Com>
**Betreff: FW: Please get me this inforamtion and a contact at Fairn and Swanson. I will work on this, together with Tim McCloskey, the CFO of DFA.**
**Datum:** 14. Februar 2020 um 5:43:39 AM MEZ
**An:** "alberts@fairn.com" <alberts@fairn.com>, 'Nicole Uhlig' <nicoleu@fairn.com>
**Kopie:** "michelle@domino-danger.com" <michelle@domino-danger.com>

Albert and Nicole and Michelle

I sent you this last night and thought because of the urgency of the matter and both of our interest to get this deal done you would immediately respond and provide the requested information below.

Today in our call to my surprise you said you wont provide anything until the LOI is signed. However you provided it this morning to another bank.

Just so you know this statement you made is illegal and unacceptable. It seems you forgot I am a shareholder and have the rights to all and any information requested.

Maybe we have been too passive and too nice but don't let that get in the way of what we can be capable of and willing to do as shareholders.

How can you have expected me to inject 3,500,000 Million Dollars into Fairn and Swanson without any guarantees and this kind of blackmail behavior.

Ever since this started you have sent numerous LOI changing agreed terms adding and deleting at your discretion what is convenient for your side and giving less then 24 hours to review and sign.

After all this you say that you need my brothers to sign a personal guarantee and the LOI and I said no problem. Do you expect me now to give you anything without the Uhlig trust signing and guaranteeing?

Then on the call you said you need the LOI that you never sent signed today by the three of us and must be today.

Each time we make an agreement you find a way to change it.

Yesterday on the call you said that you don't want to deal with fast talking slick investors. It seems that's the way your behaving.

Something in the financials or the performance of the company you must be hiding as its not clear and you haven't provided anything of significance to review and make educated assessments.

With all that I was willing to step in and save this business.

As a Shareholder I will get my Attorneys involved and get to the bottom of this.

We will demand to speak to Wells Fargo to understand the current situation and not be fed lies or possibilities that never occur.

I was doing anything I can to help but after todays comments you pushed me too far.

Now you will see what type of Shareholder we can be. Using our rights and any legal means to understand what is going on.

If you wish to explore the sale of the company to others please do so. We will wait and see what you get and when you get it and will have the right to match as is in our agreement.

At the end we will end up paying far less then you would have received if you made the deal with us and who knows how long and expensive that process will be.

I hope Wells Fargo is willing to wait and you don't end up with nothing exhausting their patience through this process that will be at the least 6 Months including Due Diligence, Refinancing, and write down of old product that hasn't moved.

Wishing you well and will be standing on the side line.

Best

Leon


**From:** Leon Falic
**Sent:** Wednesday, February 12, 2020 11:05 PM
**To:** alberts@fairn.com
**Cc:** 'Nicole Uhlig' <nicoleu@fairn.com>
**Subject:** FW: Please get me this inforamtion and a contact at Fairn and Swanson. I will work on this, together with Tim McCloskey, the CFO of DFA.

Simon,

I am copying Albert the CFO of Fairn & Swanson. He can provide what is needed.

Best,

Leon

**From:** Simon Falic <Simon@Falic.Com>
**Sent:** Wednesday, February 12, 2020 4:45 PM
**To:** Leon Falic <Leon@Falic.Com>

**Subject:** Please get me this inforamtion and a contact at Fairn and Swanson. I will work on this, together with Tim McCloskey, the CFO of DFA.

Dear Leon,

After discussing the transaction with you, regarding Fairn and Swanson, in order to seek another lender a.s.a.p., I will need the following information:

- Last 3 years of audited financial statements.
- Year-end 2019- statements
- Borrowing base certificate from current lender
- Inventory appraisal used by the lender for inventory advance rates
- Summary of loan agreement

I am sure there will be more information, but this will get us going, so as to replace the current lender a.s.a.p.

Thank you,
Simon

CONFIDENTIALITY NOTICE: This e-mail and all attachments may contain material that is confidential and/or privileged, and is intended only for the use of the person(s) named above. Any review, reliance, distribution or copying of this e-mail by others without express permission is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by e-mail reply and destroy all copies of the original message.

**EXHIBIT 7**

# Charles Berwanger

**From:** Nicole Uhlig <nicoleu@fairn.com>
**Sent:** Sunday, March 15, 2020 9:36 AM
**To:** Charles Thompson; Gordon Endow
**Cc:** Michelle Uhlig; Albert Savedra
**Subject:** Fwd: SPA
**Attachments:** 49472746_v 4_F&S - 2020 SPA (Buyers 3.15.2020)..DOCX; ATT00001.htm; 49494373_v 3 _Fairn and Swanson - Calexico PSA (Buyers 3.13.2020).DOCX; ATT00002.htm; GTRedline_FS Acquisition - SPA (Buyers 3.15.2020).pdf; ATT00003.htm; GTRedline_FS Acquisition - Calexico PSA (Buyers 3.13.2020).pdf; ATT00004.htm; 49497872_v 1_Closing Certificate - Buyers.DOC; ATT00005.htm; 49493338_v 2_F&S - Acquisition - Board Resolutions.DOCX; ATT00006.htm; 49494020_v 1_Irrevocable Stock Power - Marital GST Non-Exempt.DOC; ATT00007.htm; 49494022_v 1_Irrevocable Stock Power - Survivor's Trust.DOC; ATT00008.htm; 49494023_v 1_Irrevocable Stock Power - Bypass Trust.DOC; ATT00009.htm; 49494024_v 1_Irrevocable Stock Power - Marital GST Exempt.DOC; ATT00010.htm; 49496563_v 1_Resignation Letter - Michelle Stoldt.DOC; ATT00011.htm; 49496562_v 1_Resignation Letter - Joel Sjostrom.DOC; ATT00012.htm; 49496561_v 1 _Resignation Letter - Elke Uhlig.DOC; ATT00013.htm; 49496560_v 1_Resignation Letter - Nicole Uhlig.DOC; ATT00014.htm; 49493337_v 1_F&S Acquisition - FIRPTA Certificate.DOC; ATT00015.htm

Hi all. Please review attached
Thanks
Nicole

Sent from my iPhone

Begin forwarded message:

From: Leon Falic <Leon@Falic.com>
Date: March 15, 2020 at 9:28:44 AM PDT
To: Nicole Uhlig <nicoleu@fairn.com>
Subject: Fwd: SPA


Nicole

We haven't reviewed but might be some changes but this should be what can be signed with minor modifications once we reviewed in detail.

Have your lawyer review and let us know.

Best

Leon

_____

CONFIDENTIALITY NOTICE: This e-mail and all attachments may contain material that is confidential and/or privileged, and is intended only for the use of the person(s) named above. Any review, reliance, distribution or copying of this e-

mail by others without express permission is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by e-mail reply and destroy all copies of the original message.

## STOCK PURCHASE AGREEMENT

**This STOCK PURCHASE AGREEMENT** ("**Agreement**") is made and entered into as of March [___], 2020 ("**Effective Date**"), by and among the Survivor's Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998 (the "**Survivor's Trust**"); the Marital GST Non-Exempt Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended ("**Marital GST Non-Exempt Trust**"); the Marital GST Exempt Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended ("**Marital GST Exempt Trust**"); and the Bypass Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended ("**Bypass Trust**", and together with Survivor's Trust, Marital GST Exempt Trust, and Marital GST Non-Exempt Trust, "**Sellers**"); and Jerome Falic, Simon Falic and Leon Falic (each a "**Buyer**" and collectively, the "**Buyers**"). Capitalized terms used, but not otherwise defined, herein shall have the meanings set forth in Article X.

## RECITALS

WHEREAS, Sellers own 492 shares (the "**Shares**") of the 615 issued and outstanding shares of no par value common stock of the Fairn & Swanson Inc., a California corporation (the "**Company**"), each as set forth opposite Sellers' names on **Exhibit A**;

WHEREAS, the Sellers own that certain property located at [231] and 245 Imperial Avenue, Calexico, California, designated as Assessor's Parcel Numbers 058-473-04, -05 & -06, a legal description of which is set forth on **Exhibit B** attached hereto (the "**Calexico Property**"); and

WHEREAS, pursuant to the terms and subject to the conditions set forth in this Agreement, Buyers desire to purchase from Sellers, and Sellers desire to sell to Buyers, (i) the Shares, and (ii) the Calexico Property.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants, and agreements set forth in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF THE SHARES

Section 1.1     Purchase and Sale. Upon the terms and subject to the conditions of this Agreement, at the Closing Buyers shall purchase, acquire, and accept the Shares from Sellers, and Sellers shall sell, convey, assign, and transfer the Shares to Buyers, as set forth opposite the Buyers' names on **Exhibit C** attached hereto, free and clear of all Liens, and together with all rights now and hereafter attaching thereto.

Section 1.2     Purchase Consideration. The aggregate purchase consideration for the Shares to be purchased pursuant to Section 1.1 (the "**Purchase Consideration**") shall be an amount equal to Four Million Two Hundred Thousand Dollars ($4,200,000). The Purchase Consideration shall be paid as set forth in Article II.

Section 1.3     Closing. Upon the terms and subject to the conditions agreed hereunder, the closing of the purchase and sale of the Shares hall take place as described in Error! Reference source not found.; provided, that the closing conditions set forth in Article VII shall have been

1

satisfied or waived in writing as provided therein at or prior to the Closing. The date on which the Closing occurs shall be referred to in this Agreement as the "**Closing Date**."

Section 1.4    Calexico Transaction. Concurrent with the execution of this Agreement, Meuchadim of California – 241 S. Imperial, LLC, a Delaware limited liability company, an Affiliate of Buyers ("**Meuchadim**") as purchaser and the Survivor's Trust and Marital GST Non-Exempt Trust, as seller, shall execute and enter into an Agreement of Purchase and Sale and Escrow Instructions, in substantially similar terms and conditions to the purchase agreement included as **Exhibit D** attached hereto ("**Calexico Purchase Agreement**"), pursuant to which [Meuchadim[1]] shall purchase the Calexico Property from Survivor's Trust and Marital GST Non-Exempt Trust (the "**Calexico Transaction**"). The closing of the Calexico Transaction is contingent on the Closing of the transaction set forth in this Agreement, and the closing of the Calexico Transaction is a condition concurrent to the Closing as set forth in **Error! Reference source not found.** below.

Section 1.5    Transaction Deposit.

(a)    As of the Effective Date, the Buyers have delivered a deposit, and Sellers hereby acknowledge such delivery, of One Million Five Hundred Thousand Dollars ($1,500,000) (the "**Total Transaction Deposit**") to Old Republic Title, Attn. Rita Lin, 415-248-7166, rlin@ortc.com ("**Escrow Agent**").

(b)    One Million Three Hundred Thousand Dollars ($1,300,000) of the Total Transaction Deposit shall be deemed to be the deposit under this Agreement (the "**Stock Purchase Deposit**") and the remaining Two Hundred Thousand Dollars ($200,000) shall be deemed to be the deposit under the Calexico Purchase Agreement (the "**Calexico Property Deposit**"). The Stock Purchase Deposit shall be applied towards the payment of the Purchase Consideration at Closing under Section 2.1(a), and the Calexico Property Deposit shall be applied towards the payment of the purchase consideration of the Calexico Property as set forth under the Calexico Purchase Agreement.

(c)    An amount equal to Eight Hundred Thousand Dollars ($800,000) of the Stock Purchase Deposit shall be non-refundable and shall not be refunded for any reason (the "**Non-Refundable Stock Purchase Deposit**") other than Seller's default in performance under this Agreement or mutual termination by the parties.

## **ARTICLE II**
## **CONSIDERATION AND MANNER OF PAYMENT**

Section 2.1    Payments at Closing. On the Closing Date, Buyer shall pay to Sellers the Purchase Consideration as set forth below.

(a)    Cash Payment.

(i)    One Million Three Hundred Thousand Dollars ($1,300,000) of the Purchase Consideration shall be paid to Sellers by release of the Stock Purchase Deposit to Sellers. On the Closing Date, Buyers shall instruct the Escrow Agent to deliver the Stock Purchase Deposit to Sellers by wire transfer of immediately available funds.

---

[1] GT Note: To be confirmed if Meuchadim shall be the acquiring entity.

(ii)     Four Hundred Fifty-Seven Thousand Nine Hundred Forty-Three and 42/100 Dollars ($457,943.42) of the Purchase Consideration shall be paid by Buyers to Sellers by wire transfer of immediately available funds.

(b)     <u>Payoff of Trust Lenders Line of Credit</u>. The Company and Survivor's Trust, Marital GST Non-Exempt Trust, and Bypass Trust (collectively, "**Trust Lenders**") entered into a Line of Credit Agreement dated January 6, 2020, pursuant to which Trust Lenders have agreed to make available to the Company a line of credit ("**Trust Lenders Line of Credit**"). Draws on the Trust Lenders Line of Credit are evidenced by the following promissory notes (collectively, the "**Trust Lenders Notes**"):

(i)     Promissory Note dated September 27, 2017, in the principal amount of $500,000, to the order of Survivor's Trust;

(ii)     Promissory Note dated April 23, 2019, in the principal amount of $373,497.58, to the order of Survivor's Trust;

(iii)     Promissory Note dated October 17, 2019, in the principal amount of $1,000,000, to the order of Survivor's Trust;

(iv)     Promissory Note dated October 17, 2019, in the principal amount of $150,000, to the order of Bypass Trust; and

(v)     Promissory Note dated October 25, 2019, in the principal amount of $350,000, to the order of Marital GST Non-Exempt Trust.

(c)     Pursuant to the Trust Lenders Line of Credit, the Trust Lenders have loaned to the Company the principal sum of $2,373,497.58 which has accrued interest at a rate of three percent (3%) per annum. At Closing, the cumulative unpaid principal and accrued interest on the Trust Lenders Line of Credit will be Two Million Four Hundred Forty-Two Thousand Fifty-Six and 58/100 Dollars ($2,442,056.58) (the "**Trust Lenders Line of Credit Payoff Amount**"). An amount of the Purchase Consideration equal to the Trust Lenders Line of Credit Payoff Amount shall be disbursed to Trust Lenders to satisfy the Company's obligations to Trust Lenders under the Trust Lenders Line of Credit and the Trust Lenders Notes, and upon such payment the Trust Lenders Line of Credit shall be terminated.

Section 2.2     <u>Wiring Instructions</u>. All payments to Sellers set forth in <u>Section 2.1</u> above shall be made to the bank account(s) specified by Sellers, which accounts shall be specified by Sellers in writing at least five (5) days prior to the Closing Date.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES
## OF THE SELLERS

Sellers hereby represent and warrant to Buyers, jointly and severally, as follows:

Section 3.1     <u>Authorization; Enforceability</u>. Sellers have the requisite power and authority to execute and deliver this Agreement, to perform their obligations under this Agreement, and to consummate the transactions contemplated by this Agreement. This Agreement has been duly executed and delivered by Sellers, and, assuming the due authorization, execution, and delivery by the other parties hereto, will constitute, upon such execution and delivery in each case thereof, legal, valid, and binding obligations of Sellers enforceable in accordance with their

3

respective terms and conditions, except as such enforceability may be limited by the General Enforceability Exceptions.

Section 3.2    Title to Shares. Sellers are the holders of record and beneficial owner of the Shares and such Shares will, as of the Closing, be free and clear of any and all restrictions on transfer, Taxes or Liens (other than restrictions under the Securities Act or applicable state securities Law). Sellers have the sole voting power and the sole power of disposition and sole power to agree to all matters set forth in this Agreement with respect to the Shares, with no limitations, qualifications or restrictions on such rights and powers, and Sellers will not grant such rights and powers to any other Person prior to the Closing. There are no pending Legal Proceedings against any of Sellers affecting its Shares or the right of any of Sellers to execute, deliver and perform its obligations under this Agreement. Upon delivery of the certificates representing the Shares held by Sellers as of the Closing Date, duly endorsed in blank or accompanied by a duly executed stock power with respect to the Shares, good and marketable title to the Shares held by Sellers will be sold, assigned, conveyed, transferred and delivered to Buyers, free and clear of any and all restrictions on transfer, Taxes or Liens (other than restrictions under the Securities Act or applicable state securities Law, or Liens that may be imposed by Buyers or in connection with Buyers' financing arrangements).

Section 3.3    No Consents. No Consent of, permit or exemption from, or declaration, filing or registration with, any Person or Governmental Authority is required to be made or obtained by Sellers in connection with the execution, delivery, and performance of this Agreement by Sellers.

Section 3.4    Litigation. Except as set forth in Schedule 3.4, there are no Legal Proceedings pending, or to Sellers' Knowledge, Threatened, against Sellers, nor are any of Sellers subject to any judgment, order or decree of any court, judicial authority or Governmental Authority that would seek to prevent any of the transactions contemplated by this Agreement.

Section 3.5    No Violation. Neither the execution and delivery of this Agreement, nor the performance by any of Sellers of the transactions contemplated hereby, will (a) constitute a default under the Organizational Documents of any of Sellers, (b) to Sellers' Knowledge, result in a default, give rise to any right of termination, cancellation or acceleration, or require any Consent under any of the terms, conditions or provisions of any material mortgage, loan, license, agreement, lease or other instrument or obligation to which any of Sellers is a party, or (c) to Sellers' Knowledge, conflict with or violate any material Laws applicable to any of Sellers or by which any of their Assets are bound.

Section 3.6    Brokers. No broker, finder or agent is entitled to any brokerage fees, finder's fees or commissions in connection with the transactions contemplated by this Agreement.

Section 3.7    Options. There are no authorized or outstanding subscriptions, options, rights (conversion, preemptive or otherwise), warrants, calls, convertible securities or commitments or any other arrangements or agreements of any nature whatsoever to which the Company is a party requiring the issuance, conversion, registration, voting, sale or transfer of any Equity Interests of the Company, or any synthetic equity, including without limitation, phantom stock, profits participation or stock appreciation rights or any securities convertible, directly or indirectly, into Equity Interests of the Company, or evidencing the right to subscribe for any Equity Interests of the Company, or giving any Person (other than the Buyers) any rights with respect to any Equity Interests of the Company. At Closing, Buyers will own 100% of the issued and outstanding capital stock of the Company (on a fully diluted basis).

4

Section 3.9     Full Disclosure. Sellers are not aware of any fact, condition or circumstance that may materially and adversely affect the assets, liabilities, business, prospects, condition or results of operations of the Company that has not been previously disclosed to the Buyers. Furthermore, no representation or warranty or other statement made by Sellers in this Agreement, or otherwise in connection with the transactions contemplated hereby contains any untrue statement of material fact or omits to state a material fact necessary to make such statements not misleading.

Section 3.10     No Other Representations and Warranties. Except for the representations and warranties contained in this Article III, none of the Sellers, the Company, or any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of any Seller or the Company, including any representation or warranty as to the accuracy or completeness of any information regarding the Company furnished or made available to Buyers and its Representatives or as to the future revenue, profitability, or success of the Company, or any representation or warranty arising from statute or otherwise in law.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE BUYERS

Buyers hereby represents and warrants to Sellers as follows:

Section 4.1     Organization and Qualification.  Each of the Buyers is an individual citizen or resident of the United States.

Section 4.2     Authorization; Enforceability. Buyers have the requisite corporate power and authority to execute and deliver this Agreement, to perform their respective obligations under this Agreement, and to consummate the transactions contemplated by this Agreement. This Agreement has been duly and validly executed and delivered by Buyers, and, assuming the due authorization, execution and delivery by the other parties hereto and thereto, will constitute, upon such execution and delivery in each case thereof, legal, valid and binding obligations of Buyers, enforceable in accordance with their terms and conditions, except as such enforceability may be limited by the General Enforceability Exceptions.

Section 4.3     No Consents. No material Consent of, permit or exemption from, or declaration, filing, or registration with, any Person or Governmental Authority is required to be made or obtained by Buyers in connection with the execution, delivery, and performance of this Agreement by Buyers, and the consummation of the transactions contemplated this Agreement, which, if not made or obtained, (A) would result in a material violation of any Law, License, or Permit, (B) would result in any material Liability to the Company, or (C) would prohibit the consummation of the transactions contemplated by this Agreement.

Section 4.4     Litigation. There are no Legal Proceedings pending, or to Buyers' knowledge, Threatened, against Buyers, nor are Buyers subject to any judgment, order or decree of any court, judicial authority or Governmental Authority that would seek to prevent, delay or burden any of the transactions contemplated by this Agreement.

Section 4.5     No Violation. Neither the execution and delivery of this Agreement, nor the performance by it of the transactions contemplated hereby will (a) constitute a default under the Organizational Documents of Buyers, (b) to Buyers' knowledge, result in a default, give rise to any right of termination, cancellation or acceleration, or require any Consent under any of the terms, conditions or provisions of any material mortgage, loan, license, agreement, lease or other

instrument or obligation to which Buyers are a party, or (c) to Buyers' knowledge, conflict with or violate any Laws applicable to Buyers or by which any of its Assets is bound.

   Section 4.6  <u>No Knowledge of Breach, Misrepresentation or Disclosure</u>. Buyers have no knowledge of any facts or matters which would cause any representation made by Sellers in this Agreement to be inaccurate, incorrect, false, or misleading.

   Section 4.7  <u>Investment Purpose</u>. Each Buyer is acquiring the Shares solely for its own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof. Buyer acknowledges that the Shares are not registered under the Securities Act of 1933, as amended, or any state securities laws, and that the Shares may not be transferred or sold except pursuant to the registration provisions of the Securities Act of 1933, as amended or pursuant to an applicable exemption therefrom and subject to state securities laws and regulations, as applicable. Buyer is able to bear the economic risk of holding the Shares for an indefinite period (including total loss of its investment), and has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risk of its investment.

   Section 4.8  <u>WARN</u>. Buyers have taken no action, and will take no action, which will cause any Liability to Sellers under WARN.

**ARTICLE V**
**COVENANTS OF THE SELLERS**

   Section 5.1  <u>Conduct of Business</u>. Except as expressly consented to in writing by Buyer (which consent may not be unreasonably withheld, conditioned or delayed), from the date of this Agreement through the Closing, and Sellers shall cause the Company to, conduct the Business in the ordinary course of business, in substantially the same manner as heretofore conducted. Subject to the terms and conditions of this Agreement, Sellers shall cause the Company to use reasonable efforts to keep available the services of its present employees and Representatives, and preserve the goodwill, reputation, and present relationships of the Business with suppliers, customers, licensors and Persons having business relations with it. Without limiting the generality of the foregoing, Sellers covenant and agree that, without prior written consent of Buyer, from the Effective Date through the Closing, Sellers shall cause the Company to not:

   (a)  (i) increase in any manner the wages, salary, bonus, profit-sharing or other compensation payable to, or enter into any new bonus or incentive agreement or arrangement with, any of its Representatives, (ii) enter into any new employment, severance, consulting, or other compensation agreement with, or make any other material change in the position or job responsibilities of any of its Representatives, (iii) amend or enter into a new Employee Plan (except as required by Law), or any employment policy relating to vacation pay, sick pay, disability, severance pay or otherwise relating to any Representative, (iv) make or agree to make any bonus or profit-sharing payments to any Representative other than pursuant to requirements of pre-existing Contracts, (v) hire any new Representatives (other than to fill a vacancy or replace a terminated Representative), or (vi) fail to make contributions to any Employee Plan in the ordinary course of business;

   (b)  make any change to its authorized or issued Equity Interests, or issue, deliver or sell, or authorize or propose the issuance, delivery, sale or grant of (i) any of its Equity Interests, (ii) any securities convertible into its Equity Interests, or (iii) any rights, warrants, calls, subscriptions or options to

6

acquire its Equity Interests or synthetic equity, or purchase, redeem, retire or make any other acquisition of any Equity Interests or other securities;

(c)    amend any of its Organizational Documents;

(d)    merge or consolidate with, or purchase substantially all of the Assets of, or otherwise acquire any business of any Person; or sell, lease, transfer, license, encumber or otherwise dispose of, or agree to sell, lease, license, encumber or otherwise dispose of, any of its material Assets other than in the ordinary course of business, all of which Assets shall be maintained in their current condition, ordinary wear and tear excluded, with insurance in such amounts and of such kinds comparable to that in effect on the date of this Agreement;

(e)    make any capital expenditures, other than pursuant to commitments in effect as of the Effective Date;

(f)    alter its cash management customs and practices (including, without limitation, the timing of collection of receivables and payment of payables and other current liabilities), which receivables and payables shall continue to be collected and paid utilizing normal procedures and without discounting amounts collected or accelerating amounts paid;

(g)    alter the maintenance of its books and records other than in the ordinary course of business;

(h)    except in the ordinary course of business, incur, assume or guarantee any Indebtedness or guarantee any Indebtedness, or issue or sell any debt securities or warrants or rights to acquire any debt securities, or guarantee any debt securities of others, or create any new Lien on any of the Company's Assets;

(i)    enter into, amend, modify, terminate or grant any waiver under any Contract, or enter into, amend, modify, terminate or grant any waiver under any License or Permit;

(j)    amend, modify, extend, renew or terminate any of its leases, nor enter into any new lease, sublease, license, or other agreement for the use or occupancy of any real property;

(k)    enter into any Contract with any Sellers or any Affiliate or Representative thereof;

(l)    take any action or omit to take any action that would cause the representations and warranties contained in <u>Article III</u> to be untrue or incorrect in any material respect;

(m)    make or change any Tax election, change any annual accounting period, change or adopt any accounting method for Taxes, file any amended Tax Return, enter into any closing agreement with respect to Taxes, settle any Tax claim or assessment, surrender any right to claim a refund for Taxes, consent to any extension or waiver of the limitation period applicable to any Tax claim or assessment, or take any similar action related to the filing of any Tax Return or the payment of any Tax, if such action would have the effect of increasing the Tax Liability of the Company for any taxable period ending on or after the Closing Date, or decreasing any Tax attribute of the Company otherwise existing on the Closing Date;

(n)    knowingly fail to comply in all material respects with any applicable Law;

(o)     knowingly engage in any other transaction which could reasonably be expected to have a Material Adverse Effect on the Business, operations, Assets, financial condition or prospects of the Company; or

(p)     agree or commit to do any of the foregoing.

Nothing contained in this Agreement shall be deemed to give Buyer, directly or indirectly, the right to control or direct the Company's Business or operations prior to the Closing. Prior to the Closing, the Company shall exercise, consistent with the terms and conditions of this Agreement, complete control over its Business and operations.

Section 5.2     <u>Further Assurances</u>. Sellers shall use reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable in compliance with applicable Laws to consummate and make effective, as soon as reasonably practicable, the transactions contemplated by this Agreement.

Section 5.3     <u>Subsequent Events; Schedules Updates</u>. Sellers shall promptly and accurately advise Buyer in writing of the occurrence of any event or the existence of any fact which makes untrue in any material respect, or will make untrue in any material respect as of the Closing, or otherwise would constitute a Breach of, any representation or warranty of any Seller set forth in this Agreement.

Section 5.4     <u>Reasonable Access</u>. From the Effective Date until the Closing Date or the earlier termination of this Agreement and subject to applicable Law, Sellers shall cause the Company to give Buyer and its Representatives, upon reasonable notice to Sellers, full and complete access, during normal business hours, to the Assets, books, records, Contracts and senior management personnel of the Company and shall cause the Company to permit Buyer to make such inspections as it may reasonably require and to furnish Buyer during such period with all such information relating to the Company as Buyer may from time to time reasonably request.

Section 5.5     <u>Company Press Releases and Public Disclosure</u>. Prior to the Closing, neither the Company nor Sellers shall, without the prior written consent of Buyer, or except as required by Law, issue any press release or otherwise make any public statement or other public disclosure regarding this Agreement or any of the transactions contemplated hereby or thereby. If the Company or any Seller is required by Law to issue such press release or otherwise make such public statement or disclosure, the parties will consult with each other regarding the content thereof and cooperate in the making of such press release, public statement or other public disclosure.

Section 5.6     <u>Exclusivity</u>. During the period from the date of this Agreement through the Closing, neither Sellers nor any of their Representatives (including without limitation their attorneys and accountants), shall take or permit any other Person on its behalf to take, directly or indirectly, any action to encourage, initiate or engage in discussions or negotiations with, or provide any information to, any Person (other than Buyer and Buyer's Representatives) concerning any purchase of the Shares, any merger, acquisition, consolidation, recapitalization, liquidation, or dissolution involving Sellers or the Company, any sale of all or substantially all of the assets of the Company or any similar transaction involving the Company.

Section 5.7     <u>Regulatory Filings</u>. The parties shall use reasonable efforts to furnish each other all information required for any application or other filing to be made pursuant to any applicable Law in connection with the transactions contemplated by this Agreement.

8

**ARTICLE VI**
**COVENANTS OF THE BUYER**

Section 6.1     Payoff of Wells Fargo Loan or Assumption of Guaranty Obligations. The Company is a party to that certain Credit Agreement with Wells Fargo Bank, N.A. ("**WFB**"), dated as of November 10, 2017, as amended by the First Amendment to Credit Agreement and Waiver of Defaults, dated May 15, 2018, the Second Amendment to Credit Agreement, dated July 10, 2018, and the Third Amendment to Credit Agreement, dated February 18, 2020 (collectively, "**WFB Credit Agreement**"). Concurrently with Closing, Buyer shall (i) pay off all the Company's obligations under the WFB Credit Agreement and terminate the WFB Credit Agreement, or (ii) assume all obligations of Sellers and their related parties (including Elke Uhlig, Nicole Uhlig, and Michelle Stoldt) ("**WFB Released Persons**") under the WFB Credit Agreement and any and all related documents and guarantees, including the Guaranty and Security Agreement dated November 17, 2017  and the Subordination Agreement dated January 2, 2020, for the benefit of Wells Fargo (all such documents reflecting all such obligations, the "**WFB Credit Documents**") and cause the WFB Released Persons to be released from any and all obligations under the WFB Credit Documents. Copies of the WFB Credit Documents have been provided to the Buyers and all such documents reflect all obligations thereunder. All obligations under the WFB Credit Documents do not exceed US$[__].

Section 6.2     Regulatory Filings. The parties shall use reasonable efforts to furnish each other all information required for any application or other filing to be made pursuant to any applicable Law in connection with the transactions contemplated by this Agreement.

Section 6.3     Calexico Purchase Agreement.

(a)     Sellers shall execute and deliver, or make any of Sellers' representative to execute and deliver, a fully executed copy of the Calexico Purchase Agreement. The obligations of each of Sellers and Buyers to close the purchase and sale under this Agreement is expressly conditioned and contingent to the execution of the Calexico Purchase Agreement on the Effective Date.

(b)     Sellers agree to transfer the Calexico Property, and shall use its best efforts to complete such transfer, as soon as practicable possible upon execution of the Calexico Purchase Agreement. [As of the Effective Date and until closing under of the Calexico Purchase Agreement, the lease of the Calexico Property in favor of the Company, as in effect on the date hereof, shall remain in effect.[2]]

Section 6.4     Termination of Affiliate Arrangements.  Effective immediately prior to the Closing, the Sellers will cause (a) all Indebtedness, other than Permitted Indebtedness, owed to the Company by any of the Sellers or any Affiliate or Representative of the Company or the Sellers to be paid in full, (b) the Company to be fully and irrevocably released from all guaranties of Indebtedness or other guarantees of liabilities relating to the Sellers or any Affiliate or Representative of the Company, and (c) except for the lease agreement referenced in Section 5.3(b) above, all intercompany and intracompany accounts or Contracts between the Company, on the one hand, and the Sellers and their Affiliates, on the other hand, to be cancelled, discharged or otherwise settled in the manner that is most Tax efficient for the Company.

Section 6.5     WARN. Buyers will take no action before or after Closing that will cause any Liability to Company or Sellers under WARN.

---

[2] GT Note: Please confirm there is a lease for the Calexico Property whereby the Company is entitled to use it.

Section 6.6    Further Assurances. The Parties shall use reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable in compliance with applicable Laws to consummate and make effective, as soon as reasonably practicable, the transactions contemplated by this Agreement.

Section 6.7    Company Press Releases and Public Disclosure. Neither the Company nor the Sellers shall, without the prior written consent of the Buyers, or except as required by Law, issue any press release or otherwise make any public statement or other public disclosure regarding this Agreement, the Other Agreements or any of the transactions contemplated hereby or thereby. If the Company or any Seller is required by Law to issue such press release or otherwise make such public statement or disclosure, the Parties will consult with each other regarding the content thereof and cooperate in the making of such press release, public statement or other public disclosure.

## ARTICLE VII
## CONDITIONS PRECEDENT AND CONDITIONS CONCURRENT TO THE CLOSING

Section 7.1    Conditions Precedent to Each Party's Obligations. The respective obligations of each party to consummate the transactions contemplated hereby will be subject to the satisfaction, as of the Closing, of all of the following conditions, any one or more of which may be waived in writing at the option of the affected party:

(a)    No Legal Prohibition. No Law shall exist or be enacted or promulgated by any Governmental Authority which would prohibit the consummation by such party of the transactions contemplated hereby.

(b)    No Injunction. Such party shall not be prohibited, by any order, ruling, consent, decree, judgment or injunction of any court, judicial authority or Governmental Authority from consummating the transactions contemplated hereby.

Section 7.2    Conditions Precedent to Obligations of Buyer. The obligations of Buyer under this Agreement to consummate the transactions contemplated hereby will be subject to the satisfaction, as of the Closing, of all of the following conditions, any one or more of which may be waived in writing at the option of Buyer:

(a)    Accuracy of Representations and Warranties; Performance of Covenants. Except as expressly contemplated by this Agreement, the representations and warranties of Sellers contained in this Agreement shall be true and correct in all material respects as of the Closing with the same force and effect as though made on and as of the Closing (as supplemented pursuant to Section 5.3). The Company and Sellers shall have performed and complied, in all material respects, with all covenants and agreements required by this Agreement to be performed or complied with by them on or prior to the Closing. Buyer shall receive at the Closing a certificate, dated as of the Closing Date and executed by Sellers, certifying the fulfillment of the conditions set forth in this Section 7.2(a).

(b)    The Calexico Purchase Agreement. The obligations of the Buyers to close the purchase and sale under this Agreement is expressly conditioned on the Calexico Transaction either (i) closing concurrently with the Closing or (ii) closing immediately following the Closing pursuant to irrevocable escrow instructions from the parties.

(c)    Closing Deliveries. Buyer shall have received, or waived delivery of, the items to be delivered pursuant to Section 8.2.

10

Section 7.3    <u>Conditions Precedent to Obligations of Sellers</u>. The obligations of Sellers under this Agreement to consummate the transactions contemplated hereby will be subject to the satisfaction, as of the Closing, of all the following conditions, any one or more of which may be waived in writing at the option of Sellers:

(a)    <u>Accuracy of Representations and Warranties; Performance of Covenants</u>. Except as expressly contemplated by this Agreement, the representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects as of the Closing with the same force and effect as though made on and as of the Closing (other than representations and warranties that are qualified by materiality, Material Adverse Effect or correlative terms which shall be true and correct in all respects). Buyer shall have performed and complied, in all material respects, with all covenants and agreements required by this Agreement to be performed or complied with by Buyer on or prior to the Closing. Sellers shall receive at the Closing a certificate, dated as of the Closing Date and executed by an executive officer of Buyer, certifying the fulfillment of the conditions set forth in this Section 7.3(a) with respect to Buyer.

(b)    <u>Closing Deliveries</u>. Sellers shall have received, or waived delivery of, the items to be delivered pursuant to **Error! Reference source not found.**.

Section 7.4    <u>Conditions Concurrent to Closing</u>

(a)    <u>Payoff of Wells Fargo Loan or Assumption of Sellers' Obligations</u>. Concurrent with the Closing, Buyer shall either (i) pay off all the Company's obligations under the WFB Credit Documents and terminate the WFB Credit Documents, or (ii) assume all obligations of the Sellers' and the WFB Released Persons under the WFB Credit Documents and cause the Released Persons to be fully released from any obligations and/or liabilities under the WFB Credit Documents.

**ARTICLE VIII**
**CLOSING**

Section 8.1    <u>Time and Place</u>. The Closing shall take place on or before March 24, 2020, or such other date on which all conditions to closing have been satisfied (or waived by the Party to such waiver).

Section 8.2    <u>Deliveries by Sellers</u>. At the Closing, Sellers shall deliver or cause to be delivered to Buyer:

(a)    <u>Instruments of Transfer</u>. Certificates representing the Shares, duly endorsed in blank or accompanied by duly executed stock powers;

(b)    <u>Board Resolutions</u>. A copy of the resolutions of the Company's board of directors, certified by the secretary of the Company as having been duly and validly adopted and being in full force and affect, authorizing the execution and delivery of this Agreement and the Other Agreements to which the Company is a party and the performance by the Company of its obligations hereunder and thereunder;

(c)    <u>Minute Books</u>. Constructive possession of all of the minute books, stock ledgers and similar corporate records, and corporate seal of the Company (which shall be held at the Company's principal executive office);

(d)    <u>Sellers Certificate</u>. A certificate, dated as of the Closing Date and executed by the Sellers, certifying the fulfillment of the conditions set forth in <u>Section 7.2</u> as of the Closing Date;

(e)     Resignations. Resignations effective as of the Closing Date of those directors and officers of the Company as Buyers may request to resign not less than one day before the Closing Date; and;

(f)     Termination Election. Termination Election, fully executed, in the form attached as **Exhibit E**;

(g)     Payoff Letters; Lien Releases. The Payoff Letters, duly executed by the Trust Lenders, and any other applicable releases, termination statements or other similar documentation (to the extent not included in the Payoff Letters), in form and substance reasonably satisfactory to Buyers, releasing and terminating any and all Liens;

(h)     Trust Lenders Notes. Sellers shall deliver, or make the Trust Lenders deliver, the original Trust Lenders Notes. If not available, Trust Lenders shall cancel the Trust Lender Notes through the Payoff Letters mentioned in Section 6.1(f) above;

(i)     [338(h)(10) Election. Executed elections under Code Section 338(h)(10) for the Company on IRS Form 8023 (and any corresponding state or local income tax elections), in accordance with its instructions and the Treasury Regulations issued pursuant to Code Section 338(h)(10)[3]];

(j)     FIRPTA Certificate. A certificate, in such form as is reasonably satisfactory to the Buyers, certifying that each Seller is not a foreign person for purposes of Code Section 1445 or that the purchase is otherwise exempt from withholding under Code Section 1445; and

(k)     Other Documents. Such other documents and instruments as Buyer may reasonably request to consummate the transactions contemplated hereby.

Section 8.3     Deliveries by Buyer. Buyer will deliver or cause to be delivered to Sellers:

(a)     Purchase Consideration. Payment of the Purchase Consideration as set forth in Article II;

(b)     Buyer Certificate. The certificate required by Section 7.3(a);

(c)     Resolutions. A copy of the resolutions of Buyer's board of directors, certified by the secretary of Buyer as having been duly and validly adopted and being in full force and affect, authorizing the execution and delivery of this Agreement and the performance by Buyer of its obligations hereunder;

(d)     Company Credit Agreement. Sellers shall have received evidence or assurances satisfactory to it that the Credit Agreement has been paid off by Buyer or that all obligations of Sellers' and any guarantors thereunder have been fully assumed by Buyer and Sellers and their related parties have been fully released by WFB.

(e)     Other Documents. Such other documents and instruments as the Company or Sellers, or their respective counsel, shall deem reasonably necessary to consummate the transactions contemplated hereby

Section 8.4     "AS IS" SALE. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, BUYERS ACKNOWLEDGE AND AGREE THAT SELLERS HAVE NOT

---

[3] GT Note: To be confirmed if necessary.

MADE, DO NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS, INDEMNITIES, OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO: (A) THE INCOME TO BE DERIVED FROM THE SHARES OR THE COMPANY, OR (B) THE COMPLIANCE OF OR BY THE COMPANY OR ITS OPERATION IN ACCORDANCE WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY. BUYERS FURTHER ACKNOWLEDGE AND AGREE THAT HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE SHARES AND THE COMPANY, BUYERS ARE RELYING SOLELY ON THE REPRESENTATIONS OF THE SELLERS SET FORTH HEREIN AND THEIR OWN INVESTIGATIONS AND NOT ON ANY OTHER INFORMATION PROVIDED OR TO BE PROVIDED BY SELLERS. BUYERS ACKNOWLEDGE AND AGREE THAT THE SALE OF THE SHARES AND THE COMPANY AS PROVIDED FOR IN THIS AGREEMENT IS MADE IN AN "AS IS" CONDITION AND ON AN "AS IS" BASIS WITH ALL FAULTS.

Section 8.5 <u>REMEDIES FOR BUYERS' DEFAULT</u>. IF THE CLOSING FAILS TO OCCUR FOR ANY REASON OTHER THAN SELLERS' DEFAULT UNDER THE TERMS OF THIS AGREEMENT, BUYERS SHALL BE RESPONSIBLE FOR ALL CANCELLATION CHARGES REQUIRED TO BE PAID TO ESCROW HOLDER AND ANY ESCROW CHARGES. IN ADDITION, THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES SHALL TERMINATE AND THE TOTAL NON-REFUNDABLE TRANSACTION DEPOSIT SHALL BE IMMEDIATELY DELIVERED BY ESCROW HOLDER TO SELLERS ON SELLERS' REQUEST. THE TOTAL NON-REFUNDABLE TRANSACTION DEPOSIT SHALL BE DEEMED LIQUIDATED DAMAGES FOR BUYERS' NONPERFORMANCE UNDER THIS AGREEMENT AS SELLERS' SOLE AND EXCLUSIVE REMEDY AGAINST BUYERS (INCLUDING, WITHOUT LIMITATION, SELLER'S RIGHTS TO SEEK SPECIFIC PERFORMANCE OF THIS AGREEMENT AND TO RECEIVE DAMAGES) FOR BUYERS' FAILURE TO CLOSE THE TRANSACTION SET FORTH IN THIS AGREEMENT, WHICH SUMS SHALL BE PRESUMED TO BE A REASONABLE ESTIMATE OF THE AMOUNT OF ACTUAL DAMAGES SUSTAINED BY SELLERS BECAUSE OF BUYERS' FAILURE TO CLOSE THE TRANSACTION SET FORTH IN THIS AGREEMENT FROM THE NATURE OF THE TRANSACTIONS, IT IS IMPRACTICABLE AND EXTREMELY DIFFICULT TO FIX THE ACTUAL DAMAGES THAT SELLERS WOULD SUSTAIN IF BUYERS FAILS TO CLOSE THE TRANSACTION SET FORTH IN THIS AGREEMENT. GIVEN THE FOREGOING FACTS, AMONG OTHERS, BUYERS AND SELLERS AGREE THAT LIQUIDATED DAMAGES ARE PARTICULARLY APPROPRIATE AND SUFFICIENT FOR THIS TRANSACTION AND AGREE THAT SAID LIQUIDATED DAMAGES SHALL BE PAID IN THE EVENT OF BUYERS' FAILURE TO CLOSE THE TRANSACTION SET FORTH IN THIS AGREEMENT, DESPITE ANY WORDS OR CHARACTERIZATIONS PREVIOUSLY USED OR CONTAINED IN THIS AGREEMENT IMPLYING ANY CONTRARY INTENT. THE PAYMENT OF SUCH AMOUNT AS LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY WITHIN THE MEANING OF CALIFORNIA CIVIL CODE §3275 OR §3369 BUT IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLERS UNDER CALIFORNIA CIVIL CODE §§1671, 1676, AND 1677. NOTHING IN THIS AGREEMENT SHALL, HOWEVER, BE DEEMED TO LIMIT BUYERS' LIABILITY TO SELLERS FOR ATTORNEY FEES AND COSTS AS PROVIDED IN <u>Section 11.12</u>.

WE ACKNOWLEDGE THIS LIQUIDATED DAMAGES PROVISION:

13

SELLER'S INITIALS: _____          BUYERS' INITIALS: _____

Section 8.6     <u>Sellers' Release</u>. Without limiting the foregoing, each Seller, expressly waives all rights afforded by any statute which limits the effect of a release with respect to unknown claims, including California Civil Code Section 1542 and any other similar statutes, which provides:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

Each Seller understands the significance of this release of unknown claims and waiver of statutory protection against a release of unknown claims, and acknowledges and agrees that this waiver is an essential and material term of this Agreement.

WE ACKNOWLEDGE THIS LIQUIDATED DAMAGES PROVISION:

SELLER'S INITIALS: _____          BUYERS' INITIALS: _____

**ARTICLE IX**
**POST CLOSING COVENANTS**

Section 9.1     <u>Closing of the Books</u>. Unless closing of the books on the Closing Date takes place automatically by operation of Code section 1362(e)(6)(D), Buyers will cause the Company to elect to close its books as of the date of the transfer pursuant to Code section 1377(a)(2). Buyers shall cause the Company, its shareholders, and Sellers to execute an Election to Terminate S-Corporation's Tax Year in the form attached as **Exhibit E** ("**Termination Election**").

Section 9.2     <u>Non-Competition; Non-Solicitation; Confidentiality</u>.

(a)     <u>Non-Disclosure of Confidential Information</u>. None of the Restricted Parties shall, directly or indirectly, disclose or use at any time (and shall cause their respective Affiliates and Representatives not to use or disclose) any Confidential Information (whether or not such information is or was developed by any of the Restricted Parties), except to the extent that such disclosure or use is directly related to and required by the performance of the Restricted Party's duties to the Company or Buyers or as required by Law or as otherwise provided hereunder. The Restricted Parties each further agrees to take commercially reasonable steps, to the extent within its control, to safeguard such Confidential Information and to protect it against disclosure, misuse, espionage, loss and theft. In the event any of the Restricted Parties is required by Law to disclose any Confidential Information, such Restricted Party shall promptly notify Buyers in writing, which notification shall include the nature of the legal requirement and the extent of the required disclosure, and shall cooperate with Buyers' reasonable request to preserve the confidentiality of such Confidential Information consistent with applicable Law. For purposes of this Agreement, "**Confidential Information**" means all information of a confidential or proprietary nature (whether or not specifically labeled or identified as "confidential"), in any form or medium, that relates to the Business, the Company, or its suppliers, distributors, customers, independent contractors or other business relations. Confidential Information includes the following as they relate to the Company or the Business and, in each case, to the extent the Company or the Business obtains a commercial benefit from

14

the secret nature of such information: internal business information (including information relating to strategic and staffing plans and practices, business, training, marketing, promotional and sales plans and practices, cost, rate and pricing structures, accounting and business methods and potential acquisition candidates); identities of, individual requirements of, and specific contractual arrangements with, the Company's suppliers, distributors, customers, independent contractors or other business relations and their confidential information; trade secrets, know-how, compilations of data and analyses, techniques, systems, formulae, research, records, reports, manuals, documentation, models, data and data bases relating thereto; and inventions, innovations, improvements, developments, methods, designs, analyses, drawings, and reports. Notwithstanding the foregoing, Confidential Information does not include such information which: (A) at the time of disclosure is publicly available or thereafter becomes publicly available through no act or omission of a Restricted Party; (B) is thereafter disclosed or furnished to the Restricted Party by a third party who is not known by such Restricted Party to have acquired the information under an obligation of confidentiality; (C) is independently developed by the Restricted Party without the use of or reference to Confidential Information after the Closing Date; or (D) is disclosed by the Restricted Party (subject to compliance with the applicable provisions of this Section 9.2(a)) under compulsion of applicable Law.

    (b)    <u>Non-Competition</u>.

    (i)    Each Restricted Party is familiar with the trade secrets related to the Company and the Business, and with other Confidential Information concerning the Company and the Business, including all (A) inventions, technology and research and development related to the Business, (B) customers and clients and customer and client lists related to the Business, (C) products (including products under development) and services related to the Business and related costs and pricing structures and manufacturing techniques, (D) accounting and business methods and practices related to the Business, and (E) similar and related confidential information and trade secrets related to the Business. Each Restricted Party acknowledges and agrees that the Company would be irreparably damaged if any of the Restricted Parties were to directly or indirectly provide services to any Person competing with the Business or engaging in a similar business and that such direct or indirect competition by any Restricted Party would result in a significant loss of goodwill by the Company.

    (ii)    In further consideration for Buyers' payment of the Purchase Consideration under this Agreement (in respect of which payment each of the Restricted Parties expressly acknowledges that it derives a substantial and direct benefit), and in order to protect the value of the Company and the Business acquired by Buyers hereunder (including the goodwill inherent in the Company and the Business as of the Effective Date), each Restricted Party hereby agrees that during the period commencing on the Closing Date and ending on the [first (1st) anniversary[4]] of the Closing Date (the "**Non-Competition Period**"), such Restricted Party shall not acquire or hold any economic or financial interest in, act as a partner, member, shareholder, or Representative of, render any services to, or otherwise operate or hold an interest in any Person (other than Sellers) having any location in any country in which the Business currently operates which entity, enterprise or other Person primarily engages in, or engages in the management or operation of any Person that primarily engages in any business that competes with the Business; provided, however, that nothing contained herein shall be construed to prohibit any Restricted Party from purchasing up to an aggregate of two percent (2%) of any class of the outstanding voting securities of any other Person whose securities are listed on a national securities exchange (but only if such investment is held on a purely passive basis).

---

[4] <u>GT Note</u>: Please confirm the one-year term is acceptable. Under prior transaction, the non-compete and non-solicitation terms was three years.

(c)     Non-Solicitation; Non-Disparagement. During the period commencing on the Closing Date and ending on the [first (1st) anniversary] of the Closing Date (the "**Non-Solicitation Period**"), none of the Restricted Parties shall, directly or indirectly, either individually or acting in concert with another Person or Persons:

(i)     request, induce or attempt to influence any distributor, supplier or customer of goods or services of the Business to curtail, cancel or refrain from maintaining or increasing the amount or type of business such distributor, supplier or customer of goods or services is currently transacting, or may be transacting during the Non-Solicitation Period, with the Business or modify its pricing or other terms of sale with the Business;

(ii)     solicit for employment or retention or hire, employ or retain any Person who is an employee of the Business during the Non-Solicitation Period (provided that following the first (1st) anniversary of the Closing Date, any Restricted Party and their respective Affiliates shall be entitled to hire, employ or retain any such Person so long as such Restricted Party did not directly or indirectly solicit such Person, other than through general advertisements not intended to be specifically directed at such Person (for the avoidance of doubt, the Restricted Parties shall not be deemed to have violated this provision by hiring, employing or retaining any Person who contacts a Restricted Party on an unsolicited basis following the [first (1st) anniversary] of the Closing Date);

(iii)     influence or attempt to influence any Person who is an employee of the Business during the Non-Solicitation Period to terminate his or her employment with the Company or the Business (for purpose of clarity, if any Restricted Party exercises its right to hire in accordance with the terms of the proviso set forth in Section 9.2(c)(ii) above, such action shall not be deemed to be a violation of this subsection Section 9.2(c)(iii)); or

(iv)     make any negative, derogatory or disparaging statements or communications regarding Buyers, the Business, the Company, or their respective Affiliates or employees.

(d)     Severability. Notwithstanding anything to the contrary in this Agreement, if at any time, in any judicial or arbitration proceeding, any of the restrictions stated in this Section 9.2 are found by a final order of a court of competent jurisdiction or arbitrator to be unreasonable or otherwise unenforceable under circumstances then existing, the parties each agree that the period, scope or geographical area, as the case may be, shall be reduced to the extent necessary to enable the court to enforce the restrictions to the extent such provisions are allowable under applicable Law, giving effect to the agreement and intent of the parties that the restrictions contained herein shall be effective to the fullest extent permissible. In the event of a Breach or violation by any Restricted Party of any of the provisions of this Section 9.2, the Non-Competition Period or Non-Solicitation Period, as the case may be, will be tolled for so long as such Restricted Party was in violation of such provision. Each Restricted Party agrees that the restrictions contained in this Agreement are reasonable in all respects and necessary to protect Buyers' interest in, and the value of, the Business.

(e)     Specific Performance; Injunctive Relief. Each Restricted Party acknowledges and agrees that in the event of a Breach by any Restricted Party of any of the provisions of this Section 9.2, Buyers would suffer irreparable harm, no adequate remedy at law would exist for Buyers, and damages would be difficult to determine. Consequently, in the event of any such Breach, Buyers or its successors or assigns may, in addition to other rights and remedies existing in their favor, apply to any court of law or equity of competent jurisdiction for specific performance or injunctive or other relief in order to enforce or

16

prevent any violations of the provisions of this Agreement, in each case without the requirement of posting a bond or proving actual damages.

Section 9.3 <u>General</u>. In case at any time after the Closing any further actions are necessary or desirable to carry out the purposes of this Agreement, each of the parties shall take such further actions (including the execution and delivery of such further instruments and documents) as any other party may reasonably request, all at the sole cost and expense of the requesting party. Sellers acknowledge and agree that from and after the Closing, Buyers will be entitled to all documents, books and records (including Tax records), agreements, and financial data of any sort relating to the Company.

**ARTICLE X**
**DEFINITIONS**

<u>Definitions</u>. The definitions set forth in this Article X are not intended to provide definitions for all capitalized terms used in this Agreement. As used in this Agreement, the capitalized terms set forth below shall have the meanings assigned to them in this Article X:

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly Controlling or Controlled by, or under direct or indirect common Control with, such Person. For purposes of this definition, a Person shall be deemed to "**Control**" another Person if such Person owns or Controls, directly or indirectly, more than twenty five percent (25%) of the voting Equity Interests of the other Person.

"**Assets**" of any Person means all assets and properties of any kind, nature, character and description (whether real, personal or mixed, whether tangible or intangible, whether accrued, contingent, fixed or otherwise, and wherever located), including the good will related thereto, operated, owned or leased by such Person.

"**Breach**" means (a) the violation of any covenant, agreement, Law, right, obligation, engagement or duty, whether by commission or omission, (b) the failure to perform, refusal to perform, or prevention or hindrance of performance of, any covenant, agreement, obligation, engagement or duty, (c) the performance of any act which by covenant, agreement or duty must not be performed, (d) any breach, inaccuracy or misstatement in any representation or warranty, or (e) any event which, with the passage of time or provision of notice, would constitute any of the above.

"**Business**" means the business of distribution of duty-free merchandise and such other businesses as the Company is engaged on the Effective Date.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which the banks in the city of San Francisco are permitted or required by applicable Law to close.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Consent**" means any approval, consent, ratification, waiver, notice or other authorization.

"**Contract**" means any written or oral agreement, note, guarantee, mortgage, indenture, lease, deed of trust, license, plan, instrument or other contract or legally binding arrangement or commitment.

"**Equity Interests**" means (a) any partnership interests, (b) any membership interests or units, (c) any shares of capital stock, (d) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distribution of assets of, the issuing entity, (e) any subscriptions, calls,

17

warrants, options, or commitments of any kind or character relating to, or entitling any Person or entity to purchase or otherwise acquire membership interests or units, capital stock, or any other equity securities, (f) any securities convertible into or exercisable or exchangeable for partnership interests, membership interests or units, capital stock, or any other equity securities, or (g) any other interest classified as an equity security of a Person.

"**Escrow Agent**" means Old Republic Title, Attn. Rita Lin, 415-248-7166, rlin@ortc.om.

"**GAAP**" means United States generally accepted accounting principles, as in effect from time to time, consistently applied.

"**General Enforceability Exceptions**" means those exceptions to enforceability due to applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally, and general principles of equity (regardless of whether such enforceability is considered in a proceeding at law or in equity).

"**Governmental Authority**" means the United States or any state, provincial, county, municipal, city, local or foreign government, or any instrumentality, division, subdivision, department, agency or authority of any thereof having competent jurisdiction over any of the Company, Buyers or the transactions contemplated by this Agreement, as applicable.

"**Indebtedness**" means, with respect to any Person, all Liabilities in respect of: (a) borrowed money; (b) indebtedness evidenced by bonds, notes, debentures or similar instruments (c) financed and capitalized lease obligations (including any equipment financing arrangements); (d) the deferred purchase price of assets, services or securities (other than ordinary trade accounts payable); (e) conditional sale or other title retention agreements; (f) the factoring or discounting of accounts receivable; (g) swap or hedging agreements or arrangements, (h) reimbursement obligations, whether contingent or matured, with respect to letters of credit, bankers' acceptances, bank overdrafts, surety bonds, other financial guarantees and interest rate protection agreements (without duplication of other indebtedness supported or guaranteed thereby); (i) interest, premium, penalties and other amounts owing in respect of the items described in the foregoing clauses (a) through (h) after giving effect to the Closing, (j) all Indebtedness of the types referred to in clauses (a) through (b) guaranteed in any manner by such Person, whether or not any of the foregoing would appear on a consolidated balance sheet prepared in accordance with GAAP; (k) any unfunded pension liabilities; and (l) any so-called "change of control" payments.

"**Law**" means each provision of any currently implemented federal, state or local or foreign law, statute, ordinance, order, code, rule or regulation, promulgated or issued by any Governmental Authority.

"**Legal Proceedings**" means any and all proceedings, suits and causes of action by or before any Governmental Authority and all arbitration proceedings.

"**Liability**" means any liability or obligation of whatever kind or nature (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, due or to become due), including without limitation any liability for Taxes.

"**Licenses and Permits**" means any licenses, permits, certificates, certifications, privileges, immunities, notifications, exemptions, classifications, registrations, easements, franchises, approvals, authorizations, orders and other similar rights (or any waivers of the foregoing) issued by any Governmental Authority, and all pending applications therefor or renewals thereof.

"**Lien**" means any mortgage, pledge, hypothecation, hypothec, right of others, claim, security interest, encumbrance, lease, sublease, license, occupancy agreement, adverse claim or interest, easement, covenant, encroachment, burden, title defect, title retention agreement, voting trust agreement, proxy, interest, equity, option, lien, preemptive right, right of first offer or refusal, charge or other restrictions or limitations of any nature whatsoever, other than (i) restrictions on the offer and sale of securities under federal and state securities Laws and (ii) any Permitted Liens.

"**Material Adverse Effect**" or "**Material Adverse Change**" means any change, effect, event, occurrence, state of facts or development that, individually or in the aggregate, is materially adverse to the business, operations, Assets, condition (financial or otherwise), results of operations or prospects (including the achievement or the ability to achieve forecasts of revenue and/or earnings) of the Company or the Business

"**Organizational Documents**" means (a) with respect to a corporation, the certificate or articles of incorporation and bylaws; (b) with respect to any other entity, any charter or similar document adopted or filed in connection with the creation, formation or organization of such entity; and (c) any amendment to any of the foregoing.

"**Permitted Indebtedness**" means (a) the aggregate principal and interest and all other amounts (including penalties, fees and expenses) owed by the Company under the Credit Agreement, and (b) trade payables, accrued expenses and other liabilities incurred in the ordinary course of business and set forth on the Company's financial statements.

"**Permitted Liens**" means, collectively, (a) Liens for Taxes not yet payable or the validity of which are being contested in good faith by appropriate proceedings and for which adequate reserves are reflected in the Company's most recent balance sheet as required by GAAP ("**Balance Sheet**"), (b) mechanics', workmen's, repairmen's, warehousemen's, processor's, landlord's, carrier's, maritime, materialmen's, consignee's or other like Liens, including all statutory Liens arising or incurred in the ordinary course of business, for which adequate reserves are reflected in the Balance Sheet as required by GAAP, (c) Liens arising in connection with worker's compensation, unemployment insurance, old age pensions and social security benefits which are not overdue or are being contested in good faith by appropriate proceedings and for which provision for the payment of such Liens has been reflected in the Balance Sheet as required by GAAP, (d) Liens (i) incurred or deposits made in the ordinary course of business to secure the performance of bids, tenders, statutory obligations, fee and expense arrangements with trustees and fiscal agents (exclusive of obligations incurred in connection with the borrowing of money or the payment of the deferred purchase price of property) and (ii) securing surety, indemnity, performance, appeal and release bonds, (e) any imperfection of title, easements, encroachments, covenants, rights of way, defects, irregularities or encumbrances on title or similar Lien which does not and would not reasonably be expected to impair in any material respect the operations of the Business of the Company, (f) licenses, leases and subleases of property and assets in the ordinary course of business, (g) customary rights of set-off, revocation, refund or chargeback, (h) Liens arising by operation of law on insurance policies and proceeds thereof to secure premiums thereunder, (i) any conditions that shown by a current, accurate survey, (j) Liens to secure capital lease obligations to the extent the incurrence of such obligations does not violate this Agreement, (k) any Liens incurred pursuant to equipment leases in the ordinary course of business, (l) Liens incurred pursuant to actions of Buyers, (n) Liens disclosed on the Schedules hereto and (m) Liens that, individually or in the aggregate, do not and would not reasonably be expected to materially impair or affect the use, value or merchantability of title of the underlying asset to the Company.

"**Person**" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated association, corporation, limited liability company, entity or Governmental Authority, in

each case including, without limitation, such Person's successors and permitted assigns (or, in the case of a Governmental Authority, Persons succeeding to the relevant function of such Governmental Authority).

"**Representative**" means, with respect to any Person, any director, officer, principal, attorney, employee, agent, consultant, accountant, or any other Person acting in a representative capacity for such Person.

"**Restricted Party**" or "**Restricted Parties**" means Sellers and Nicole Uhlig, Elke Uhlig, and Michelle Stoldt, and their corresponding successors and assigns.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Sellers' Knowledge**" or "**Knowledge of Sellers**" means any matter, fact, or thing that is, as of the Effective Date or the Closing Date, actually known to Sellers, any individual Seller, or any other Representative of Sellers.

"**Tax**" or "**Taxes**" means (a) any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the Code), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, escheat, value-added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not and including any obligations to indemnify or otherwise assume or succeed to the Tax liability of any other Person, (b) any amounts described in clause (a) above owed by another party for which a taxpayer is liable pursuant to any statute or regulation imposing joint or several liability to taxpayers filing consolidated, combined, unitary or other similar Tax Returns and (c) any amounts described in clauses (a) or (b) above for which a taxpayer is liable pursuant to a tax indemnification agreement, tax sharing agreement, tax allocation agreement or other similar agreement.

"**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement filed or required to be filed with any Taxing Authority.

"**Taxing Authority**" means any governmental authority, domestic or foreign, having jurisdiction over the assessment, determination, collection, or other imposition of any Taxes.

"**Threatened**" means that a demand or statement has been made or any notice of commencement of an action or suit has been given.

"**WARN**" means the federal Worker Adjustment and Retraining Notification Act of 1988, and similar state, local and foreign laws related to plant closings, relocations, mass layoffs and employment losses.

"**WFB Credit Agreement**" means that certain Credit Agreement with Wells Fargo Bank, N.A. ("**WFB**"), dated as of November 10, 2017, as amended by the First Amendment to Credit Agreement and Waiver of Defaults, dated May 15, 2018, the Second Amendment to Credit Agreement, dated July 10, 2018, and the Third Amendment to Credit Agreement, dated February 18, 2020.

"**WFB Credit Documents**" means the WFB Credit Agreement and any and all related documents and guarantees, including, without limitation, the Guaranty and Security Agreement dated November 17, 2017.

# ARTICLE XI
## MISCELLANEOUS

Section 11.1    Notices, Consents, etc.. Any notices, consents or other communications required to be sent or given hereunder by any of the parties shall in every case be in writing and shall be deemed properly served if and when (a) delivered by hand, (b) transmitted by facsimile, E-mail or other means of electronic transmission, or (c) delivered by Federal Express or other express overnight delivery service, or registered or certified mail, return receipt requested, to the parties at the addresses as set forth below or at such other addresses as may be furnished in writing:

**If to Sellers:**
6641 Saroni Drive
Oakland CA 94611
Attention: Nicole Uhlig
Telephone (work): (510) 533-8260 ext 000
Mobile: (510) 872-4208
E-mail: nicoleu@fairn.com

with a copy to:

Thompson Welch Soroko & Gilbert LLP
450 Pacific Avenue, Suite 200
San Francisco, CA 94133
Attention: Charles M. Thompson
Telephone: (415) 262-1200
Facsimile: (415) 262-1212
E-mail: cthompson@twsglaw.com

**If to Buyers:**

_____
_____
Attention: _____
Telephone: _____
Facsimile: _____
E-mail: _____

with a copy (which shall
not constitute notice) to:

Greenberg Traurig, P.A.
333 S.E. 2nd Avenue, Suite 4400
Miami, FL 33131
Attention:  Yosbel Ibarra
Facsimile: +1 305 579 0706
E-mail:  ibarray@gtlaw.com

Date of service of such notice shall be (i) the date such notice is delivered by hand or by facsimile, E-mail or other form of electronic transmission, (ii) one Business Day following the delivery by express overnight delivery service, (iii) the date confirmation of transmission is received if sent by facsimile during any Business Day, or the next succeeding Business Day if confirmation of

21

transmission is not received on a Business Day, or (iv) three (3) days after the date of mailing if sent by certified or registered mail.

Section 11.2    Severability. The unenforceability or invalidity of any provision of this Agreement shall not affect the enforceability or validity of any other provision. Upon such determination that any term or other provision is unenforceable or invalid, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a legally acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

Section 11.3    Successors; Assignment. This Agreement will be binding upon, and inure to the benefit of, the parties hereto and their respective successors and permitted assigns, but will not be assignable or delegable by either party without the prior written consent of the other party, which consent may not be unreasonably withheld, delayed, or conditioned.

Section 11.4    Counterparts; Facsimile Signatures. This Agreement may be executed simultaneously in multiple counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement, any and all agreements and instruments executed and delivered in accordance herewith, along with any amendments hereto or thereto, to the extent signed and delivered by means of E-mail, a facsimile machine or other means of electronic transmission, shall be treated in all manner and respects and for all purposes as an original signature, agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

Section 11.5    Expenses. Except as otherwise provided in this Agreement, each of Sellers and Buyers shall bear and pay for all of their own costs, fees and expenses (including legal, accounting, investment banking, broker's, finder's and other professional or advisory fees and expenses) incurred or to be incurred by it, in each case, in negotiating and preparing this Agreement and in closing and carrying out the transactions contemplated hereby.

Section 11.6    Governing Law. All matters relating to the interpretation, construction, validity and enforcement of this Agreement shall be governed by and construed in accordance with the domestic laws of the State of California without giving effect to any choice or conflict of law provision or rule (whether of the State of California or any other jurisdiction) that would cause the application of laws of any jurisdiction other than the State of California.

Section 11.7    Entire Agreement. This Agreement, the Recitals, the Schedules, and the Exhibits attached to this Agreement (all of which shall be deemed incorporated in this Agreement and made a part of this Agreement), set forth the entire understanding of the parties with respect to the transactions contemplated by this Agreement, supersede all prior discussions, understandings, agreements, and representations (including that certain Letter of Intent, by and among the parties dated February 10, 2020) and shall not be modified or affected by any offer, proposal, statement, or representation, oral or written, made by or for any party in connection with the negotiation of the terms of this . This Agreement may be modified only by subsequent instruments signed by Buyers and Sellers.

Section 11.8    Third Parties. Nothing expressed or implied in this Agreement is intended or shall be construed to confer upon or give to any Person, other than the parties to this Agreement and their respective successors and permitted assigns, any rights or remedies under or by reason of this Agreement. This Agreement and all provisions and conditions of this Agreement are

22

intended to be, and shall be, for the sole and exclusive benefit of such Persons and for the benefit of no other Person.

Section 11.9    Integration. This Agreement, any attached exhibits, and the documents expressly described or referred to in this Agreement constitute all of the understandings and agreements existing between the parties concerning the subject of this Agreement and the rights and obligations created under it, and replace and supersede all prior written and oral agreements or statements by and among the parties or any of them. Concerning the subject of this Agreement, no representation, statement, condition, or warranty not contained in this Agreement or the exhibits will be binding on the parties or have any force or effect.

Section 11.10    Interpretive Matters. Unless the context otherwise requires, (a) all references to Articles, Sections, Schedules or Exhibits shall mean and refer to Articles, Sections, Schedules or Exhibits in this Agreement, (b) each accounting term not otherwise defined in this Agreement has the meaning assigned to it in accordance with GAAP, (c) words in the singular or plural include the singular and plural, and pronouns stated in either the masculine, feminine or neuter gender shall include the masculine, feminine and neuter, (d) the term "including" shall mean "including without limitation" (*i.e.*, by way of example and not by way of limitation), (e) all references to statutes and related regulations shall include all amendments of the same and any successor or replacement statutes and regulations, (f) references to "hereof", "herein", "hereby" and similar terms shall refer to this entire Agreement (including the Schedules, Schedules Updates and Exhibits hereto) (g) references to "records" shall refer to all information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form, (h) "or" is used in the inclusive sense of "and/or," and (i) whenever this Agreement refers to a number of days, such number shall refer to calendar days, unless such reference is specifically to "Business Days." The parties intend that each representation, warranty and covenant contained herein shall have independent significance. If any party has Breached any representation, warranty or covenant contained herein in any respect, the fact that there exists another representation, warranty or covenant relating to the same subject matter (regardless of the relative levels of specificity) that the party has not Breached shall not detract from or mitigate the fact that the party is in Breach of such representation, warranty or covenant.

Section 11.11    Construction. Each of the parties acknowledges that it has been represented by independent counsel of its choice throughout all negotiations that have preceded the execution of this Agreement and that it has executed the same with consent and upon the advice of said independent counsel. The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise, or rule of strict construction applied, favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. Accordingly, any rule of law or any legal decision that would require interpretation of any ambiguities in this Agreement against the party that drafted it is of no application and is hereby expressly waived by the parties hereto.

Section 11.12    Attorneys' Fees. In the event any party institutes any litigation or other legal proceeding concerning the enforcement or interpretation of the provisions of this Agreement, the prevailing party in such proceeding shall be entitled to receive reasonable attorneys' fees, arbitrator costs, and other costs incurred in such proceedings.

Section 11.13    Submission to Jurisdiction. EACH OF THE PARTIES SUBMITS TO THE EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT SITTING IN SAN FRANCISCO, CALIFORNIA, IN ANY ACTION OR PROCEEDING ARISING OUT OF,

OR RELATING TO, THIS AGREEMENT, AGREES THAT ALL CLAIMS IN RESPECT OF THE ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT AND AGREES NOT TO BRING ANY ACTION OR PROCEEDING ARISING OUT OF, OR RELATING TO, THIS AGREEMENT IN ANY OTHER COURT. EACH OF THE PARTIES WAIVES ANY DEFENSE OF INCONVENIENT FORUM TO THE MAINTENANCE OF ANY ACTION OR PROCEEDING SO BROUGHT AND WAIVES ANY BOND, SURETY OR OTHER SECURITY THAT MIGHT BE REQUIRED OF ANY OTHER PARTY WITH RESPECT THERETO. EACH PARTY AGREES THAT SERVICE OF SUMMONS AND COMPLAINT OR ANY OTHER PROCESS THAT MIGHT BE SERVED IN ANY ACTION OR PROCEEDING MAY BE MADE ON SUCH PARTY BY SENDING OR DELIVERING A COPY OF THE PROCESS TO THE PARTY TO BE SERVED AT THE ADDRESS OF THE PARTY AND IN THE MANNER PROVIDED FOR THE GIVING OF NOTICES IN Section 11.1. NOTHING IN THIS SECTION, HOWEVER, SHALL AFFECT THE RIGHT OF ANY PARTY TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW. EACH PARTY AGREES THAT A FINAL JUDGMENT IN ANY ACTION OR PROCEEDING SO BROUGHT SHALL BE CONCLUSIVE AND MAY BE ENFORCED BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

Section 11.14    Specific Performance. The parties agree that if any provision of this Agreement is not performed in accordance with its terms or is otherwise Breached, irreparable harm would occur, no adequate remedy at law would exist, and damages would be difficult to determine. Accordingly, it is agreed that the party or parties not in Breach shall be entitled to an injunction or injunctions to prevent Breaches of this Agreement, and to the remedy of specific performance of the terms and conditions of this Agreement, in addition to any other remedies that may be available, at law or in equity, by reason of such Breach.

Section 11.15    Arbitration. In the event of any dispute, controversy or claim after the Closing between any of the Parties hereto arising out of or relating to this Agreement, the Parties shall attempt to resolve such dispute among themselves within thirty (30) calendar days from the date either Party sends written notice of such dispute to the other Party. If the Parties fail to resolve the dispute within such period, such dispute shall be finally and exclusively resolved by arbitration in San Francisco, California in accordance with the then prevailing JAMS Streamlined Arbitration Rules and Procedures, except as modified herein (the "**Rules**"). There shall be a single arbitrator. The parties shall have five Business Days from commencement of the arbitration in accordance with the Rules to agree on a single arbitrator. Failing timely agreement, the arbitrator shall be selected by JAMS. All arbitration pursuant to this Section 11.15 shall be confidential and shall be treated as compromise and settlement negotiations, and no oral or documentary representations made by the Parties during such arbitration shall be admissible for any purpose in any subsequent proceedings. There shall be no discovery in the arbitration and the Parties shall only be required to produce in advance of the hearing on the merits any documents which they plan to introduce in evidence at the hearing. The arbitral tribunal is not empowered to award damages in excess of compensatory damages, and each Party hereby irrevocably waives any right to recover punitive, exemplary or similar damages with respect to any claim. Any arbitration proceedings, decision or award rendered hereunder and the validity, effect and interpretation of this arbitration agreement shall be governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. The award shall be final and binding upon the Parties and shall be the sole and exclusive remedy between the Parties regarding any claims, counterclaims, issues or accounting presented to the arbitral tribunal. Judgment upon any award may be entered in any court having jurisdiction

Section 11.16    <u>Waiver; Remedies Cumulative</u>. The rights and remedies of the parties are cumulative and not alternative. Neither any failure nor any delay by any party in exercising any right, power or privilege under this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege. To the maximum extent permitted by applicable Law, (a) no claim or right arising out of this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless such waiver or renunciation is in writing and signed by the other parties, (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given, and (c) no notice or demand by one party will be deemed to be a waiver of any obligation of that party, or a waiver of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement.

Section 11.17    <u>Time of the Essence</u>. Time is of the essence with respect to all time periods and dates set forth in or referenced in this Agreement.

Section 11.18    <u>Warranty of Authority</u>. Each person executing this Agreement on behalf of an entity or another person warrants that he has the power and authority to execute this Agreement on behalf of such entity or other person.

*[Signature pages follow.]*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**BUYERS:**

_____

Jerome Falic

_____

Simon Falic

_____

Leon Falic

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**SELLERS:**

Survivor's Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended

By: _____

Name:_____

Title:_____

Bypass Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended

By: _____

Name:_____

Title: _____

Marital GST Non-Exempt Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended

By:_____

Name:_____

Title:_____

Marital GST Exempt Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended

By:_____

Name:_____

Title:_____

# EXHIBIT A
## Shares Ownership

| Seller | Number of Shares |
|---|---|
| Survivor's Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended | 184.500 Shares |
| Marital GST Non-Exempt Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended | 158.230 Shares |
| Marital GST Exempt Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended | 20.780 Shares |
| Bypass Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended | 128.490 Shares |

ACTIVE 49472746v4

## <u>EXHIBIT B</u>
## <u>Legal Description of Calexico Property</u>

THE LAND REFERRED TO HEREIN IS SITUATED IN THE CITY OF CALEXICO, COUNTY OF IMPERIAL, STATE OF CALIFORNIA, DESCRIBED AS FOLLOWS:

Lots 1, 2, 3 and 4, Block 56, Townsite of Calexico, in the City of Calexico, County of Imperial, State of California, according to Map No. 911 on file in Book 1, Page 14 of the Official Maps on file in the Office of the County Recorder of San Diego County, a copy of said map being on file in the Office of the County Recorder of Imperial County.

APNs: 058-473-004; 058-473-005, & 058-473-006

# EXHIBIT C
## Shares Transfer Allocation

| Buyers | Shares to be Transferred |
|--------|-------------------------|
| Jerome Falic | **[164]** |
| Simon Falic | **[164]** |
| Leon Falic | **[164]** |
| **TOTAL:** | **492** |

ACTIVE 49472746v4

**EXHIBIT D**
**Calexico Purchase Agreement**

[attached]

## Form of Election to Terminate S-Corporation's Tax Year

**Election to Terminate S-Corporation's Tax Year under IRC § 1377(a)(2)**

*Attachment to IRS Form 1120S, Tax Year Ending December 31, 2020*

Fairn & Swanson Inc., a California corporation (the "**Corporation**"), whose address is 400 Lancaster Street, Oakland, CA 94601 hereby elects under Section 1377(a)(2) of the Internal Revenue Code and Treasury Regulations Section 1.1377-1(b) to have the rules of Section 1377(a)(1) of the Internal Revenue Code apply as if the taxable year consisted of two separate taxable years.

The election applies with respect to the termination of the interest in the Corporation of the following shareholders: (i) Survivor's Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998 (the "**Survivor's Trust**"); (ii) the Marital GST Non-Exempt Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended ("**Marital GST Non-Exempt Trust**"); (iii) the Marital GST Exempt Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended ("**Marital GST Exempt Trust**"); and (iv) the Bypass Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended (collectively, the "**Terminating Shareholders**"). The Terminating Shareholders' interest in the Corporation ended on March 24, 2020 upon the closing of the acquisition transaction under the terms of the Stock Purchase Agreement, dated March [___], 2020, pursuant to which the Terminating Shareholder's interests in the Corporation were acquired by Fairn & Swanson Holdings, Inc., a Delaware corporation.

Pursuant to this election, the taxable year of the Corporation ending on December 31, 2020, is being treated as if it consists of two separate taxable years, the first from December 30, 2019 to March 23, 2020 and the second from March 24, 2020 to January 3, 2021.

The Corporation, the Terminating Shareholders, and the undersigned shareholders declare that hereby consent to making the above election under Section 1377(a)(2) of the Internal Revenue Code.

Dated: _____

**Fairn & Swanson Inc.**

By: _____
Name: _____
Title: _____

**Shareholders:**

_____
Jerome Falic

_____
Simon Falic

_____
Leon Falic

Fairn & Swanson Holdings, Inc.

By: _____
Name: _____
Title: _____

**Terminating Shareholders**:

Survivor's Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended

By: _____

Name:_____

Title:_____

Bypass Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended

By: _____

Name:_____

Title: _____

Marital GST Non-Exempt Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended

By: _____

Name:_____

Title:_____

Marital GST Exempt Trust established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended

By: _____

Name:_____

Title:_____

1.  <u>Keith Haynes</u>. Mr. Haynes was employed by the Company at its Miami, Florida, facility from approximately some time in 2010 to approximately September 24, 2019. In December 2019, the Company received a demand letter from Marcus J. Susen, Mr. Haynes' attorney, claiming that Mr. Haynes was wrongfully terminated in retaliation for suffering a workplace injury on September 27, 2018, and filing a valid worker's compensation claim, and demanding $55,000 to settle the claim ("Haynes Claim"). The Company tendered the Haynes Claim to its EPLI carrier, Allied World. By letter dated January 15, 2020, Allied World accepted the tender, subject to the policy's self-insured retention of $35,000. Counsel for the Company retained by the insurer intends to reject the Haynes Claim.

2.  <u>Jazmin Mason</u>. The Company received a letter, dated February 12, 2020, from Nicholas Ferraro claiming that the Company has violated and continues to violate various provisions of the California Labor Code and Industrial Welfare Commission ("IWC") Wage Orders. Ms. Mason was employed an hourly, non-exempt employee by the Company in its San Diego, California, facility until December 2019. Mr. Ferraro's letter claims that the Company failed to pay required amounts for sick leave, overtime, and meals and rest breaks, and provides improper wage statements. Outside counsel for the Company is evaluating the claims.

**EXHIBIT 8**



Jordan D. Grotzinger
Tel 310.586.7713
Fax 310.586.7800
grotzingerj@gtlaw.com

April 2, 2020

Gordon I. Endow
Gordon & Rees Scully Mansukhani
275 Battery St., 20th Floor
San Francisco, CA 94111
gendow@grsm.com


      Re:    Fairn & Swanson Inc. and Calexico Property Transactions


Dear Mr. Endow:

      This firm represents Jerome Falic, Simon Falic and Leon Falic (the "Falic Brothers"), and Fairn & Swanson Holdings, Inc. ("F&S") (together, the "Buyers"), with regard to their proposed acquisition of the outstanding capital stock (the "Shares") of Fairn & Swanson Inc. (the "Company"), as well as the real property located at 237 and 241 S. Imperial Road, Calexico, California (the "Calexico Property") (collectively, the "Acquisition") from your clients (the "Sellers"). We write in response to your letter dated March 24, 2020, which misrepresents the law and the facts. Additionally, and in light of the parties' failure to reach an agreement regarding the Acquisition—due in no small part to the Sellers' bad faith—we demand the return of the Buyers' deposit.

      Initially, pursuant to California law, the March 4, 2020 Letter of Intent (the "Letter"), is a non-binding, unenforceable agreement to agree in the future. (*Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4th 199, 213 ["the parties had at best an 'agreement to agree,' which is unenforceable under California law"]; *Copeland v. Baskin Robbins U.S.A.* (2002) 96 Cal.App.4th 1251, 1256 [there is no remedy "for breach of an 'agreement to agree' in the future"]; *Autry v. Republic Productions, Inc.* (1947) 30 Cal.2d 144, 151.) As your March 24 letter makes clear, the parties were still negotiating material contractual terms as late as March 12, nearly two weeks after the parties signed the Letter. Among the terms that the parties were still negotiating were the purchase price and closing mechanics and date of the Acquisition—terms that the Letter itself states are "essential." Another key provision that is also not reflected in the Letter, and that was still being negotiated, was a one-year "consulting" agreement for Ms. Uhlig and Ms. Stoldt. Thus, the material terms of the Acquisition were "'left for further negotiation and agreement, [and thus] there is no contract . . . .'" (*Kruse v. Bank of America* (1988) 202 Cal.App.3d 38, 59 [quoting Corbin on Contracts, § 95, p. 397].)

Moreover, numerous terms fundamental to the Acquisition are absent from the Letter. It is axiomatic under California law that, "where any of the essential elements of a promise are reserved for the future agreement of both parties, no legal obligation arises 'until such future agreement is made.'" (*Copeland, supra*, 96 Cal.App.4th at p. 1256; *Bonk v. Boyajian* (1954) 128 Cal.App.2d 153, 155-156 ["Where, in a business transaction, an important item is reserved for future determination, no enforceable obligation is thereby created for 'neither law nor equity provides a remedy for breach of an agreement to agree in the future.'"].) Instead, an agreement is unenforceable where, as here, it is "incomplete, uncertain and indefinite" regarding a transaction's fundamental terms. (*Bonk, supra*, 128 Cal.App.2d at p. 156; see also *Copeland, supra*, 96 Cal.App.4th at p. 1256.) This is true "even if there was agreement on some of the terms." (*Bustamante, supra*, 141 Cal.App.4th at p. 215 [finding parties did not form a binding contract, even where parties had agreed to some terms].)

For example, in *Bonk v. Boyajian*, the court found that an option agreement for the purchase of real property was an unenforceable agreement to agree where it did not provide key terms such as monthly payments, an interest rate (if any), and collateral. (*Bonk, supra*, 128 Cal.App.2d at p. 156; see also *Burgess v. Rodom* (1953) 121 Cal.App.2d 71, 73-74 [finding essential terms for purchase of real property, including terms for payment of the balance of the purchase price and security, were not specified].) In *Copeland*, the court noted that a letter of intent to enter into an "ice cream purchase arrangement" was not a binding contract because it lacked "'a variety of complex terms,'" including "price, the flavors to be manufactured, quality control standards, and responsibility for waste." (*Copeland, supra*, 96 Cal.App.4th at p. 1256.)

Here, contract terms that are essential to the Acquisition are not set forth in the Letter. Instead, the Letter is "incomplete, uncertain and indefinite" on its face, with numerous fundamental terms undecided and absent (and arguably the most important one expressly disclaimed), including:

- ***Critically, despite initially claiming to be unaware of any violations of applicable laws and regulations, the Sellers <u>disclaimed</u> compliance in their draft of the Stock Purchase Agreement.*** The Sellers are fully aware that compliance is paramount in the duty-free industry, where money laundering and other risks are rampant. Yet, despite their claimed ignorance of any noncompliance by Sellers during the parties' March 12 meeting in Las Vegas, the Sellers expressly *disclaimed* compliance in the version of the Stock Purchase Agreement on which they insisted. Section 8.4 of that draft provided: "BUYER ACKNOWLEDGES AND AGREES THAT SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS, INDEMNITIES, OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO:... (C) THE COMPLIANCE OF OR BY THE COMPANY OR ITS

OPERATION IN ACCORDANCE WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY ....." The Buyers had not yet provided all of their comments to the Sellers and were going to insist that a representation of compliance be made. Furthermore, during the parties' Las Vegas meeting, the Sellers and their employees provided inconsistent information regarding the existence of a compliance program. Notably, there were inconsistencies regarding the Company's compliance with "Know Your Customer" protocols, which protect against money laundering and other associated corrupt practices. This issue has ramifications beyond this potential deal—the Buyers' connection to a non-compliant company could jeopardize their broader business in this space, a risk no reasonable party would take. Thus, an unequivocal representation of compliance was an essential contractual term, without which the Acquisition could not proceed, and which was not only missing here, but expressly disclaimed. In short—and particularly in this business—this disclaimer was a "deal breaker."

- ***There are no terms for the purchase of the Calexico Property.*** Instead, the Letter references the Calexico Property in passing. However, a key term of the sale of the Calexico Property was that the Property would be transferred directly to the Buyers. Likewise, the Letter was silent as to whether the Calexico Property would be transferred simultaneously with the Shares, or any time thereafter. Another key term of the Calexico Property sale was the provision of a separate purchase agreement, which would provide for standard provisions for a transaction of that type.

- ***The Sellers provided materially incomplete financial information.*** The Sellers never provided the Buyers with the total amount due to Wells Fargo. This information was critical, given that the Letter references the Buyers being liable for debts through March 17, 2020. Nevertheless, the Buyers were never provided with definitive financial statements reflecting such amount. For example, after the Letter, the Buyers were notified that Wells Fargo was demanding an additional $370,000 in fees and penalties—a significant liability not previously disclosed to the Buyers. Similarly, the Sellers provided only an *estimate* of the debt owed to the Sellers—a key term. No reasonable party would simply "take the sellers' word for it" with respect to such key financial information about what the purchaser was buying.

- ***The identity of the "Buyer" was yet to be finalized and agreed to between the parties.*** The parties had discussed that the Shares were to be purchased by the Falic Brothers, rather than F&S, due to tax implications. Despite this discussion, which remained ongoing, the Sellers nevertheless still provided for F&S to act as buyer of the Shares.

In sum, pursuant to California law and the facts, (1) the Letter is not binding, and (2) as a result, your accusation that the Buyers are in breach is baseless and without merit.

Moreover, *even if* the Letter were considered to be binding, then at best it is simply a contract to negotiate in good faith, which the Sellers breached. Such an agreement "is distinguishable from the ultimate agreement that parties hope to eventually reach." (See *Cedar Fair, L.P. v. City of Santa Clara* (2011) 194 Cal.App.4th at p. 1150, 1171; see also *Copeland, supra*, 96 Cal.App.4th at pp. 1253, 1255 [recognizing cause of action for breach of agreement to negotiate in good faith].) The Letter requires that "Buyer and Sellers will make a good faith effort to negotiate and enter into definitive agreements for the Acquisition . . . ." The Sellers breached this requirement when they refused to negotiate in good faith—or at all—and instead presented a signed Stock Purchase Agreement ("SPA") and Agreement of Purchase and Sale and Escrow Instructions for the Calexico Property ("APA"), which did not reflect any of the initial comments provided by the Buyers, on a "take-it-or-leave-it" basis. (See *Copeland, supra*, 96 Cal.App.4th at p. 1257 [noting that refusing to negotiate contract terms could constitute breach of an agreement to negotiate in good faith]; see also *Channel Home Centers* (3d Cir. 1986) 795 F.2d 291, 298-300 [looking to circumstances surrounding execution of letter of intent and finding sufficient evidence that the parties intended it to be a binding contract to negotiate in good faith].)

The facts concerning your clients' breach are clear. Within hours of receiving the Buyers' redlined drafts of the SPA and the APA, the Sellers instead reverted with signed versions of the SPA and the APA and refused to negotiate further. This conduct is precisely the bad faith contemplated by *Copeland*. In doing so, the Sellers rejected out of hand the Buyers' revisions—including a host of standard but important contractual terms, such as a general release pursuant to Section 1542 of the Civil Code, Board resolutions, and a standard adjustment mechanism for debt. The Sellers' refusal to incorporate these basic provisions further demonstrates their bad faith. Finally, the Sellers omitted, and possibly even concealed, material information. As discussed above, the Sellers refused to make an unequivocal representation of compliance, which is among *the most* important deal points in a transaction in this business, and even disclaimed such a representation. The Sellers also refused to provide wholesale invoices, the outstanding amount due to Wells Fargo Bank, or final financial statements reflecting their debt load, leaving the Buyers "in the blind" as to what they were purchasing.

In contrast, the Buyers have acted in good faith throughout the parties' negotiations. Despite the Sellers' evasiveness regarding their regulatory compliance, the Buyers did not immediately terminate negotiations. And, prior to receiving the Sellers' "take-it-or-leave-it" ultimatum, the Buyers understood that they were engaged in an actual negotiation and anticipated additional comments from the Sellers regarding the redlined SPA and APA. In fact, as further evidence of their good faith in attempting to reach a deal with the Sellers, along with the redlined draft SPA and APA, the Buyers also provided documents that were required to be delivered at closing, such as resolutions, a closing certificate, and resignation letters, among other things.

As evidenced by the Sellers' conduct, they acted in bad faith and, to the extent the Letter constitutes a binding agreement to negotiate in good faith, the Sellers are in breach.

In any event, whether the Letter is entirely unenforceable, or simply binding as a contract to negotiate in good faith, the Sellers are required to return the Buyers' deposit. The parties have failed to enter into the SPA and APA contemplated by the Letter, no Acquisition is going forward, and the Sellers have no right to retain the deposit. **<u>Please return the Buyers' deposit by April 9, 2020, or we will be forced to take legal action.</u>**

Finally, as the holder of 20% of the shares in the Company, and pursuant to the 2015 SPA, F&S has certain continuing rights. Among these is the Right of First Offer. Pursuant to this continuing right, if the Sellers decide to sell the Shares at some future date, they must first provide notice to F&S and give it the opportunity to instead purchase the Shares. F&S is also entitled to receive certain information from Sellers, including NDAs with third parties, and correspondence between the Sellers and potential purchasers, which Sellers have thus far refused to provide in response to requests. Accordingly, please provide F&S with all requested information immediately.

The Buyers reserve all claims and rights.

Sincerely,

*/s/ Jordan D. Grotzinger*
Jordan D. Grotzinger
Shareholder

JDG:dg